UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RICHARD B. MALLETT | : | NO.:  3:01CV1137 (AHN) |
| | : | |
| v. | : | |
| | : | |
| TOWN OF PLAINVILLE; AND IN THEIR | : | |
| INDIVIDUAL AND OFFICIAL CAPACITIES | : | |
| JOHN BOHENKO, FORMER TOWN | : | |
| MANAGER; ROBERT JACKSON, TOWN | : | |
| MANAGER; SHIRLEY OSLE, ASSISTANT | : | |
| TOWN MANAGER; ROBERT JAHN | : | |
| DIRECTOR, WATER POLLUTION | : | |
| CONTROL DEPARTMENT; DONALD | : | |
| BECKER; JAMES KAINE; MICHAEL | : | |
| CONKLIN; BUTCH PARADIS, FORMER | : | |
| MUNICIPAL EMPLOYEES UNION | : | |
| PRESIDENT; STEVEN CLARK, | : | |
| MUNICIPAL EMPLOYEES UNION | : | |
| PRESIDENT; AMERICAN FEDERATION | : | |
| OF STATE, COUNTY AND MUNICIPAL | : | |
| EMPLOYEES LOCAL 1303-56 | : | SEPTEMBER 27, 2004 |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS,
DONALD BECKER, JAMES KAINE, AND MICHAEL CONKLIN'S,
MOTION FOR SUMMARY JUDGMENT**

**I.     PROCEDURAL BACKGROUND:**

The plaintiff, Richard Mallett, initiated this action by way of an eight-count

Complaint dated June 21, 2001 seeking to recover damages from the Town of

Plainville, his former employer, numerous individual town employees, the former and

current Municipal Employees Union presidents, and Local 1303-56.  The plaintiff alleges

that the individual defendants deprived him of his constitutional rights to free speech

and due process.  Specifically, the plaintiff claims that his co-workers Donald Becker,

James Kaine and Michael Conklin violated his First and Fourteenth Amendment rights

by (1) retaliating against him for disclosing what he believed to be workplace improprieties, and (2) by carrying out a pattern of harassment and intimidation.  See Plaintiff's Complaint, Count One, ¶¶ 55-56, and Count Two, ¶¶64-69.

In Count Five, the plaintiff alleges threatening, harassment and intimidation in violation of Conn. Gen. Stat. §§53a-62 and 46a-71.  In Counts Seven and Eight, the plaintiff sets forth common law tort claims of assault and intentional infliction of emotional distress, respectively.

The defendants, Donald Becker, James Kaine, and Michael Conklin, hereby move for summary judgment as to all five counts directed against them.

## II.    FACTUAL BACKGROUND

Richard Mallett began working for the Town of Plainville in March 1990 as an operator in the Water Pollution Control Department (hereinafter "WPC").  See Plaintiff's 7/20/04 Deposition Transcript, p. 27, attached as **Exhibit A**; and Plaintiff's 12/4/01 Deposition Transcript, p. 26, attached as **Exhibit B**.  He was encouraged to apply for the position by Donald Becker and James Kaine, and believes that he was selected for the position based on their recommendations.  See **Exhibit B**, pp. 24, 26.

Donald Becker, James Kaine and Michael Conklin were all coworkers of Mallett's.  See **Exhibit A**, pp. 7-10; and **Exhibit B**, p. 27.  They were not Mallett's supervisors or bosses.  See **Exhibit B**, pp. 27, 112.

Mallett is six feet four and weighs two hundred thirty-five pounds.  See **Exhibit B**, pp. 47-48.  Conklin is six feet two, weighs 210 pounds, and suffers from a neck injury. See Conklin's Deposition Transcript, pp. 20-21, attached as **Exhibit C**.  Kaine is much

smaller than Conklin, and as such, necessarily much smaller than Mallett.  See Kaine's Deposition Transcript, p. 74, attached as **Exhibit D**.

At no time did Becker, Kaine or Conklin ever punch Mallett, wrestle with him, strike him or otherwise physically hit him.  See **Exhibit B**, pp. 78-79.

Mallett was a beneficiary of the Collective Bargaining Agreement between the Town of Plainville and his union.  See Plaintiff's Complaint, Count Four, ¶¶83-84; and Collective Bargaining Agreement, attached as **Exhibit E**.  Said Agreement sets forth a four-step grievance process that culminates in binding arbitration.  See **Exhibit E**, Article XIII, §13.0.  Pursuant to the terms of the Agreement, the decision of the arbitrator "shall be final and binding on both parties."  See **Exhibit E**, Article XIII, §13.0(E).

1.     **March 1990 - July 31, 1992**

During his first two years on the job, Mallett allegedly witnessed Becker consume alcohol while working.  See **Exhibit B**, p. 29.  Mallett did not, however, report this activity to management.  See **Exhibit B**, pp. 30-31.

Mallett also witnessed Becker criticizing other employees for their job performance.  See **Exhibit A**, pp. 39-40; and **Exhibit B**, pp. 39-41.  Despite Becker having over fifteen years with the WPC, Mallett thought it was improper for Becker to criticize their work.  See **Exhibit B**, p. 40.  In 1991, Becker began criticizing Mallett's work performance as well.  See **Exhibit A**, p. 40; and **Exhibit B**, p. 41-42.  According to Mallett, Becker wasn't nice and spoke to him and other employees in an inappropriate manner.  See **Exhibit B**, p. 43.  On one occasion in June 1991, Becker said, "my way or the highway" and "if you don't like it, here is the gate."  See **Exhibit B**, p. 44.  Mallett

understood that Becker was a co-employee, and that he did not have supervisory authority over him. <u>See</u> **Exhibit B**, p. 27.

Mallett alleges that James Kaine also participated in the criticisms espoused by Becker. <u>See</u> **Exhibit B**, p. 48. Mallett identified only one incident of criticism from Kaine - that incident occurred prior to Mallett leaving the WPC in July of 1992. <u>See</u> **Exhibit B**, p. 49. Mallett acknowledges that Kaine was his friend during this time and believes that Kaine simply felt that Mallett "wasn't living up to expectations of an employee." <u>See</u> **Exhibit B**, pp. 48-49.

Mallett contends that Becker and Kaine began harassing him as a result of his standing up to Becker during a verbal altercation. <u>See</u> **Exhibit A**, pp. 161-63, 165.

Mallett filed a claim for Workers' Compensation in late July 1992 due to alleged job stress. <u>See</u> **Exhibit A**, pp. 40-41; and **Exhibit B**, p. 50. As part of the settlement of his claim, he agreed to a reassignment to the Department of Public Works. <u>See</u> **Exhibit A**, pp. 42-44. Before leaving the WPC, however, Mallett informed management of Becker's alleged 1991 consumption of alcohol while on the job and Becker's harassment/criticisms of his work performance, as he wanted to describe the general conditions that led to his leaving the WPC. <u>See</u> **Exhibit A**, p. 41; and **Exhibit B**, p. 33.

## 2.   <u>June 14, 1993 - August 1995</u>

In February, 1993, Mallett reapplied to his Operator 1 position within the WPC and returned in June. <u>See</u> Plaintiff's Complaint, Count One, ¶ 27; and **Exhibit A**, p. 44-45. Becker and Kaine allegedly resumed their harassment shortly thereafter.

The first alleged incident occurred on June 16, 1993. Mallett observed on a bulletin board a picture of "Frankenstein likeness," which he believed to be referring to

him and his wife.  See **Exhibit A**, pp. 14-16, 171-73.  Mallett believes that Becker was involved in the posting; however, he has no evidence to support that belief.  See **Exhibit A**, pp. 14-16, 171-73.

The next incident occurred on July 13, 1993 as Mallett was delivering a bundle of rags.  Mallett said to Becker, who was standing in the doorway, "I don't want to hit you."  Becker allegedly responded, "you're fucking right you don't want to hit me with that bundle of rags, you fucking queer."  See **Exhibit A**, pp. 16-17, 169; and **Exhibit B**, p. 56.  Becker and Mallett were several feet apart.  See **Exhibit A**, p. 154.  Becker did not take any physical action toward Mallett.  See **Exhibit A**, p. 154.

On July 20, 1993, Becker rode by in a truck and allegedly said to Mallett, "fuck you, asshole."  See **Exhibit A**, p. 170; and **Exhibit B**, p. 59.  During that same month, Becker allegedly whispered baby noises into Mallett's ear, to which James Kaine purportedly laughed.  See **Exhibit B**, p. 60-61.  On yet another occasion in 1993, Becker allegedly called Mallett a "fat ass."  See **Exhibit A**, pp. 169-70.

