73

1          A          In my opinion, it was.

2          Q          Now, you also mention in paragraph

3     thirty-four the raising and keeping the pit bull at

4     the WPC.  What was the problem raising and keeping the

5     pit bull at WPC?

6          A          Along the same line as the weight room.  It

7     was a privilege that I felt was extended to somebody

8     when I couldn't even get what I felt was decent

9     treatment, which I pointed out.

10          Q          So since, in essence, you thought Becker

11     was being cruel to you, you were going to retaliate

12     against everybody and get the gym shut down and get

13     the dog thrown out, right?  That's how you were going

14     to respond to that situation?

15          A          I believe it's perceived that way, yes.

16          Q          Are you aware Mr. Kaine had permission to

17     have the dog at the WPC?

18          A          I'm sure he did.

19          Q          Did you ever contribute weekly to the dog's

20     upkeep?

21          A          Yes.

22          Q          So you didn't think having the dog was a

23     problem there for the first four years that you were

24     there, right?

25          A          Did I think it was a problem?  I knew it

NIZIANKIEWICZ & MILLER REPORTING SERVICE

1  theirs, right?

2       A    I wouldn't put it that way.

3       Q    Paragraph thirty-five of your Complaint

4  says "From October 1993 to August '95, plaintiff was

5  subject to numerous threats and acts of intimidation

6  directed by Becker and Kaine regarding his numerous

7  filed grievances detailing the misuse of Town

8  facilities."

9            Give me all the specifics of which you are

10 aware in which you were subject to numerous threats

11 and acts of intimidation and harassment by these two

12 defendants as articulated in that paragraph.

13      A    There are many incidents of -- like I talk

14 about those crew meetings where --

15      Q    Specifically, after reporting, you've

16 alleged that these gentlemen are misusing Town funds,

17 which is a very, very serious allegation.  You've then

18 alleged that they retaliated against you.

19 Specifically, when?

20      A    Town funds?  Could you explain that.

21      Q    It's your phrase.  It's your lawyer's

22 phrase.  Your lawyer uses, actually in paragraph

23 thirty-five, "numerous filed grievances detailing

24 misuse of Town facilities at the WPC."  You're

25 claiming these gentleman retaliated against you.  I

NIZIANKIEWICZ & MILLER REPORTING SERVICE

1    want to know what they did.

2         A    Well, like I said, I was criticized --

3    specifics, I'd have to go back to my notes and see if

4    I can recall specifics.

5         Q    The notes that you did not bring today?

6         A    They're at my attorney's office.

7         Q    So it's your testimony that you couldn't

8    answer questions about your Complaint without notes

9    that you don't have here today?

10        A    That's not what I'm saying.  There were,

11   like I said, several times when there, it was supposed

12   to be like a crew meeting and what it ended up being

13   is a criticizing session of me and my actions and

14   performance.

15        Q    Did they ever, did Becker or Kaine ever in

16   these meetings mention your grievances?

17        A    I don't recall specifically.  I really

18   don't recall.

19        Q    So how do you know their criticism, which

20   you've by your own admission say had gone on before

21   this, how do you know it was caused by your filing of

22   these grievances?

23        A    I believe it was.

24        Q    Based on what facts?

25        A    The atmosphere in the department.  It could

NIZIANKIEWICZ & MILLER REPORTING SERVICE

1    be a pretty hostile place sometimes.

2        Q      Is that all you can give me for examples in

3    that two year period of threats and intimidation by

4    Becker and Kaine is them criticizing you at crew

5    meetings?

6        A      That's a nice way of putting it.  There's,

7    it was much worse.

8        Q      What's the worst thing they said?  What's

9    the worst thing they said, Mr. Mallett, in one of

10   these crew meetings?

11       A      I don't recall the specific words but when

12   you're in a meeting and singled out and criticized,

13   it's a pretty tough place to be, and it happened a lot

14   of times.