In August 1993, the then Town Manager, John Bohenko, interviewed Mallett concerning Becker's alleged sexual harassment of a co-employee.  See **Exhibit A**, p. 47; and **Exhibit B**, p. 61.  In regards to that investigation, Mallett informed Bohenko that on one occasion Becker grabbed his cheek and made a noise with his mouth.  See **Exhibit B**, p. 61-63.  Mallett also complained about Becker's conduct towards him during this time.  See **Exhibit A**, pp. 48-49.  Specifically, he reported the "fucking queer" incident, the "fuck you, asshole" comment, and the "fat ass" comment.  See **Exhibit A**, pp. 48-50, 169-70; and **Exhibit B**, p. 57.  Becker was subsequently suspended for three

days.  <u>See</u> **Exhibit B**, p. 63.  Mallett believes Becker was suspended for harassing both the co-employee as well as himself.  <u>See</u> **Exhibit B**, pp. 63-64.

Despite the allegations in his complaint to the contrary, Mallett did not file any grievances against specific individuals.  <u>See</u> **Exhibit A**, pp. 20-22, 53-54, 177.  He may have, however, voiced some personal complaints in May 1994 regarding conduct within the department.  Mallett's deposition testimony is inconsistent regarding whether he reported Becker's alleged posting of harassing messages on a bulletin board.  <u>See</u> **Exhibit A**, p. 178; and **Exhibit B**, p. 65-66.  Mallett concedes that had no knowledge that Becker was actually responsible for the display.  <u>See</u> **Exhibit B**, p. 66-67.  Mallett's testimony is also inconsistent regarding whether he complained that James Kaine was misusing town property.  <u>See</u> **Exhibit A**, pp. 177-78; and **Exhibit B**, p. 67.  Mallett reportedly believed that Kaine misused town property when: (1) with the WPC's permission, Kaine used his own gym equipment while at a town garage; and (2) with the WPC's permission, Kaine kept a dog at the garage during the daytime.  <u>See</u> **Exhibit B**, p. 67-73.  Mallett admittedly did not complain until after he thought Becker and Kaine were behaving inappropriately towards him.  <u>See</u> **Exhibit B**, p. 68.  Mallett had been aware of both the use of gym equipment and the keeping of the dog since he started with the Town four years earlier.  <u>See</u> **Exhibit B**, pp. 68, 73.  Mallett admits that he was motivated by a desire to point out the disparity in treatment that he believed he was receiving.  <u>See</u> **Exhibit B**, pp. 67, 69-70, 71, 73.  He testified as follows:

> Q.    I'm curious why you would report on somebody who got you a job for setting up a weight room?
>
> A.    During this time, I felt as though I was being mistreated.
> . . .

Q.    So you took something you knew about for four years and you reported him on it to try to get him into trouble, right?

A.    During this time I was treated poorly and there were things going on there that some people had privileges, some people didn't.  There was no - I didn't think it was a fair place.  People weren't treated equally.  I wanted to point out that this - like I was being excluded from certain jobs.  It was like two ends of a scale.

. . .

A.    When I was there, there were things going on where there was unequal treatment and I wanted to point out that how can this be happening when I can't even get a change to get experience or -

. . .

Q.    Now, you also mention in paragraph thirty-four the raising and keeping the pit bull at the WPC.  What was the problem raising and keeping the pit bull at WPC?

A.    Along the same line as the weight room.  It was a privilege that I felt was extended to somebody when I couldn't even get what I felt was decent treatment, which I pointed out.

See **Exhibit B**, pp. 67, 69-70, 71, 73.

Mallett contends that as a result of his complaints, he was the target of retaliatory behavior by Becker and Kaine, which included verbal criticisms of his work performance at crew meetings from October 1993 to August 1995.  See **Exhibit A**, p. 160; and **Exhibit B**, p. 75-77.  Mallett does not recall any specific remarks.  See **Exhibit A**, p. 160; and **Exhibit B**, pp. 77-79.  Mallett claims that he approached Becker and told him how his treatment made him feel.  See **Exhibit A**, p. 157.  Becker allegedly retorted that he was trying to push Mallett over the edge psychologically.  See **Exhibit A**, p. 157.

   **3.    August 8, 1995 - May 1999**

Mallett has not identified any alleged acts of misconduct by these defendants occurring between August 8, 1995, and June of 1999, a gap in time of approximately four (4) years.  See Plaintiff's Complaint, Count One, ¶¶ 36, 37; and **Exhibit B**, p. 82.

Mallett does contend that Becker unjustly took overtime from him during the 1997 time period.  See **Exhibit A**, p. 69.  The undisputed evidence, however, indicates otherwise.  The standard overtime practice amongst the WPC crew was for the senior operator to have first call regarding all overtime.  See **Exhibit A**, pp. 133, 155-56. Becker was senior to Mallett.  See **Exhibit A**, p. 159.  Nonetheless, in 1996-1997, when Mallett and Becker were partners, they alternated overtime until such time as Mallett failed to call in Becker on one occasion.  See **Exhibit A**, pp. 70-72, 76.   From then on, Becker began adhering to the standard practice of the senior man's right of first refusal. See **Exhibit A**, pp. 74-75.  Becker did not treat Mallett less favorably than others, but in fact, had in the past been treating him more favorably.  See **Exhibit A**, p. 156.

### 4.    June 1999 - February 7, 2001

Mallett alleges that in June 1999, he was denied necessary training time for lab certification, and that he was ultimately removed from the lab in 2000.  See **Exhibit A**, pp. 86-87, 96-99; and **Exhibit B**, pp. 83-84.  Mallett does not know who actually denied him lab time or the reasons why his lab time was decreased.  See **Exhibit B**, p. 84. Similarly, he does not know whether Becker or Kaine had any involvement in his removal from the lab; in fact, he actually believes that the decision to remove him was made by the person who ran the lab, Richard Tingle.  See **Exhibit A**, pp. 175-76. Mallett concedes that neither Becker nor Kaine were the final decision makers.  See **Exhibit A**, pp. 175-76.

In November 1999, James Kaine allegedly assigned Mallett to work in "Siberia" for a four-month period of time.  See **Exhibit B**, pp. 84-85.  "Siberia" is an isolated facility that is apart from the main building and manned by one person.  See **Exhibit A**,

p. 35.  Generally, crew members classified as Operator 1s were assigned to "Siberia."

See **Exhibit A**, p. 35.  Other Operator 1s and 2s within the WPC were regularly

assigned to "Siberia" for various lengths of time, including Kaine himself.  See **Exhibit

A**, pp. 35-38; and **Exhibit D**, p. 45.  Mallett did not complain regarding the assignment.

See **Exhibit A**, p. 38.  He believes that Kaine assigned him to "Siberia" to remove him

from some hostility at the plant.  See **Exhibit B**, p. 85.  Mallett testified as follows:

> Q.    And why do you think he assigned you there?
>
> A.    My own opinion is to get me out of the way.
>
> Q.    Why?  Any particular reason?
>
> A.    Because of the atmosphere hostilities down at the plant.
>       . . .
>
> Q.    What did you believe his motivation was?
>
> A.    Just to get me away from, get me out of the way, just to where I
>       could be off doing my job and everybody else could be doing theirs.
>       ...

See **Exhibit B**, p. 85.

Mallett did not attend a late November 1999 union meeting due to his part-time

job.  See **Exhibit B**, p. 87.  On December 14th, after Mallett had missed the union

meeting, Kaine allegedly attempted to provoke him into a physical altercation by calling

him "a piece of shit" and "a coward" for not attending the meeting.  See **Exhibit B**, pp.

88-89.  Kaine allegedly puffed out his chest, clenched his fist in a "boxing" position,

showed a rage in his eye, and said "come on."  See **Exhibit A**, pp. 105-06, 152-53; and

**Exhibit B**, p. 90.  Kaine did not step toward Mallett.  See **Exhibit A**, p. 153.  Kaine

actually walked away and Mallett was able to return to work.  See **Exhibit B**, p. 89.

Mallett did not report the incident.  See **Exhibit B**, pp. 90-91.  Kaine denies trying to

provoke Mallett and calling him "a piece of shit," but contends that he told Mallett that someone at the meeting was "talking shit" about him.  <u>See</u> **Exhibit D**, pp. 37-39.