15       Q      What's the worst thing they said?

16       A      Specific words, I don't recall.  Specific

17   words, I can't give you a specific.  But this happened

18   many times and I was singled out many times and

19   singled out and criticized.  You'd have to be there to

20   understand.  No offense in that.

21       Q      None taken.  Isn't it true, Mr. Mallett,

22   that you're suing the defendants Becker and Kaine

23   based on what they've said to you and their words?

24   You find their words to be upsetting?

25       A      The words are upsetting, yes.


                 NIZIANKIEWICZ & MILLER REPORTING SERVICE

78

1       Q     No one ever punched you?

2       A     No.

3       Q     No one ever wrestled with you?

4       A     No.

5       Q     No one ever struck you?

6       A     No.

7       Q     You're suing them for words, right?

8       A     I would have to talk to my counsel to get a

9 good answer for you.  It's more than words.  It's more

10 than words.

11      Q     Well, what else?

12      A     Like I said, I'd have to, to be able to

13 express myself fully to you.

14      Q     With all due respect, your attorney can't

15 help you express yourself.  If you can't answer that

16 question, that's fine.  But the way I understand it is

17 that these gentlemen have said things to you that

18 makes you upset and now you're asking a federal court

19 to give you money for that, is that, in essence, what

20 your Complaint is?

21      A     I would, with my limited experience, I

22 would have to say what you said is not totally

23 accurate right there.

24      Q     What's not accurate?

25      A     There's more than words involved.

79

1          Q      What else?  Tell me.  That's what we're

2     here to find out.  What else did these gentlemen do to

3     you other than criticize you at staff meetings?

4          A      My opinion, emotional abuse.

5          Q      Right.  But through words, right?

6          A      Well, yeah.  They didn't, never physically

7     hit me.

8                          (J. William Gagne, Esq. left the

9                          deposition.)

10    BY MR. ROSE:

11         Q      So as far as paragraph thirty-five is

12    concerned, where it says "From October of '93 to

13    August of '95 you were subject to numerous threats,"

14    you can't give me any more specific examples other

15    than those crew meetings that you were criticized?

16         A      Not right now, I can't.  I'd have to go

17    with my notes.  I don't have my notes.

18         Q      Number thirty-six, "On August 8, 1995,

19    Becker was to receive a hearing of his appeal for his

20    suspension, the basis of which was plaintiff's

21    Complaint of sexual harassment."  Now, you never made

22    a complaint of sexual harassment, did you?

23         A      I reported what happened.

24         Q      Right.  But you didn't believe that Mr.

25    Becker wanted to have sexual relations with you, did

NIZIANKIEWICZ & MILLER REPORTING SERVICE

82

1    dropped the sexual part of the complaint and if the

2    harassment stood, and we agreed to it.

3         Q    What happened to Mr. Becker?

4         A    He was given a three-day suspension, I

5    believe.  That's what it said.

6         Q    Do you remember how I told you at the

7    beginning we wanted to break this up into two periods.

8    What we did was talked about 1991 to 1992.  Right?

9         A    Yes.

10        Q    We've also then talked about 1993 when you

11   came back to WPC, all the way up to this hearing on,

12   in August of 1995, correct?

13        A    Yes.

14        Q    Now your Complaint doesn't have anything

15   else that occurred between August 8, 1995 and June

16   1999, correct?

17        A    I'm not sure.

18        Q    Well, feel free to take a look at it and

19   see if there's any other allegations of wrongdoing

20   between August of '95 and June of '99.

21        A    There doesn't appear to be anything here.

22        Q    Did you make any entries in your journal

23   for any activities that occurred between August 1995

24   and June of 1999?

25        A    I'd have to refer back to it.  I honestly

NIZIANKIEWICZ & MILLER REPORTING SERVICE

83

1    don't remember now.

2         Q    Okay.  Paragraph thirty-seven says that On

3    June 1999 you were offered training towards lab

4    certification by Marino and Richard Tingle.  It says,

5    "However, the defendants consistently denied him the

6    necessary training time for certification."  Which

7    defendant denied you that training time?