During this time, a memorandum was also passed around challenging the union election that Mallett refused to sign.  <u>See</u> **Exhibit A**, p. 182; and **Exhibit B**, pp. 124-25. Afterwards, Mallett's time card was placed at the bottom of the time card slot.  <u>See</u> **Exhibit A**, p. 182; and **Exhibit B**, pp. 124-25.  Mallett believes Becker was responsible, but he has no evidence to that effect.  <u>See</u> **Exhibit A**, pp. 182-83; and **Exhibit B**, pp. 124-25.  He never saw Becker move the time cards to which everyone had access. <u>See</u> **Exhibit A**, pp. 182-83.

On June 23 2000, Mallett was allegedly involved in another verbal confrontation with Kaine.  On said occasion, Mallett had failed to report to a job assignment, and as a result, Kaine reportedly became upset.  <u>See</u> **Exhibit B**, p. 91.  Mallett explained that he had misunderstood the assignment, and Kaine allegedly responded, "if you mess with me, I'll mess with you."  <u>See</u> **Exhibit B**, pp. 91-92.  Kaine also allegedly told Mallett, "you're never going anywhere in this department."  <u>See</u> **Exhibit B**, pp. 91, 118.  Kaine denies making said remark.  <u>See</u> **Exhibit D**, p. 91.  Mallett did not report the incident. <u>See</u> **Exhibit A**, p. 168.

On or about August 25, 2000, during a crew meeting, Becker allegedly accused Mallett of leaking information to a Town resident regarding time card abuses by certain WPC employees, including Mallett himself, and threatened legal action against Mallett. <u>See</u> **Exhibit A**, p. 115; and **Exhibit B**, p. 96-98.  A couple months later, at another crew meeting, Becker again raised the timecard issue.  <u>See</u> **Exhibit B**, pp. 98-99.

Mallett admits to speaking with the resident regarding said time card abuses.

<u>See</u> **Exhibit B**, p. 96.  The resident, a neighbor, approached Mallett and he responded

to the neighbor's questions.  <u>See</u> **Exhibit A**, pp. 128-29.  Mallett did not seek out the

resident to expose any wrongdoing within the Town.  <u>See</u> **Exhibit A**, p. 159.  Mallett

does not even recall providing information about the time cards.  <u>See</u> **Exhibit A**, p. 128.

> Q.     Did you actually seek Mr. Cunningham out to expose some wrongdoing
>        within the town?
>
> A.     No.  We live on the same street two houses apart.
>
> Q.     Okay.  When you spoke to him, was that your goal to unveil this
>        wrongdoing?
>
> A.     I spoke to him as a neighbor, like I do a lot of neighbors.

<u>See</u> **Exhibit A**, p. 159.

On or about February 7, 2001, Mallett and Michael Conklin were involved in a

verbal confrontation.  Conklin had heard that Mallett was being paid for work he didn't

do, and said to Mallett, "that's stealing something from the town and you're going to go

down for that, nigger."  <u>See</u> **Exhibit A**, p. 12; **Exhibit B**, pp. 108-09; and **Exhibit C**, pp.

35-36.  Conklin then turned around and walked away.  <u>See</u> **Exhibit C**, p. 46.  Conklin

meant that Mallett was going to get in trouble.  <u>See</u> **Exhibit C**, pp. 36, 129.  Mallett

alleges that Conklin also called him a "cunt" and stuck a finger in his face during this

altercation.  <u>See</u> **Exhibit A**, p. 12; and **Exhibit B**, pp. 108-09.  Conklin denies calling

Mallet a "cunt."  <u>See</u> **Exhibit C**, pp. 20, 28.  According to Mallett, Conklin had told him

that his behavior was prompted by another employee telling him that Mallett had "ratted

him out."  <u>See</u> **Exhibit A**, p. 13.  Conklin later apologized for his words, represented to

Mallett that he thought he was a good guy, and shook his hand.  <u>See</u> **Exhibit B**, pp.

109-10.  Irrespective, Mallett reported the incident to his supervisor.  <u>See</u> **Exhibit A**, p.

168; and **Exhibit B**, p. 110.  Conklin received a one-day suspension for calling Mallett a

"nigger."  <u>See</u> **Exhibit C**, pp. 29, 30.

Mallett recalls only one other "harassing" incident involving Conklin.  Conklin

allegedly hit a punching bag as Mallett walked by.  <u>See</u> **Exhibit A**, pp. 150-51.  Conklin

did not say anything when doing so.  <u>See</u> **Exhibit A**, p. 151.  Mallett concedes that

Kaine may have been hitting the punching bag before he even entered the room.  <u>See</u>

**Exhibit A**, pp. 150-51.  Mallett did not report the incident.  <u>See</u> **Exhibit A**, p. 168.

Mallett stopped working for the Town in 2001.  <u>See</u> **Exhibit A**, pp. 138-39.

## III.    <u>SUMMARY JUDGEMENT STANDARD:</u>

The court shall render summary judgment when the "pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty</u>

<u>Lobby</u>, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986).  A factual dispute is "genuine"

when the evidence is such that a reasonable jury can return a verdict for the non-

moving party.  <u>See</u> <u>Anderson</u>, 477 U.S. at 247-48.  A "material fact" is one whose

resolution will affect the ultimate determination of the case.  <u>See</u> <u>id</u>.  "One of the

principal purposes of the summary judgment rule is to isolate and dispose of factually

unsupported claims… and it should be interpreted in a way that allows it to accomplish

this purpose."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24, 106 S.Ct. 2548 (1986).

In determining whether a material issue of fact exists, the court must resolve all

ambiguities and draw all inferences against the moving party.  <u>See</u> <u>Anderson</u>, 477 U.S.

at 255.  However, "[t]he mere existence of a scintilla of evidence in support of the non-movant's position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  Hayut v. State University of New York, 352 F.3d 733, 743 (2nd Cir. 2003).  "[T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Caldarola v. Calabrese, 298 F.3d 156, 160 (2nd Cir. 2002), quoting, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348 (1986) (underline in original).  A non-moving party may not rely on mere allegations, legal conclusions, unsupported statements, or a denial of the pleadings.  See Celotex Corp., 477 U.S. at 327.  Similarly, hearsay that does not fall under one or more of the exceptions set forth in Rules 803-805 of the Federal Rules of Evidence, may not properly be considered.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 159, 90 S.Ct. 1598 (1970).

IV.    **LEGAL ARGUMENT:**

   A.    **The Defendants Are Entitled To Summary Judgment As To Plaintiff's First Amendment Retaliation Claim (Count One).**

        In order to survive summary judgment on a First Amendment retaliation claim, the plaintiff must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was constitutionally protected, (2) that he was subject to an adverse employment action, and (3) that there was a causal connection between the protected speech and the adverse action, "so that it can be said that [the plaintiff's] speech was a motivating factor in the [action]."  Morris v. Lindau, 196 F.3d 102 (2nd Cir. 1999), citing, Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 283-87, 97 S.Ct. 568 (1977); see also, Dawes v. Walker, 239 F.3d 489, 492 (2nd Cir. 2001).

        In this case, the defendants are entitled to summary judgment as to Count One

for three reasons: (i) the plaintiff's "speech" was not protected under the First Amendment; (ii) the plaintiff's action is barred, in part, by the applicable statute of limitations; (iii) the plaintiff was not subject to an adverse employment action; (iv) the plaintiff has submitted no evidence of a causal connection between the plaintiff's claimed protected speech and an adverse employment action; and (v) the defendants are entitled to qualified immunity.

### 1.    The Plaintiff's "Speech" Was Not Protected Under The First Amendment

In determining a public employee's First Amendment rights, the court must seek "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Connick v. Myers, 461 U.S. 138, 142, 103 S.Ct. 1684 (1983), *quoting*, Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731 (1968). "A public employee's right to freedom of speech is not absolute." Bernheim v. Litt, 79 F.3d 318 (2nd Cir. 1996). "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, … a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Connick, 461 U.S. at 147; Bernheim, supra. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement…." Connick, 461 U.S. at 147-48.

In the instant case, the plaintiff claims that he was retaliated against for reporting alleged improprieties within the WPC. See Plaintiff's Complaint, Count One, ¶54.

Specifically, the plaintiff alleges that he: (1) reported harassment and threats against him by Becker in 1993, (2) provided information against Becker in a 1993 harassment investigation regarding a co-employee, (3) <u>may</u> have filed grievances against Becker and Kaine in May 1994,[1] (4) leaked information to a town resident in 2000 regarding WPC employee time card abuses; and (5) failed to attend a December 1999 union meeting and sign a petition challenging the union election.  None of these "reports" or conduct constitutes protected speech under the First Amendment.