8         A    Could I read the first part of that again?

9         Q    Sure.

10        A    Because I think there's something in here

11   that's not accurate or may not be.

12             This isn't -- okay.

13        Q    It isn't what?

14        A    The wording is a little -- I was offered

15   the opportunity to work towards lab certification

16   training I had asked for over and over, and Rich

17   Tingle was the head of the lab and when I was to get

18   lab time he would request it for me because that's the

19   way we had always done it.  And my lab time has

20   disappeared.

21        Q    Did my clients, Becker, Kaine or Conklin

22   ever tell you that they were responsible for the

23   reduction in your lab time?

24        A    No.

25        Q    Which defendants are you referring to here

                NIZIANKIEWICZ & MILLER REPORTING SERVICE

1    when you say "The defendants reduced your lab time"?
2    Not my clients, right?
3         A    Ninety-nine?  At this time, I believe Jim
4    was in charge of staffing, assigning people to
5    wherever they were going to go.  And the proper
6    procedure was for me to go to Rich Tingle to tell him
7    I need more lab time.  And he would go to Jim who
8    would do the staffing and notify Jan, and I repeatedly
9    went to him after I was offered this opportunity to
10   get certified in the lab, and my lab time just
11   disappeared.  I was replaced.
12        Q    My question was, did Kaine, Conklin or
13   Becker take away your lab time or did someone else?
14        A    I'm not positive who actually did it but I
15   know it was done.
16                    MR. ROSE:  Can we take five
17        minutes?
18                    (Recess held from 3:19 p.m. to
19        3:28 p.m.)
20                    (Jim Kaine left the deposition.)
21   BY MR. ROSE:
22        Q    Paragraph thirty-eight of your Complaint
23   talks about you being assigned to a place called
24   Siberia in November of 1999, who assigned you there?
25        A    Jim.


             NIZIANKIEWICZ & MILLER REPORTING SERVICE

1    Q    Kaine?

2    A    Yes.

3    Q    And why do you think he assigned you there?

4    A    My own opinion is to get me out of the way.

5    Q    Why?  Any particular reason?

6    A    Because of the atmosphere hostilities down

7    at the plant.

8    Q    Was he trying to help you out or was he

9    trying to --

10    A    I don't think it helped me out.

11    Q    What did you believe his motivation was?

12    A    Just to get me away from, get me out of the

13    way, just to where I could be off doing my job and

14    everybody else could be off doing theirs.  Just kind

15    of an out of way place where it's kind of isolated.

16    You don't have a lot of contact over there, usually.

17    I didn't anyway.

18                    (Answer read by the Reporter.)

19    BY MR. ROSE:

20    Q    Paragraph thirty-nine of your Complaint

21    indicates that Steven Gregory contacted you about an

22    upcoming union meeting.  Tell me about that.

23    A    I was working in Siberia and there was an

24    upcoming union meeting and he came over and he told me

25    that he was concerned for my well-being if I didn't go

NIZIANKIEWICZ & MILLER REPORTING SERVICE

87

```
1        A      The whole crew.

2        Q      The whole?

3        A      The whole crew.

4        Q      At Water Pollution Control?

5        A      Yes.

6        Q      Why?  What was going on at this meeting?

7        A      From the gossip I heard around, I believe

the Water Pollution Control Department wanted to take

the control of the union back, I guess, and I believe

that's why I was spoken to like this, because I felt

as though I was supposed to go and do, vote for

somebody from this department that wanted to be an

officer, and I wasn't about to do it.  I had other

responsibilities.

15       Q      Who was running for officerships from your

department?

17       A      I think Don was.  I'm not sure.  I think he

was and -- I'm not sure.

19       Q      And you didn't go to the meeting on

November 30th, correct?

21       A      No.  I went to my part-time job.

22       Q      Where's your part time job?

23       A      At the time I worked at Nabby Beverages in

Plainville, trying to earn some extra money to put my

kid through college.  And that's where my priority was
```

NIZIANKIEWICZ & MILLER REPORTING SERVICE

1      that particular day, because they were expecting me

2      for this particular job I had to do.