Speech is protected only when an employee is acting as a citizen on a matter of public concern.  "[T]he fact that an employee's speech touches on matters of public concern will not render that speech protected where the employee's motive for the speech is private and personal."  <u>Blum v. Schlegel</u>, 18 F.3d 1005 (2nd Cir. 1994).  "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark – and certainly every criticism directed at a public official – would plant the seed of a constitutional case."  <u>Connick</u>, 461 U.S. at 149.  Fortunately, this is not the case.  When an employee speaks out only upon matters of personal interest, that employee may not rely on the First Amendment to protect him from a subsequent personnel decision allegedly taken in response to his conduct.  <u>See</u>, <u>Connick</u>, 461 U.S. at 147.

In the instant case, Mallett spoke out only on a matter of private interest.  First, he reported alleged harassment and threats made against him.  Specifically, he reported Becker's harassment/criticism of his work performance, the July 13, 1993 "fucking queer" incident, the July 20, 1993 "fuck you asshole" comment, and the 1993 "fat ass" comment.  These complaints did not touch on a matter of public concern, and

---

[1] As mentioned above, Mallett denied filing such grievances in his July 20, 2004 deposition.

therefore are not afforded First Amendment protection.  See Connick, 461 U.S. at 147;

see e.g., Saulpaugh v. Monroe Community Hosp., 4 F.3d 134 (2nd Cir. 1993) (internal

complaint of sexual harassment motivated by individual employment situation and

therefore not protected under First Amendment); Auriemma v. Rice, 895 F.2d 338 (7th

Cir. 1990) (filing a civil rights action is not protected by First Amendment unless suit

itself is matter of public concern); Yatvin v. Madison Metropolitan School Dist., 840 F.2d

412 (7th Cir. 1988) (sex discrimination lawsuit is not a matter of public concern where

the plaintiff did not attempt to debate the issues of sex discrimination and failed to

distinguish her case from any other single-plaintiff discrimination case); Arvinger v.

Mayor of Baltimore, 811 F. Supp. 1121 (D. Md. 1993) (individual employment claim for

discrimination not a matter of public concern) (attached as **Exhibit F**).

Second, Mallett provided information to the Town Manager, John Bohenko,

against Becker during a 1993 sexual harassment investigation regarding another

employee.  Mallett complained to Bohenko about Becker's conduct towards him during

this time.  Mallett believes that Becker was suspended for his conduct towards both the

female employee as well as himself.  Again, Mallett was not speaking out on a matter of

public concern, but was addressing complaints of a personal interest.  He did not

attempt to debate the issue of sexual harassment, but instead responded to Bohenko's

questions regarding what he witnessed.  See Yatvin, supra.  His own complaints

regarding Becker likewise stemmed from and addressed his own employment situation,

and are addressed above.  See Saulpaugh, supra. As such, Mallett's speech was not

protected by the First Amendment.

16

Third, Mallett <u>may</u> have filed grievances regarding Becker's alleged harassing messages on a bulletin board and Kaine's alleged misuse of Town property. These grievances, however, were not protected speech under the First Amendment. First, Mallett's complaint against Becker did not address a matter of public concern and was motivated by his own employment situation. <u>See</u> <u>Connick</u>, <u>supra</u>; <u>Saulpaugh</u>, <u>supra</u>. Second, although Mallett's complaints against Kaine arguably touched on a matter of public concern, his speech was not protected under the First Amendment because his motivation for speaking out was personal and private. <u>See</u> <u>Blum</u>, <u>supra</u>. Mallett admittedly did not complain until after he thought Becker and Kaine were behaving inappropriately towards him. Mallett had been aware of both the use of gym equipment and the keeping of the dog since he started with the Town four years earlier. Indeed, Mallett's complaints against Kaine were admittedly motivated by a desire to point out the disparity in treatment that he believed he was receiving.

Fourth, Mallett spoke to a town resident regarding alleged time card abuses. Again, this information arguable touches on a matter of public concern; however, the speech is not protected under the First Amendment because of the context and intent of the speech. According to Mallett, the resident, a neighbor, approached him and Mallett simply responded to the neighbor's questions. Mallett does not even recall speaking to the neighbor about time cards. Moreover, Mallett denies seeking out the resident neighbor to expose any wrongdoing within the Town. Where, as here, the speech was in the context of casual conversation between neighbors and where the employee was not motivated as a citizen to speak out on a matter of public concern, the speech is not protected. <u>See</u> <u>Connick</u>, <u>supra</u>; <u>Blum</u>, <u>supra</u>.

Mallett's leak to the town resident is also not protected speech in light of the interests of the Town of Plainville in running an efficient department.  See Connick, 461 U.S. at 142, *quoting*, Pickering, 391 U.S. at 568.  Although Mallett had a past history of filing grievances with the WPC for multiple concerns, including misuse of town property, he chose an alternate medium in this instance to expose the alleged wrongdoings by fellow employees.  By leaking information to a town resident, versus reporting the timecard abuses to the WPC, Mallett disrupted the department, undermined his supervisor's authority, precluded the WPC and the Town from having an opportunity to conduct an internal investigation absent a Freedom of Information request, media and other Town scrutiny, and threatened the overall authority of the Town to manage the WPC effectively.

Fifth, Mallett's failure to attend a union meeting or sign a union petition does not constitute protected conduct under the First Amendment.  Union elections are not a matter of public concern.  Moreover, Mallett was not attempting to make a political statement by not attending the meeting or voting for Becker, but simply skipped the meeting to work a part-time job.  His motivation was not to speak out as a citizen on a matter of public concern.  See Connick, supra; Blum, supra.

### 2.    The Plaintiff's Action Is, In Part, Barred By The Applicable Statute of Limitations

Connecticut General Statutes § 52-577 provides that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."  This three-year limitation period is the operative statute of limitations for tort actions based on §1983 civil rights claims.  See Wallace v. Town of Stratford Bd. of Educ., 674 F. Supp. 67, 71 (D. Conn. 1986); see also, Williams v. Walsh, 558 F.2d

667, 673 (2nd Cir. 1977).  It is well-established that "state law supplies the statute of limitations for claims under §1983."  <u>Connolly v. McCall</u>, 254 F.3d 46, 41 (2nd Cir. 2001), <i>citing</i>, <u>Eagleston v. Guido</u>, 41 F.3d 865, 871 (2nd Cir. 1994).  "When conducting an analysis under §52-577, 'the only facts material to the trial court's decision on a motion for summary judgment are the date of the wrongful conduct alleged in the complaint and the date the action was filed.'"  <u>Collum v. Chapin</u>, 40 Conn. App. 449, 451, 671 A.2d 1329 (1996).

The plaintiff initiated this action in June 2001.  Accordingly, pursuant to §52-557, any alleged wrongful conduct against defendants Donald Becker, James Kaine or Michael Conklin that occurred prior to June 1998 are barred as a matter of law.

The only claims of wrongful conduct against Becker occurring within the applicable three-year time period are Becker's alleged harassment of Mallett at the two crew meetings and the relocation of Mallett's time cards.  Kaine's alleged wrongful conduct is limited to his alleged placement of Mallett in Siberia, the December 14, 1999 incident, and the June 3, 2000 verbal altercation.  Conklin's alleged wrongful conduct is limited to the February 7, 2001 altercation and the incident with the punching bag.  Only these claims may be considered.

**3.    The Plaintiff Was Not Subjected To An Adverse Employment Action**

The plaintiff's First Amendment claim must fail because there is no evidence that he was subjected to an adverse employment action.  "Adverse employment actions [under the First Amendment] include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand."  <u>Morris v. Lindau</u>, 196 F.3d 102, 110 (2nd Cir. 1999).  In <u>Morris</u>, the Second Circuit concluded that neither the insertion of a

supervisor over the plaintiff nor a lateral transfer constituted an adverse employment action absent a change in hours, duties, benefits or an opportunity for promotion. <u>See id</u>. at 112, 113.

In the instant case, the plaintiff was not subject to an adverse employment action at the hands of these defendants. First, Becker, Kaine and Conklin were Mallett's co-workers. As such, none of them made hiring, firing or promotion decisions or decisions regarding Mallett's hours, duties, benefits or salary. They were not the final decision makers for the Town. Mallett claims that he was denied lab time in 1999 and ultimately removed from the lab in 2000; however, he concedes that he does not know who actually denied him lab time or the reasons why his lab time was decreased. Similarly, he does not know whether Becker or Kaine had any involvement in his removal from the lab, but in fact believes that the decision was made by Richard Tingle.