3          Q      How many hours a week did you work

4      part-time during this period?

5          A      Approximately twenty.  Sometimes more.

6      Sometimes less.

7          Q      Now, paragraph thirty-one of your Complaint

8      talks about Mr. Kaine coming up and speaking with you

9      on the morning of December 14th.  Tell me about that

10     incident as best as you can recall.

11         A      Well, I went in, we all meet in a room in

12     the morning in a break room to get our assignments.

13         Q      Even though you were still at Siberia you

14     went?

15         A      Yeah.  Courtesy or whatever, because there

16     could be a change.  You might be assigned somewhere

17     else.  You just meet there and go do your job.  So

18     this was the, the day after the meeting, the union

19     meeting I went in and was waiting to get my assignment

20     and Jim mentioned something about the union meeting,

21     something to the effect if I was there I would have

22     known what happened, whatever.  So I assumed I still

23     had the same job in Siberia, so I just got up and I

24     said, have a nice day guys, and I walked out of the

25     room, because I knew something was going to happen.

NIZIANKIEWICZ & MILLER REPORTING SERVICE

1    It was going to be, experience told me there was going

2    to be something I was going to be criticized for, so I

3    just went to work.  And I went into the garage and Jim

4    came after me, went into the garage area and he

5    started to harass me.

6         Q     What did he say?

7         A     About, well, first he told -- he said

8    something about the union is my life.  What's Nabby

9    Beverage going to do for you?  He called me a piece of

10   shit and said I always was a piece of shit.  Called me

11   a coward.  And he got, came up to me and says, come

12   on.  You'd have to see it.  It was like, I took it as

13   pretty threatening.  And he criticized me about my

14   part-time job.  And I told him, I says, I have to do

15   what I got to do.  So I just went off to the garage

16   area, put my rubbers on.  I just wanted to go to work

17   and get out of there.  I guess he calmed down and went

18   away.  So I absorbed what happened and went on my way.

19   The whole thing was I guess my part-time job I was

20   supposed to go to the meeting instead of going to

21   work.  But that's not what I did.

22        Q     Did Jim Kaine physically attack you in any

23   way on December 14th, 1999?

24        A     No.  He didn't attack me.

25        Q     He didn't attack you?


               NIZIANKIEWICZ & MILLER REPORTING SERVICE

```
1         A       Physically, no.

2         Q       What did he do which you think is designed

3    to quote "provoke the plaintiff into a physical

4    altercation"?

5         A       He came up close to my body and he clenched

6    and he went, "come on," like that.  And that's like

7    pretty clear to me that that's the intent to call

8    somebody out to fight, to provoke a violent reaction.

9    That's the way I took it.  If I did that to somebody I

10   probably would expect to be popped in the mouth or

11   something.  I don't know.  I took it as provoking me

12   for violence.

13        Q       Did you feel that you were a victim of an

14   assault on the morning of December 14th, 1999?

15        A       I believe it could be considered verbal

16   assault, what I had to endure.

17        Q       So you believe you were assaulted that

18   morning?

19        A       I don't know legal, if it qualifies.  I

20   know what happened to me.

21        Q       I'm just asking you subjectively.  Did you

22   believe you were assaulted?  Whatever that term means,

23   did you believe you were assaulted?

24        A       I was pursued, yes.

25        Q       To whom did you report that?
```