Second, regardless of these defendants' employment status, none of the alleged conduct rises to the level of an adverse employment action. As for Becker, accusing an employee of leaking information, threatening legal action, and/or rearranging time cards did not negatively impact Mallett's employment position. There were no changes in the "conditions" of his employment. Further, Mallett has no evidence that Becker was even responsible for the rearranging of the time cards. Similarly, the altercations with Kaine and Conklin, although likely unpleasant, did not constitute an adverse employment action. They were sporadic incidents that do not rise to the level of a constitutional violation. "[T]he law is ineffective to compel friendship or courtesy." <u>Diesel v. Town of Lewisboro</u>, 232 F.3d 92, 104 (2nd Cir. 2000). Finally, Mallett cannot establish a *prima facie* case against Kaine based on his claimed four-month assignment in "Siberia." The

temporary assignments in "Siberia" were not limited to Mallett but were given to other Operator 1s, as well as Operator 2s.  Furthermore, as in <u>Morris</u>, <u>supra</u>, the assignment did not involve a change in hours, duties, benefits or an opportunity for promotion.

      **4.    There Is No Evidence Of A Causal Connection Between The Plaintiff's Claimed Protected Speech And An Adverse Employment Action**

Assuming *arguendo*, that the plaintiff was engaged in protected speech and that he suffered an adverse employment action, his First Amendment retaliation claim must nonetheless fail because the plaintiff cannot establish the third element of a *prima case*. To establish the causal connection component of a *prima facie* case, the plaintiff must show that his speech was a "substantial motivating factor" behind the adverse employment action.  <u>See</u> <u>Washington v. County of Rockland</u>, 373 F.3d 310, 321 (2nd Cir. 2004), *citing*, <u>Deters v. Lafeunte</u>, 368 F.3d 185, 190 (2nd Cir. 2004).  "To do so, plaintiff[] must aver some 'tangible proof' demonstrating that [his] protected speech animated [the adverse employment action].  <u>Id</u>.  The plaintiff "may not rely on conclusory assertions of retaliatory motive."  <u>Id</u>.

In this case, the plaintiff has offered no evidence to support his theory of retaliation.  On the contrary, Mallett contends that Becker and Kaine had been harassing him since 1992, as a result of Mallett's standing up to Becker during a verbal altercation.  Indeed, Mallett complained about Becker and Kaine precisely because of the harassment that they purportedly inflicted.  As for the assignment to Siberia, Mallett testified that Kaine removed him because of the hostile atmosphere - Kaine wanted Mallett to be able to do his job and for his co-workers to do theirs.  This testimony runs counter to Mallett's retaliation claim.  As for Conklin, Mallett believes that the February

7, 2001 altercation stemmed from Conklin's misunderstanding that Mallett had "ratted him out" - which was not the case - and therefore cannot support his First Amendment claim. The plaintiff has submitted no evidence to show that any of his claimed protected speech was a "substantial motivating factor" behind the defendants' conduct.

Furthermore, the plaintiff cannot, in this case, defeat summary judgment based simply on the timing of events. "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508 (2001), quoting, O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001). Twenty months, four months and even three months have all been held to be insufficient. See e.g., Breeden, 532 U.S. at 273; Richmond v. Oneok, Inc., 120 F.3d 205, 209 (10th Cir.1997); Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir. 1992).

In this case, the temporal proximity between Mallett's alleged protected conduct and the incidents with Conklin are not "very close." On the contrary, they occurred eight years after Mallett complained to Bohenko about Becker's alleged harassment and participated in the sexual harassment investigation, seven years after Mallett filed the grievances, fourteen months after the union election, and six months after Becker first accused him of leaking information to the town resident. Similarly, the June 3, 2000 altercation with Kaine occurred seven years after Mallett complained to Bohenko about Becker and participated in the sexual harassment investigation, six years after Mallett filed the grievances, six months after the union election, and prior to Mallett's leaking of

22

information to the town resident.  The temporary assignment to "Siberia" likewise took place years after Mallett's grievances and complaints regarding Becker and Kaine, and prior to both the union election and Mallett's leaking of information to the town resident. As such, none of these incidents suggest causality.

### 5.     The Defendants Were Not Acting Under Color of Law

The plaintiff's procedural vehicle for bringing his First Amendment claim is pursuant to 42 U.S.C. §1983.  <u>See</u> Plaintiff's Complaint, §II.  Section 1983 provides a right of action against any person who, acting under color of law, deprives another of a right, privilege, or immunity secured by the Constitution or federal laws.  <u>See</u> 42 U.S.C. §1983; <u>Rendell-Baker v. Kohn</u>, 457 U.S. 830, 835, 102 S.Ct. 2764.

The Supreme Court has defined "acting under color of law" as acting with power possessed by virtue of the defendant's employment with the state.  <u>See</u> <u>West v. Atkins</u>, 487 U.S. 42, 49, 108 S.Ct. 2250, 2255.  "The dispositive issue is whether the official was acting pursuant to the power he/she possessed by state authority or acting only as a private individual."  <u>Edwards v. Wallace Community College</u>, 49 F.3d 1517 (11th Cir. 1995), *citing*, <u>Monroe v. Pape</u>, 365 U.S. 167, 184, 81 S.Ct. 473, 482 (1961).

In the instant case, the three defendants, at all times, were co-employees of the plaintiff, without supervisory powers over him.  "Cases have declined to find liability under §1983 against a co-employee for harassment when the harassment did not involve use of state authority or position."  <u>Rouse v. City of Milwaukee</u>, 921 F. Supp. 583, 588 (E.D. Wis. 1996) (citations omitted) (attached as **Exhibit G**).  The alleged conduct claimed by Mallett against these three defendants can be categorized as simple name-calling, and performance criticisms.  The alleged conduct does not include

the use of state authority to create an environment hostile to the plaintiff.  Therefore, the defendants are entitled to summary judgment in their favor.

### 6.     The Defendants Are Entitled To Qualified Immunity

Assuming *arguendo* that these defendants were acting under color of state law, then they are entitled to summary judgment on the grounds of qualified immunity.  The federal doctrine of qualified immunity will protect municipal employees acting in their official capacity against §1983 suits unless their actions violate clearly established constitutional or statutory rights <u>and</u> a reasonable official in the same position would have known that the challenged conduct violated that established right.  <u>See</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982).  The defense is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."  <u>Saucier v. Katz</u>, 533 U.S. 194, 200-201, 121 S.Ct. 2151 (2001), *quoting*, <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985).

The summary judgment standard to be applied in cases involving the affirmative defense of qualified immunity was articulated in <u>Lennon v. Miller</u>, 66 F.3d 416, 422 (2nd Cir. 1995), as follows:

> To establish qualified immunity, a defendant must demonstrate either that his conduct did not violate any of the plaintiff's...clearly established rights, ...that would have been known to a reasonable person or that it was objectively reasonable for him to believe that his...actions did not violate any of those clearly established rights.

<u>Lennon</u>, 66 F.3d at 422.  The availability of this defense does not depend on whether the plaintiff's rights were in fact violated.  <u>See</u> <u>id</u>.  "Even where a right is clearly established, a defendant may enjoy immunity if it was objectively reasonable for the official to believe that his acts did not violate that right."  <u>Kaluczky v. City of White</u>

Plains, 57 F.3d 202 (2nd Cir. 1995). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. "[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." Id.

In order to be liable under a First Amendment retaliation theory, the plaintiff must prove both that the defendants retaliated against him on account of protected speech *and* that the speech at issue was "clearly established" as protected speech. As a matter of law, the plaintiff's internal complaints were not clearly established as protected speech. See Saulpaugh v. Monroe Community Hosp., 4 F.3d 134 (2nd Cir. 1993); Auriemma v. Rice, 895 F.2d 338 (7th Cir. 1990); Yatvin v. Madison Metropolitan School Dist., 840 F.2d 412 (7th Cir. 1988); Arringer v. Mayor of Baltimore, 811 F. Supp. 1121 (D. Md. 1993). Similarly, the defendants are not aware of any precedent within the Second Circuit that would indicate that the plaintiff's other conduct was clearly established at the time as protected speech. The law does not require municipal employees to guess or speculate as to the state of the law. Therefore, where, as here, the subject matter of the plaintiff's claim was not clearly established as protected speech, the defendant is entitled to summary judgment.