NIZIANKIEWICZ & MILLER REPORTING SERVICE

```
1         A      I didn't report it, because I feared
2    retaliation in many forms.
3         Q      Okay.  Then the next allegation in your
4    Complaint is about six months later on June 23rd,
5    2000, it says quote "Kaine and plaintiff got into an
6    argument.  Kaine again threatened the plaintiff,
7    stating quote 'if you mess with me I'll mess with
8    you,' close quote.  Kaine then told plaintiff quote
9    'you're never going anywhere in this department.'"
10              What is that all about?
11        A      I misunderstood an assignment and I went up
12   on the roof to pick weeds.  It was an assignment where
13   one guy could handle the assignment, the immediate
14   assignment, to take readings.  And I was going to
15   finish a job.  I misunderstood the importance of the
16   directions I got and I went up on the roof and started
17   picking weeds.  And come to find out I was supposed to
18   be on the road, but the other guy took care of that
19   anyway, and we could go out in the afternoon and
20   finish anyway.  Jim got upset and apparently thought I
21   was messing with him or something.  And he got pretty
22   mad.  I guess he had some words with the other guy,
23   Steve.  And I told him, I said, this is my fault.  I
24   misunderstood, not Steve.  I believe he took it as
25   though I was playing games with him or something, and
```

1    he told me that if I wanted to mess with him I will

2    mess with you.  I had no intention.  It was just

3    ridiculous.  I misunderstood and I did a job that had

4    to be done anyway, so actually there was no reason for

5    any commotion at all, anyway.  Everything got done.

6         Q    When's the first time you talked to Bill

7    Cunningham about the timecards?

8         A    First time I talked to Bill Cunningham?

9         Q    About the timecards.

10        A    About the timecards?  Sometime last summer

11   we had talked about, he had mentioned that he sees

12   people around town.  I told him, I said, hey, you do

13   what you got to do.  And he had mentioned he was going

14   to get a FOI request.  I don't remember the dates.

15        Q    Let's be a little more specific.  In June

16   of 2000 you went and spoke to Bill Cunningham about

17   timecard abuses at WPC, correct?

18        A    I don't know if I went to him or we met at

19   my driveway in the neighborhood, you meet all over the

20   places.  And he would ask me questions about -- this

21   went on for years, he asked me questions about this

22   job, this job, whatever.  And I think he did, he

23   brought up the timecard thing.  "What's this person

24   doing here, here?"  I said, I'm not the one to ask.

25   So he decided that he was going to look into it.


NIZIANKIEWICZ & MILLER REPORTING SERVICE

96

1       Q       And paragraph forty-four of your Complaint

2  says "On August 25th, 2000 during a crew meeting

3  Becker accused the plaintiff of leaking information to

4  Cunningham." Do you remember that crew meeting?

5       A       Oh, yes.

6       Q       Did Mr. Becker say that you were leaking

7  information to Cunningham?

8       A       Something to that effect.

9       Q       And you were, weren't you?

10      A       I was discussing situations with him.

11      Q       And the answer is yes, right, you were

12 leaking information to Cunningham?  Maybe you should

13 have, maybe you shouldn't.  I'm not saying there was

14 anything wrong with it.

15      A       Leaking is kind of a --

16      Q       Use whatever word you want.

17      A       I was talking to Mr. Cunningham.

18      Q       Didn't you deny it in that crew meeting in

19 front of all your co-workers?

20      A       I didn't have a chance to talk.

21      Q       So you didn't deny it in that meeting?

22      A       I made a point of not saying anything in

23 them meetings.

24      Q       So your testimony is that you did not deny

25 that you were the person giving information to Bill

NIZIANKIEWICZ & MILLER REPORTING SERVICE

1    Cunningham in this meeting of August 25th, 2000?

2        A    I don't believe I said a word.  Usually in

3    those meetings I don't say anything because they're --

4    as far as I was concerned you just feed the fire.

5        Q    The rest of the paragraph says "Becker

6    threatened and harassed the plaintiff in front of his

7    co-workers and WPC management." How did Becker

8    threaten and harass you in this meeting?

9        A    He accused me of leaking this information.

10   And it said something about legal action.  When you're

11   in a room and you're singled out and accused, it's

12   tough.  It was inappropriate at the time.