### B.    The Defendants Are Entitled To Summary Judgment As To Plaintiff's Due Process Claim (Count Two).

#### 1.    No Procedural Due Process Violation

In Count Two, the plaintiff alleges that the defendants deprived him of liberty without due process of law by harassing him and disparaging him at his workplace. See

Plaintiff's Complaint, Count Two, ¶65.[2]  The plaintiff cannot prevail on this claim

because he was not deprived of a liberty interest protected under the Fourteenth

Amendment.  The plaintiff has not even identified the liberty interest that he contends he

was denied.  Assuming *arguendo*, however, that the plaintiff's allegation that the

defendants disparaged him is an attempt to set forth a liberty interest claim based on

loss of reputation or good name, his claim must fail.

      The United States Supreme Court has repeatedly held that a claim of defamation

is not actionable under the Fourteenth Amendment.  <u>See</u> <u>Siegert v. Gilley</u>, 500 U.S.

226, 111 S.Ct. 1789 (1991); <u>Paul v. Davis</u>, 424 U.S. 693, 96 S.Ct. 1155 (1976).

"Defamation, by itself, is a tort actionable under the laws of most States, but not a

constitutional deprivation."  <u>Siegert</u>, 500 U.S. at 233.

      The term "liberty," as guaranteed by the Fourteenth Amendment, denotes

freedom from bodily restraint, as well as "the right of the individual to contract, to

engage in any of the common occupations of life, to acquire useful knowledge, to marry,

to establish a home and bring up children, to worship God according to the dictates of

his own conscience, and generally to enjoy those privileges long recognized … as

essential to the orderly pursuit of happiness by free men."  <u>Board of Regents v. Roth</u>,

408 U.S. 564, 572, 92 S.Ct. 2701 (1972), *quoting*, <u>Meyer v. Nebraska</u>, 262 U.S. 390,

399.  Conversely, the infliction of a stigma on a person's reputation, absent more, does

not constitute a liberty interest; the alleged defamation by a public official must be

accompanied by a "tangible injury" such as a loss of employment to invoke the

---

[2] The plaintiff also premises his claim on the defendants' failure to adequately act upon his
complaints.  This alleged deprivation, however, cannot form the basis of the plaintiff's claims
against Becker, Kaine or Conklin as these defendants were not the recipient of the plaintiff's
complaints and, as co-workers, had no duty or authority to act upon his complaints.

protections of the Fourteenth Amendment.  See Paul, 424 U.S. at 701-10.  In other

words, "[d]ue process is only implicated when there is 'stigma plus,' that is to say a loss

of reputation 'coupled with some other tangible element.'"  Morris v. Lindau, 196 F.3d

102, 114 (2nd Cir. 1999).

> For a government employee, a federal cause of action for deprivation of a
> liberty interest arises when the alleged defamation occurs in the course of
> some negative alteration of the employee's status, such as dismissal or
> refusal to rehire.  In addition, the defamation must have occurred close in
> time to the dismissal or other negative employment action for an employee
> to succeed on a claim of a liberty deprivation.

Morris, 196 F.3d at 114 (citations omitted).

"Personnel decisions short of termination do not constitute a deprivation under

the due process claim of the Fourteenth Amendment."  Wargat v. Long, 590 F. Supp.

1213, 1215 (D. Conn. 1984).  In Wargat, the plaintiff alleged a due process deprivation

when he was transferred from one assignment to another.  The District Court rejected

the plaintiff's constitutional claims by concluding that the "constitution must not be

trivialized by being dragged into every personnel dispute in state and local government."

Id. (internal citations and quotations omitted).

In this case, the plaintiff was not subject to a negative employment action by

these defendants.  Indeed, Becker, Kaine and Conklin were not final decision makers

for the Town, but were merely the plaintiff's coworkers.  As such, the plaintiff cannot

prevail on a due process claim against them.

### 2.    No Substantive Due Process Violation

Assuming *arguendo* that Count Two can be read to include a substantive due

process claim, the defendants are nonetheless entitled to summary judgment.

Substantive due process has been extended to those rights that are "fundamental" and "implicit in the concept of ordered liberty." Palko v. Connecticut, 302 U.S. 319, 325 (1937); Skinner v. City of Miami, Florida, 62 F.3d 344, 347 (11th Cir. 1995). The Supreme Court has been reluctant to expand the scope of substantive due process. See Albright v. Oliver, 510 U.S. 266, 271-72, 114 S.Ct. 807 (1994). Protection has generally been afforded only "to matters relating to marriage, family, procreation, and the right to bodily integrity." Id. at 272.

Furthermore, governmental acts that violate substantive due process protections ordinarily must "shock the conscience" of the court. See e.g., Rochin v. State of California, 342 U.S. 165, 72 S.Ct. 205 (1952). In a due process challenge to abusive conduct by a state actor, the court must determine "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." County of Sacramento v. Lewis, 523 U.S. 833, 848, 118 S.Ct. 1708 (1998). "[M]inor discomfort and hurt feelings do not make a federal case." Wise v. Pea Ridge Sch. Dist., 855 F.2d 560, 565 (8th Cir. 1988).

Here, the plaintiff argues that the defendants violated his constitutional rights by subjecting him to harassment. See Complaint, Count Two, ¶65. While arguably the defendants' conduct may have been juvenile and/or inappropriate in a place of business, there is nothing about the alleged conduct that is brutal or shocking to the conscience. See Lewis, supra. Moreover, the plaintiff has not identified the claimed right of which he was allegedly deprived. See Graham v. Conner, 490 U.S. 386, 394, 109 S.Ct. 1865, 1867 (1989). As such, any substantive due process claim must fail as a matter of law.

### 3.    The Defendants Were Not Acting Under Color Of Law

The plaintiff's due process claim is brought pursuant to 42 U.S.C. §1983.  As set forth above, the defendant coworkers are entitled to summary judgment because they were not acting under color of law.  See section A5 above.

### 4.    The Defendants Are Entitled To Qualified Immunity

Assuming *arguendo* that the defendants were acting under color of law, then they are entitled to qualified immunity.  See section A6 above.

### C.    The Defendants Are Entitled To Summary Judgment As To Plaintiff's Statutory Claims (Count Five).

In Count Five, the plaintiff alleges that the defendants threatened, harassed and intimidated him in violation of General Statutes §53a-62 (threatening) and §46a-71 (discrimination).  Both claims must fail as a matter of law.

### 1.    No Private Cause Of Action Under Conn. Gen. Stat. §53a-62

Section 53a-62 falls within the Connecticut Penal Code, and states as follows:

(a) A person is guilty of threatening in the second degree when: (1) By physical threat, such person intentionally places or attempts to place another person in fear of imminent serious physical injury, (2) such person threatens to commit any crime of violence with the intent to terrorize another person, or (3) such person threatens to commit such crime of violence in reckless disregard of the risk of causing such terror.

(b)    Threatening in the second degree is a class A misdemeanor.

Conn. Gen. Stat. §53a-62.

Section 53-62 of the Connecticut penal statutes does not provide for an independent civil cause of action for money damages, but states only that a violation of the statute constitutes a class A misdemeanor.  See e.g., Torres v. Armstrong, 2001 Ct. Sup. 12554 (Sept. 6, 2001) (Thompson, J.) (attached as **Exhibit H**); Ellsley v. Benson,

1992 Ct. Sup. 11787 (Dec. 23, 1992) (Leheny, J.) (attached as **Exhibit I**).   As such, the

defendants are entitled to summary judgment as to this claim.

### 2.     Conn. Gen. Stat. §46a-71 Is Inapplicable

The plaintiff cannot maintain an action against these defendants pursuant to

§46a-71, as this statute prohibits discriminatory practices by *state agencies* only.  The

Town of Plainville is a municipal corporation, and Becker, Kaine and Conklin are

municipal employees.  See Plaintiff's Complaint, Count One, ¶¶8-10.

### D.     The Defendants Are Entitled To Summary Judgment As To Plaintiff's Common Law And/Or Statutory Assault Claim (Count Seven).

### 1.     Statutory Claim of Assault Must Fail

In Count Seven, the plaintiff attempts to sets forth a claim for assault through

reference to two criminal statutes, §53a-62 (threatening) and §53a-64 (reckless

endangerment).  Section 53a-62 is quoted above.  Section 53a-64 states as follows:

> (a) A person is guilty of reckless endangerment in the second degree when
> he recklessly engages in conduct which creates a risk of physical injury to
> another person.