13       Q    It was true?

14       A    It wasn't appropriate for that to happen.

15       Q    It's tough, because it was true, he caught

16   you, he knew who was giving the information to

17   Cunningham, that's what was tough about it?

18       A    What was tough about it was being subjected

19   to psychological abuse in a room when you're singled

20   out.  You know, there was, I felt, I don't think that

21   was an appropriate way to do anything.

22       Q    What did you expect was going to happen

23   when you told an area gadfly that the WPC was

24   misappropriating Town funds?

25       A    I didn't tell him that.


         NIZIANKIEWICZ & MILLER REPORTING SERVICE

98

1    Q        Did you expect he'd FOI the records?

2    A        I had a feeling he was going to do what he

3  was going to do.

4    Q        Didn't you expect that that FOI would make

5  it to the newspaper?

6    A        I knew I was going to pay the price for his

7  actions, yes.

8    Q        Now, as far as the threatening and

9  harassing, have you fully described it?  Becker

10  singled you out and that's what you describe as

11  threatening and harassing?

12    A        Like I said before, you would have to be in

13  the situation to fully understand what it feels like.

14  I been through it a lot of times and it's not a fun

15  thing to go through.

16    Q        Well, the answer then is yes, that's all

17  Becker did, was singled you out and said you were

18  leaking information, and that's what you mean when you

19  say threatened and harassed?

20    A        I believe, yeah, he's threatened, something

21  to do with legal action and, yeah, I felt harassed.

22    Q        Did Becker ever say anything to you again

23  about the timecard issues?

24    A        There was another meeting.

25    Q        When was that?


                NIZIANKIEWICZ & MILLER REPORTING SERVICE

99

```
 1        A       I don't have the date, but after this

 2   meeting I went to my boss and I explained to her how

 3   it made me feel and I asked her that I not be put in

 4   that position again.  I don't know, a couple of months

 5   later, whatever it was, there was another meeting

 6   downtown and the same thing happened and I was singled

 7   out again.  The only one that stopped what was

 8   happening was my staff rep said we're not here to

 9   accuse anybody of anything.

10        Q       Who was that?

11        A       Charlie Lumbarg.  Management didn't seem to

12   think there was any need to come to my rescue or

13   whatever, however you want to put it.  But I had

14   talked about it with my supervisor after the first

15   meeting and told how it made me feel.  And it happened

16   again.

17        Q       You have a notation, your paragraph

18   forty-six talks about seeing Tingle at the -- sorry.

19   You didn't see Tingle.  Tingle saw Daniel Winkler?

20        A       Yes.

21        Q       Did Winkler tell you what Tingle said?

22        A       Yes.

23        Q       What did Winkler tell you that Tingle said?

24        A       I believe that was the time -- he called me

25   a couple of times because he seen another individual
```

NIZIANKIEWICZ & MILLER REPORTING SERVICE

1      Q      You suspect it but did you see them?

2      A      No, didn't see them.

3      Q      Anybody tell you they did it?

4      A      Of course not.

5      Q      Now, this thing on February 7th, what was

6   that all about, February 7th 2001?

7      A      Well, there was a snowstorm the night of

8   February 6th into the 7th I guess and it was snowing

9   and I stayed home and came in at seven o'clock.  I

10  removed snow from my own house and I came in in the

11  morning and I was sitting in the break room with Rich

12  Tingle and Frank Marcioni.  And Mike came in and

13  started complaining to me about he was out working all

14  night and something about how I was getting paid while

15  he was working, while I was home lying in bed.  I told

16  him I was doing my own snow.  Then I said something, I

17  believe I said, you have to ask Jan if I was getting

18  paid.  I didn't even know I was getting paid, didn't

19  come to work.  Anyway, he walked out and he said,

20  You're a cunt.  And he walked out down the hall and

21  punched in, came back in the room and came over to me

22  and he mentioned about he thought I was, he felt I was

23  steeling money from the Town getting paid for not

24  working.  He came over to me, stuck his finger in my

25  face like this (indicating) and he told me, "you're

NIZIANKIEWICZ & MILLER REPORTING SERVICE

1  going down, nigger."