> (b) Reckless endangerment in the second degree is a class B
> misdemeanor.

As set forth above, no civil action for money damages arises from criminal

statutes unless specifically authorized.  Neither of these statutes allows for civil liability;

they state only that the respective offenses constitute either a class A or a class B

misdemeanor.  Summary judgment is therefore appropriate.

### 2.     Common Law Tort Claim of Assault Must Fail

Assuming *arugendo* that the plaintiff is attempting to bring a common law tort

claim for assault, his claim must nonetheless fail.  In order to prevail on a common law

assault claim, the plaintiff must prove "the [defendant's] intentional causing of imminent apprehension of harmful or offensive contact in another."  Dewitt v. John Hancock Mutual Life Ins. Co., 5 Conn. App. 590, 594 (1985); 1 Restatement (Second) Torts, §21 (1965).

> [I]t is necessary that the actor intend to inflict a harmful or offensive bodily contact upon the other or a third person or put him in apprehension of such contact.  Unless he acts with such intent, the actor is not liable for an assault.  ***An assault cannot be accomplished by words alone***.  There must be an overt act evidencing some corporeal threat.

D. Wright, J. Fitzgerald & W. Ankerman, Connecticut Law of Torts, §8, p. 9 (3rd Ed. 1991) (emphasis added).

"As it is seldom that an actionable assault occurs without a battery also occurring, Connecticut cases on the subject of assault are very rare.  In fact, the Connecticut Court has apparently discarded the classical definition of an assault, and the word "assault" is often used when in truth "battery" would be more accurate in the text book sense."  Connecticut Law of Torts, §6, p. 8.

The applicable statute of limitations for assault, an intentional tort, is three years. See Conn. Gen. Stat. § 52-577.   As set forth in section A2 above, the only claims of wrongful conduct against these defendants, occurring within that period, are as follows:

- Becker's alleged verbal harassment of Mallett at the two crew meetings;

- Kaine's alleged verbal attacks on December 14, 1999 and June 3, 2000; and

- Conklin's alleged verbal attack on February 7, 2001 and the punching bag incident.

The plaintiff's assault claim against each of theses defendants must fail.  First, there is no evidence that Becker, Kaine or Conklin physically assaulted the plaintiff.

Mallett concedes that at no time did these defendants ever punch him, wrestle with him, strike him or otherwise physically hit him.  Second, there is no evidence that any of the verbal altercations involved an overt act on the part of the defendants to intentionally cause an imminent apprehension in Mallett of harmful or offensive conduct.  See Dewitt, 5 Conn. App. at 594; Restatement, §21.

Mallett contends that Becker accused him of leaking information and threatened him with a civil lawsuit at two separate crew meetings.  Becker's conduct was limited to words alone and lacked any threat of physical harm.  Connecticut Law of Torts, §8, p. 9.  As such, Becker is entitled to summary judgment.

As for Kaine, Mallett contends that on December 14, 1999, Kaine called him a "coward" and a "piece of shit," said "come on," puffed his chest out and clenched his fist in a manner similar to a boxing position.  Mallett contends further that Kaine showed a rage in his eye.  Kaine, however, never verbally threatened Mallett with physical harm.  Moreover, Mallett concedes that Kaine did not step toward him, never touched him, and in fact walked away.  As mentioned above, words alone are insufficient to warrant liability, and in this case, Mallett has failed to introduce additional evidence showing that Kaine intended to inflict a harmful or offensive bodily contact upon Mallett or otherwise put him in apprehension of such contact.  See Connecticut Law of Torts, §8, p. 9.  It is undisputed that the June 23, 2000 altercation was likewise limited to words alone.  Mallett has offered no evidence of an overt act by Kaine evidencing a physical threat on this occasion.  Therefore, Kaine is entitled to summary judgment.

As for Conklin, Mallett cites two incidents that he contends were physically threatening; neither, however, amounts to an assault.  Mallett claims that the February

7, 2001 incident was physically threatening because of Conklin's size and the rage in his eye. See **Exhibit A**, pp. 104-05. Mallett has, however, submitted no evidence of an overt act by Conklin evidencing a threat of physical harm. Conklin explained that he meant only that Mallett was going to get into trouble with the Town. With regards to the punching bag incident, Kaine did not say or do anything other than hit the bag. Mallett concedes that Kaine may have been hitting the punching bag before he even entered the room. This conduct certainly cannot be sufficient to impose liability for an assault. As such, Conklin is likewise entitled to summary judgment.

> **E.      The Defendants Are Entitled To Summary Judgment As To Plaintiff's Intentional Infliction Of Emotional Distress Claim (Count Eight).**

In Count Eight, the plaintiff alleges intentional infliction of emotional distress. The three-year statute of limitations for an intentional tort is equally applicable to this claim. Therefore, the plaintiff's sole support for this cause of action must be premised on the allegations of conduct set forth in sections A2 and D2 above.

In order to prevail on a cause of action for intentional infliction of emotional distress, the plaintiff must establish four elements: "(1) that the actor intended to inflict emotional distress; or that he knew or should have known that the emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." Petyan v. Ellis, 200 Conn. 243, 253, 510 A.2d 1337 (1986). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." 1 RESTATEMENT (SECOND) OF TORTS §46, p. 73, comment (d). In

addition, the conduct must be "especially calculated to cause, and does cause mental distress of a very serious kind." DeLaurentis v. New Haven, 220 Conn. 225, 266 (1991); W. Prosser & W. Keeton, Torts (5th Ed. 1984) §12, p. 64.

In an employment setting, individuals reasonably should expect to be subject to routine employment-related conduct, including performance evaluations, transfers, demotions, disciplinary action, investigations arising from actual or alleged misconduct, workplace gossip and rivalry. See Perodeau v. Hartford, 259 Conn. 752, 757, 792 A.2d 752 (2002). It follows that "individuals in the workplace reasonably should expect to experience some level of emotional distress, even significant emotional distress, as a result of conduct in the workplace." Id. The issue of whether the alleged conduct rises to the level of extreme and outrageous conduct is to be determined, in the first instance, by the Court. See Campbell v. Town of Plymouth, 74 Conn. App. 67, 78 (2002); Armstead v. Stop & Shop Co., Inc., No. 3:01cv1489 (JBA) (D. Conn. 2003) (attached as **Exhibit J**); Schug v. The Pyne-Davidson Co., No. 3:99cv1493 (CFD) (D. Conn. 2001) (attached as **Exhibit K**); Reed v. Town of Branford, 949 F. Supp. 87, 91 (D. Conn. 1996); RESTATEMENT (SECOND) OF TORTS §46, comment (h) (1965). In this case, the question should be resolved in favor of the defendants.

In Appleton v. Board of Educ. of Stonington, 254 Conn. 205, 211 (2000), the plaintiff, a teacher, alleged that the defendants made condescending comments to her in front of colleagues; alerted her daughter that she "had been acting differently" and that she should take a few days off; called the police, who escorted the plaintiff from the building; subjected the plaintiff to two psychiatric examinations; and forced the plaintiff to take a suspension and leave of absence, and ultimately forced her to resign.

Reversing the Appellate Court, the Supreme Court concluded that the alleged occurrences, although distressing, did not constitute extreme and outrageous conduct for purposes of an intentional infliction of emotional distress claim.  Id. at 211.

In Dollard v. Board of Education, 63 Conn. App. 500, 552 (2001), the plaintiff alleged that the defendants orchestrated a plan to force her to resign.  As part of said plan, the defendants hypercritically scrutinized every aspect of the plaintiff's work and personal life, transferred her to a school where she did not want to be assigned, publicly admonished her for chewing gum, being habitually late and disorganized, and ultimately forced her to resign.  See id. at 552-53.  The Appellate Court held that the conduct was not extreme and outrageous as a matter of law, and affirmed the trial court's granting of the defendant's motion to strike.  Id. at 554.

In Bombalicki v. Pastore, 71 Conn. App. 835 (2002), evidence was presented at trial to show that: Pastore and the plaintiff did not like each other; Pastore expressed his dislike of the plaintiff and talked about him unfavorably to other officers; and Pastore opposed the plaintiff's promotion and did not recommend the plaintiff for promotion despite the fact that an article had been published in the New Haven Register newspaper stating that Pastore intended to promote nineteen officers, including the plaintiff.  See id. at 839, 840-41.  The Appellate Court noted that the conduct was "hardly extreme and outrageous," and affirmed the trial court's granting of the defendants' motion for a directed verdict.  Id. at 842.