2        Q    Did you report that?

3        A    Later on I did.  My boss doesn't come in at

4  seven.  At that time she didn't.  So I didn't know

5  what I was going to do.  Knowing that she wasn't there

6  I went to work and just went about my business and I

7  was, I didn't know what to do yet.  I went to work and

8  Mike came over and talked to me.  He told me it was

9  wrong.  He told me that a guy in the lab had told him

10  that I ratted him out the previous day because he came

11  in early without authorization and was reprimanded,

12  and he thought I was the one that ratted him out.  So

13  I guess he figured he'd do what he did.

14        Q    He apologized?

15        A    Not in them words.  He said he was wrong,

16  it was morally wrong.

17        Q    That's not an apology?

18        A    Could be considered an apology.  I'm not

19  finished.

20        Q    Okay.  Go ahead.

21        A    Then he went on to tell me how he was told

22  I ratted him out.  Then he told me, he says, you're

23  not the bad guy around here.  I said, we -- we talked

24  about that.  It was, I believe, I don't know if, if he

25  was sincere or if he was trying to make up covers but,

NIZIANKIEWICZ & MILLER REPORTING SERVICE

1    I don't know, wasn't sure, and he reached out and I

2    shook his hand.  He went off to work and then when Jan

3    came in, Jan Marciano, my boss, I reported the

4    incident to her.

5        Q    So even after he apologized you reported it

6    anyway?

7        A    Yes.

8        Q    Mike was suspended, the Town investigated

9    and suspended Mike for a day?

10        A    I believe so.

11        Q    Do you think he should have been suspended

12    for more than a day?

13        A    Taking all, yes, not Mike personally,

14    nothing against him personally.  I'm saying any, I'll

15    put it this way, if I did that, I believe I'd be out

16    of a job today.

17        Q    Okay.  I understand that you may think

18    that.  So you think the Town's suspension wasn't long

19    enough, even though Mike apologized?

20        A    The following day there was a meeting

21    downtown to discuss what happened and I went to the

22    meeting and on the foot of the Town Hall, the first

23    step, my union president was there and first thing he

24    told me he says, Rich Tingle refuses to testify.  And

25    I said -- I was shocked, you know.  Even though I had

NIZIANKIEWICZ & MILLER REPORTING SERVICE

112

```
1    was long enough?
2         A     I think it, like if I did that, I would
3    expect a lot more than that.
4         Q     Is Mike your supervisor?
5         A     No.
6         Q     Co-worker?
7         Q     What was your grade and title as of
8    February 7th, 2001?
9         A     Operator one.
10        Q     What was Mike's title?
11        A     Operator one.
12        Q     So this is a dispute between two
13   co-workers?
14        A     I wouldn't say it's a dispute.
15        Q     It's a disagreement?
16        A     No.
17        Q     What is it?
18        A     I feel it was an attack on me.  There was
19   no -- I didn't see a dispute.  I don't know if that
20   would fit.
21        Q     Now, have we fully described all of your
22   altercations with Conklin?
23        A     I believe so.  Actually, I wouldn't even --
24   altercation is a two-way thing, isn't it?
25        Q     I don't want to get into a debate.  You're
```

NIZIANKIEWICZ & MILLER REPORTING SERVICE

118

1      Q      I'm trying to figure out what is your best

2  recollection of what you told Cunningham?  Did you

3  blow the whistle and tell Cunningham there were

4  misdeeds going on at WPC, or did you not?

5      A      He asked me questions and I told him.  I

6  didn't go to him and say there's this going on.  We

7  met, we're neighbors, we talked.  He asked me

8  questions, I told him.

9      Q      Did you tell Cunningham that you had used

10  the timecards, or had participated in the timecard

11  scheme as well?