In Bator v. Yale-New Haven Hospital, 73 Conn. App. 576, 577 (2002), the plaintiff alleged that he was subjected to abusive and disparate treatment during the course of his employment.  Specifically, the plaintiff alleged that: his supervisor scheduled him to

report to work when he was under a physician's care, and then, when the plaintiff failed to report, recommended discipline; the plaintiff received less compensation than other less experienced employees in his position; a supervisor falsely accused him of endangering a patient's life after a nurse had complained that the plaintiff was rude; a supervisor suggested that the plaintiff seek psychiatric help when he complained about his schedule and assignments; another supervisor recommended that the plaintiff attend anger management classes after he had a confrontation with a nurse; the plaintiff was given a written warning in response to a complaint about a change in his monthly rotation assignment; and a supervisor gave the plaintiff a final written warning for violence after another altercation with a nurse about a patient's care. See id. at 577-78. The Appellate Court held that the conduct was not extreme and outrageous, and affirmed the trial court's granting of the defendant's motion to strike. Id. at 579.

In Carnemolla v. Walsh, 75 Conn. App. 319, 332 (2003), the plaintiff alleged that she was a devoted mother and employee, and an honest person who had never been accused of a crime, when the defendant confronted her, accused her of embezzling company funds, and requested that she sign a resignation and release. Evidence was also presented that another employee resigned after observing the manner in which the plaintiff was treated. See id. The Appellate Court affirmed the trial court's granting of the defendant's motion for summary judgment. Id. at 333.

Pursuant to Appleton and its progeny, each of these defendants is entitled to summary judgment as to the plaintiff's intentional infliction of emotional distress claim. Becker's accusing Mallett of leaking information and threatening a civil lawsuit is not extreme and outrageous as a matter of law. See Bator, supra; Carnemolla, supra.

Similarly, Kaine's and Conklin's conduct, even if unpleasant and vulgar, does not rise to the level of outrageousness and atrociousness as as to be "beyond all possible bounds of decency."  See RESTATEMENT §46, p. 73, comment (d).

### F.   The Defendants Are Entitled To Summary Judgment Because The Plaintiff Failed To Exhaust The Available Grievance Procedure.

The defendants are also entitled to summary judgment as to Counts Two, Seven and Eight because the plaintiff failed to file a grievance pursuant to the applicable Collective Bargaining Agreement.

"It is well settled under both federal and state law that a before a resort to the courts is allowed, an employee must at least attempt to exhaust exclusive grievance and arbitration procedures, such as those contained in the Collective Bargaining Agreement between the defendant and the plaintiff Union…."  Hunt v. Prior, 236 Conn. 421, 31-432 (1996).  "Failure to exhaust the grievances procedures deprives the court of subject matter jurisdiction." Id. at 431, quoting, Labbe v. Pension Commission, 229 Conn. 801, 811 (1994).

> The purpose of the exhaustion requirement is to encourage the use of grievance procedures, rather than the courts, for settling disputes.   A contrary rule which would permit an individual employee to completely sidestep available grievance procedures in favor of a lawsuit has little to commend it. . . .[I]t would deprive employer and union of the ability to establish a uniform and exclusive method for orderly settlement of employee grievances.   If a grievance procedure cannot be made exclusive, it loses much of its desirability as a method of settlement.   A rule creating such a situation would inevitably exert a disruptive influence upon both the negotiation and administration of collective [bargaining] agreements.

Hunt, 236 Conn. at 431-32, quoting, Labbe, 229 Conn. at 811-12; see also, School Administrators Assn. v. Dow, 200 Conn. 376, 382 (1986); Daley v. Hartford, 215 Conn. 14, 23 (1990).

"The doctrine of exhaustion is grounded in a policy of fostering an orderly process of administrative adjudication and judicial review in which a reviewing court will have the benefit of the agency's findings and conclusions." Mendillo v. Board of Education, 246 Conn. 456, 466 (1998); Connecticut Life & Health Insur. Guaranty Assn. v. Jackson, 173 Conn. 352, 358-59 (1977).  Pursuant to this doctrine, labor issues are to be handled in the first instance by the individuals and boards most familiar with the practices, norms, interpretation and standards within a given field.

The doctrine of exhaustion is not limited to breach of contract claims, but applies equally to common law tort claims as well.  See e.g., Bigio v. Montagna, 2003 Ct. Sup. 11015 (Oct. 2, 2003) (Gilardi, J.) (granting summary judgment as to claims of negligent and intentional infliction of emotional distress) (attached as **Exhibit L**); Peters v. National Wholesale Liquidators, 2002 Ct. Sup. 2841 (Mar. 6, 2002) (Sequino, J.) (granting summary judgment as to claims of negligent and intentional infliction of emotional distress, breach of the implied covenant of good faith and fair dealing, negligence and a nonspecific violation of the terms of the plaintiff's employment) (attached as **Exhibit M**); Cassotto v. Winchester Board of Education, 1994 Ct. Sup. 11479, *11484 (Nov. 15, 1994) (Pickett, J.) (granting summary judgment as to claims of wrongful discharge, breach of contract, and intentional infliction of emotional distress) (attached as **Exhibit N**); and Cross v. Nearine, 1995 Ct. Sup. 1639, *1647-48 (Feb. 17, 1995) (Wagner, J.) (granting motion to dismiss as to claims of defamation, invasion of privacy based on false light, failure to supervise, intentional infliction of emotional distress, constructive wrongful discharge, and breach of the implied covenant of good faith and fair dealing) (attached as **Exhibit O**).

In this case, the grievance process is set forth at Article XIII of the collective bargaining agreement.  See **Exhibit E**.  Pursuant to §13.0, "disputes and consultations on any questions arising out of the Employer-Employee relationship" are to be handled via the grievance process."  See **Exhibit E**.   The plaintiff claims that he had in the past filed grievances against Becker and Kaine, evidencing the fact that the grievance process encompasses his complaints.  The plaintiff, however, did not file a grievance as a result of any the alleged conduct by Becker, Kaine or Conklin that occurred within the three years prior to his initiating this lawsuit.  Therefore, his common law claims of assault and intentional infliction of emotional distress are barred.

The plaintiff's §1983 due process claim must also fail due to the availability of the grievance procedure and the plaintiff's failure to pursue the same.  The essential elements of due process are notice and an opportunity to be heard.  See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985).  Post-deprivation grievance procedures that provide for a hearing to contest a challenged employment decision satisfy the due process requirement.  See Harhay v. Town of Ellington, 323 F.3d 206 (2nd Cir. 2003).  "Although one need not exhaust state remedies before bringing a Section 1983 action claiming a violation of procedural due process, one must nonetheless prove as an element of that claim that state procedural remedies are inadequate."  Marino v. Ameruso, 837 F.2d 45, 47 (2nd Cir. 1988); Narumanchi v. Bd. of Trustees of Conn. State University, 850 F.2d 70, 72 (2nd Cir. 1988).  The plaintiff's failure to do so in this case is fatal to his claim.

IV.    **CONCLUSION**:

For the foregoing reasons, the co-employee defendants, Donald Becker, James Kaine, and Michael Conklin, are entitled to summary judgment as to Counts One, Two, Five, Seven and Eight of the Plaintiff's Complaint.

                        DEFENDANTS,
                        DONALD BECKER, JAMES KAINE and
                        MICHAEL CONKLIN


                        By/s/Alexandria L. Voccio
                          Alexandria L. Voccio,
                          ct21792
                          Howd & Ludorf
                          65 Wethersfield Avenue
                          Hartford, CT  06114
                          Phone:  (860) 249-1361
                          Fax:  (860) 249-7665
                          E-mail:  avoccio@hl-law.com

## **CERTIFICATION**

       This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via U.S. Mail to the following counsel of record this 27th day of September, 2004.

James S. Brewer, Esquire
Erin I. O'Neil-Baker, Esquire
Brewer & O'Neil, LLC
818 Farmington Avenue
West Hartford, CT  06119

Dennis Ciccarillo, Esquire
Plainville Town Counsel
Eisenberg, Anderson, Michalik & Lynch
136 West Main Street
P.O. Box 2950
New Britain, CT  06050-2950

J. William Gagne, Jr., Esquire
Gagne & Associates, P.C.
1260 Silas Deane Highway
Wethersfield, CT  06109


                         /S/Alexandria L. Voccio
                         Alexandria L. Voccio