12      A      I believe so.  I had been a part of that.

13      Q      If I were to look back say in the past

14  three years, just with an eye towards Jim Kaine, what

15  has Jim Kaine done to you in the past three years?

16  Have we already touched on it?  The day after the

17  union meeting where he called you a coward, is that

18  it?

19      A      No.

20      Q      What else?

21      A      He's told me I'm never going anywhere in

22  that department.

23      Q      So we've got two things, number one, you

24  were in a meeting with him where he called you a

25  coward or where he pursued you, and the other time he

NIZIANKIEWICZ & MILLER REPORTING SERVICE

124

1          You are suing Mike?

2      A     The reasons are laid out.

3      Q     So paragraph fifty-one, he used the word

4  beginning with a C and said "you're going down,

5  nigger" and crumbled up your timecard, so he's getting

6  sued for violation of your First Amendment Rights, for

7  assault, criminal threatening, for all of those

8  things?

9      A     As far as I know.

10     Q     How about Don Becker what has he done in

11 the past three years?

12     A     Then again, there's a lot of things that

13 haven't been reported.

14     Q     Well, that's what we're trying to do,

15 report them now.  Just in the past three years.  So

16 from December of 2001 going back.

17     A     Since the union meeting of '99 when I was

18 harassed.

19     Q     Not by Becker, though, Becker didn't talk

20 to you.

21     A     I didn't say he did.

22     Q     I'm asking about what Don did to you now.

23     A     I am saying after that there was a memo

24 sent around that there was a protest to the meeting

25 and they brought it down in the break room, the whole

NIZIANKIEWICZ & MILLER REPORTING SERVICE

1    crew was there.  And it was initiated by Don, I

2    believe, he wrote it up, it was a complaint about the

3    union.  It was a challenge to it, whatever.  Anyway,

4    the document is brought down into the room with the

5    whole crew.  I read it and I didn't sign it.

6    Everybody signed it.  So again I was the odd man out.

7            And after that, I noticed when I would come

8    in in the morning my timecard would be down at the

9    bottom, everybody else would be in succession at the

10   top.  Some days it would be backwards, some days it

11   would be -- and I can't say that Don did it for sure,

12   but he was the timekeeper who would come in early and

13   put the cards where they should be.  It led me to go

14   to my boss to ask for my own specific time slot so

15   this wouldn't happen anymore.

16        Q    We're going back three years, you've sued

17   Mr. Becker and so far all you can say is you think he

18   might have turned your timecards around backwards?

19        A    And whatever else is articulated in the

20   document.

21        Q    No.  Because the document doesn't deal with

22   anything in the past three years, other than I guess

23   him accusing you of leaking to Cunningham at the

24   meeting.

25        A    Yeah.


              NIZIANKIEWICZ & MILLER REPORTING SERVICE

1   STATE OF CONNECTICUT:

2                        ss.

3   COUNTY OF HARTFORD   :

4              I, Susan Lemire, R.P.R., C.S.R., a

5   Notary Public for the State of Connecticut, do hereby

6   certify that the deposition of RICHARD MALLETT, was

7   taken before me pursuant to Notice, at the office of

8   Eisenberg, Anderson, Michalik & Lynch, 136 West Main

9   Street, New Britain, Connecticut, commencing at 1:17

10  p.m., on December 4, 2001.

11             I further certify that the witness was

12  first sworn by me to tell the truth, the whole truth,

13  and his testimony stenographically reported by me and

14  subsequently transcribed as hereinbefore appears.

15             I further certify that I am not related

16  to the parties hereto or their counsel, and that I am

17  not in any way interested in the event of said cause.

18             Dated at South Windsor, Connecticut

19  this 12th day of December, 2001.

20

21

22             _____
                           Susan Lemire
23                 Certified Shorthand Reporter
               Registered Professional Reporter
24                        Notary Public

25  My Commission Expires October 31, 2003.


          NIZIANKIEWICZ & MILLER REPORTING SERVICE