**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
-------------------------------------------x
                                           )
RICHARD B. MALLETT,                        )         CIVIL ACTION NO.
            Plaintiff                      )         3:01 CV 1137 (AHN)
                                           )
VS.                                        )
                                           )
TOWN OF PLAINVILLE, ET AL.,                )         September 30, 2004
            Defendants                     )
                                           )
-------------------------------------------x
```

<u>**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**</u>

The Defendants, Town of Plainville, John Bohenko, Robert Jackson, Shirley Osle,

Robert Jahn, and Janet Marineau, (hereinafter, "the Town Defendants") hereby submit this

Memorandum in support of their Motion for Summary Judgment as to the First, Second,

Third, Fifth, Sixth, Seventh, and Eighth Counts.

<u>**I. FACTUAL BACKGROUND**</u>

The Complaint, in about 90 factual paragraphs, reads like a diary of every issue or

troubling occurrence experienced by the Plaintiff since his date of hire in 1990, including

sporadic name-calling such as F-ing queer, c-t, and nigger.  A reading of the Complaint and

the deposition of Mr. Mallett reveals that the litany of complaints focuses on one or two co-

workers who complained about Mr. Mallett's and other's work performance, and who

allegedly "conspired" to "shun" him in response to a variety of events like standing up to one

of them in 1991 or 1992, not attending a certain union meeting in 1999, and supposedly disclosing information to his neighbor regarding employee attendance practices and time card issues.  In most of the circumstances of conflict between Mallett and his co-workers, he did not complain to the Town or its supervisors at all.  The Town took no adverse action whatsoever against the Plaintiff.  The Plaintiff filed suit rather than return to work after being released by his doctors from workers compensation  (hernia) status.  After exhausting his paid sick leave, which ran out in April, 2002, he did not return to work and was deemed to have voluntarily resigned.  The single complaint that was grieved through the union and decided by an arbitration panel under the Collective Bargaining Agreement resulted in the denial of the grievance.  Finally, the Plaintiff himself has acknowledged in his deposition that none of the individual Town Defendants retaliated, harassed or defamed him in any way.

The Plaintiff has also alleged a denial of training (¶ 37), an assignment to "Siberia" (¶ 38), the withdrawal of a "promotion" (¶ 48), and a denial of overtime opportunities on two days (¶ 49).  There is no allegation that any of these routine employment grievances are causally related to any of the allegations of harassment that otherwise dominate the Complaint.  The Plaintiff has not complained to the Town or its management employees about these routine matters, with the exception of the overtime issue, regarding which a grievance has been filed on his behalf by Local 1303-56 pursuant to the Collective Bargaining Agreement.

2

More specifically, in the 1990-June, 1993 timeframe, Mr. Mallett claims that he, among other employees of the Water Pollution Control Department (WPC), was unjustly criticized for his performance by two certain non-supervisory employees, Mr. Becker and Mr. Kaine.  The plaintiff claims to have observed Mr. Becker criticizing both himself and other employees, in staff meetings, for their job performance. (Depo. of Mr. MaIlett, December 4, 2001, pp. 39, 41, 42, 49, 76, Exhibit A; July 20, 2004, pp. 39-40, Exhibit B)  The Plaintiff believes that some people on the WPC crew considered him to be of less than a certain level of competence, and that this was a reason for "retaliation."  (Depo. Of Mr. Mallett, July 20, 2004, pp. 85-6, Exhibit B).  The plaintiff believed that there was an effort to convince management that he was incompetent and unsafe.  Yet he acknowledges that management never disciplined, warned or in any way punished Mr. Mallett because of what anybody allegedly said about him that was untrue or false.  (Depo. Of Mr. Mallett, July 20, 2004, pp. 119, 121-22, Exhibit B).

On or about September 14, 1992, with representation by an attorney, Mr. Mallett signed a Stipulation for Agreement and Award through the Workers Compensation Commission for the Sixth District by which Mr. Mallett settled all claims with respect to harassment and abuse by co-employees, accepted a job in the Department of Public Works, and received other good and sufficient consideration.  (Affidavit of Shirley Osle, Exhibit C, with Attachment 1 thereto)  The plaintiff does not believe that the Town did anything wrong

in reassigning him back to the position of Operator I at the WPC in 1993.  (Depo. Of Mr.

Mallett, July 20, 2004, p. 45, Exhibit B).

The only individual Town Defendant mentioned in this series of allegations

(Complaint, Pars. 1-27) is the former Town Manager, John Bohenko, who reached a workers

comp agreement with Mr. Mallett that continued his employment, and who returned him to

the WPC job at his request.

Between June, 1993 and August, 1995, Mr. Mallett claims to have been the object of

name-calling and of more unjust criticism of his performance by co-workers, which he refers

to as harassment.  The plaintiff alleges that, in August of 1993, he was interviewed at length

by then Town Manager John Bohenko, and that he offered information concerning Mr.

Becker's alleged harassment of a co-employee (Patricia Cassidy) as well as information

concerning Mr. Becker's alleged harassment of Mr. Mallett himself. (Complaint, Par. 33;

Depo. of Mr. Mallett, December 4, 2001, p.61-64, Exhibit A; July 20, 2004, pp. 47-50,

Exhibit B).  On or about September, 1993, Mr. Becker was suspended for three days.

(Complaint, Par. 31; Answer, Par. 31).  At the August, 1995, arbitration hearing on Mr.

Becker's grievance challenging his three day suspension, which suspension had emanated

from the investigation that included the Bohenko-Mallett interview, Town Manager Bohenko

solicited Mr. Mallett's opinion regarding a resolution of the arbitration, and Mr. Mallett

agreed to the proposed resolution.  (Complaint, Par.36; Depo. Of Mr. Mallett, December 4,

2001, pp. 81-2 Exhibit A; July 20, 2004, p. 52, Exhibit B).  The plaintiff did not file a claim

with the EEOC or the CHRO either for the claimed harassment by Mr. Becker or for any

retaliation claimed to have been caused by Mr. Mallett's participation in Town Manager

Bohenko's investigation of both his and Ms. Cassidy's complaints. (Depo. of Mr. Mallett,

December 4, 2001, p. 63-4, Exhibit A).

The plaintiff claims to have filed a grievance against Mr. Becker for allegedly placing

miscellaneous rags and refuse papers up on a general bulletin board. (Complaint, Par. 33;

Depo. of Mr. Mallett, December 4, 2001, p. 65-66, Exhibit A).  However, the plaintiff

acknowledged not filing any grievance over this  (Depo. Of Mr. Mallett, July 20, 2004, p.

177, Exhibit B), and he does not recall complaining to any supervisor regarding the alleged

posting of harassing messages on the bulletin board.  (Depo. Of Mr. Mallett, July 20, 2004, p.

178, Exhibit B).  The Plaintiff claims to have filed numerous grievances against Mr. Kaine in

May, 1994 (Complaint, Par. 34), yet, he does not believe, or cannot remember filing

numerous grievances with the Town against the defendant Kaine, based on his belief that Mr.

Kaine misused town property. (Depo. of Mr. Mallett, December 4, 2001, p. 67, Exhibit A July

20, 2004, pp. 21-2, Exhibit B).

Specifically, the plaintiff believed that Mr. Kaine misused town property when: (1)

with the WPC's permission, Mr. Kaine used his own gym equipment while at a town garage;

and (2) with the WPC's permission, he kept a dog at the garage during the daytime. (Depo. of

Mr. Mallett, December 4, 2001, p. 69-73, Exhibit A).  However, the Plaintiff had known about and used the gym equipment for three or four years, and he had contributed to the dog's upkeep.  Id.  The plaintiff does not recall reporting or complaining to anyone in management about either the gym equipment or the pit bull.  (Depo. Of Mr. Mallett, July 20, 2004, pp. 177-78, Exhibit B).  If the plaintiff ever did report anything about the gym equipment or the pit bull to management, he was not mistreated or punished by the Town in any way for mentioning these things.  (Depo. Of Mr. Mallett, July 20, 2004, p. 113, Exhibit B).

During the period August, 1995, until June, 1999, Mr. Mallett alleges no harassment or problems with anyone working for the Town.  Complaint, Par. 36, 37.

The plaintiff next claims that he was offered training toward lab certification by Jan Marineau and Richard Tingle; that the "Defendants" consistently denied him training, and that he was replaced by another employee as the back-up lab technician.  (Complaint, Count One, Par 37).  The plaintiff claims that he volunteered to be the part time helper in the lab in 1995, and that he did "sampling," and washed dishes for a few years on and off, without any change in his rate of pay. (Depo. Of Mr. Mallett, July 20, 2004, pp. 82-84, Exhibit B).   The plaintiff claims that he was rotating in this role with another employee, and that he asked for more lab time because he made mistakes on tests.  (Depo. Of Mr. Mallett, July 20, 2004, pp. 96-97, Exhibit B).  The plaintiff does not know who actually reduced his lab time, or the reasons for the decrease. (Depo. of Mr. Mallett, December 4, 2001, p. 84, Exhibit A).   The plaintiff

speculates that it could have been the defendant, James Kaine. (Depo. of Mr. Mallett, December 4, 2001, p. 84, Exhibit A); and he also believes that Tingle wanted him out of the lab (Depo. Of Mr. Mallett, July 20, 2004, p. 65, Exhibit B), and that the decision was Tingle's (Depo. Of Mr. Mallett, July 20, 2004, p. 176, Exhibit B).  It "appeared" to the plaintiff that he was replaced as the back-up lab helper by, and because, another employee had worked on the lab director's [Tingle's] car (Depo. Of Mr. Mallett, July 20, 2004, p. 65, Exhibit B), or that Tingle conspired with several other WPC crew members to get him out, all because he did not attend and vote at a certain union election in November, 1999. (Complaint, Par. 40; Depo. Of Mr. Mallett, July 20, 2004, p. 65-69, Exhibit B).  The plaintiff did not receive any additional compensation for the role of back-up lab helper, and he did not complain to Jan Marineau about either the compensation or being relieved of this additional role.  (Depo. Of Mr. Mallett, July 20, 2004, pp. 84-5, 107-8, Exhibit B).  The Town encouraged Mr. Mallett to receive more training, helped him to get it, together with various certifications in waste water management.  (Depo. Of Mr. Mallett, July 20, 2004, p. 100, 111-12, Exhibit B; Affidavit of Janet Marineau).  The plaintiff did not ask Jan Marineau why he was no longer the back-up lab helper, and he did not make any complaint, including a grievance, over this,  (Depo. Of Mr. Mallett, July 20, 2004, pp. 107-8, Exhibit B), yet Ms Marineau had told him about his testing deficiencies and had offered both more course training and that he be second back-up in the lab.  (Affidavit of Janet Marineau, Exhibit D).  In November, 1999, the plaintiff claims

that the defendant, James Kaine, assigned him to a job at an isolated facility called "Siberia" for a four-month period of time. (Complaint, Count One, Par. 38).  The plaintiff <u>speculates</u> that it was to get him away from the hostilities of the plant. (Depo. of Mr. Mallett, December 4, 2001, p. 85, Exhibit A).  "Siberia" is the nickname for a certain WPC facility that was staffed at any one time by one person. Employees in the Operator I and Operator II classifications received assignments to "Siberia" from time to time, and the assignments could last for weeks to months at a time.  The plaintiff does not know the length of any other employee's assignments to "Siberia."  The plaintiff did not complain about this assignment. (Depo. Of Mr. Mallett, July 20, 2004, pp. 35-38, 89, Exhibit B).  In fact, the plaintiff was assigned to "Siberia" from December 20, 1999 until January 21, 2000 (five weeks).  For the period August, 1999 through March, 2000, five employees served in "Siberia," with the Defendant Michael Conklin serving the single longest stint, at seven weeks.  Mr. Mallett never complained about this assignment, and there was nothing unusual about it.  (Affidavit of Janet Marineau, Exhibit D)

 The plaintiff claims to have disclosed some information to a Town resident concerning his knowledge of time card abuses. (Depo. of Mr. Mallett, December 4, 2001, p. 94, Exhibit A).  The plaintiff does not recall giving Mr. Cunningham any specific information (Depo. Of Mr. Mallett, July 20, 2004, pp. 128, Exhibit B), and he only "may have spoken" to someone about time cards.  <u>Id</u>., at p. 114.  The plaintiff's motivation for answering Mr. Cunningham's

8

questions was that he was not happy with the way the place had been run for years. (Depo. of Mr. Mallett, December 4, 2001, p. 100, Exhibit A).

On or about August 25, 2000, during a crew meeting, the defendant, Mr. Becker, allegedly accused the plaintiff of leaking information to a Town resident regarding time card abuses by certain WPC employees. (Complaint, Count One, Par. 44). In the meeting, Mr. Mallett did not agree or disagree with the accusation, and he made it a point not to speak in the meetings. (Depo. Of Mr. Mallett, July 20, 2004, pp. 128, 116, Exhibit B). The plaintiff does not remember telling Shirley Osle, Robert Jackson, Robert Jahn, or Janet Marineau about his having spoken with Mr. Cunningham. (Depo. Of Mr. Mallett, July 20, 2004, p. 129-30, Exhibit B).

Subsequent to the issue of the time cards in the summer and fall of 2000, the plaintiff's only allegations against any individual Town Defendants is that they did not speak up for Mr. Mallett, that they did not stop Becker from speaking in staff meetings, and that they did not "come to my rescue." (Depo. Of Mr. Mallett, December 4, 2001, p. 99, Exhibit A; July 20, 2004, p. 113, Exhibit B; Complaint, Count One, Par. 44, 50). On or about October, 2000, the plaintiff claims to have been promoted to crew leader (Complaint, Count One, Par. 48). The plaintiffs promotion was rescinded the day after, allegedly due to complaints to upper management by his co-employees, Mr. Becker and Mr. Conklin. (Depo. of Mr Mallett, December 4, 2001, p. 103, Exhibit A). The plaintiff has no direct

9

evidence of this activity by the defendants. (Depo. of Mr. Mallett, December 4, 2001, p. 103-104, Exhibit A).  The plaintiff did not ask Jan Marineau why he was no longer a crew leader. (Depo. of Mr. Mallett, July 20, 2004, p. 138, Exhibit B).

The plaintiff was denied two days of leaf-raking overtime in November, 2000, and claimed that this was contrary to past practice and a union agreement.  (Complaint, Count One Par. 49) The plaintiff filed a grievance over this denial of overtime, and, by award dated April 17, 2002, an arbitration panel of the State Board of Mediation and Arbitration denied the grievance, finding that the Town had not violated a certain Memorandum of Agreement or any past practice by declining to allow Mr. Mallett to work the claimed overtime. (Depo. Of Mr. Mallett, July 20, 2004, pp. 54-57, 101, Exhibit B; Affidavit of Shirley Osle, Exhibit C, and Attachments 2 and 3, thereto).  The plaintiff does not claim that the denial of leaf-raking overtime in November, 2000 was retaliation by the Town for anything.  (Depo. Of Mr. Mallett, July 20, 2004, p. 101, Exhibit B).

On or about February 7, 2001, the plaintiff (a white male) and the defendant, Mr. Conklin, were involved in a verbal confrontation, whereby Mr. Conklin allegedly called him a "cunt" and that he was "going down, nigger." (Complaint, Count One, Par. 51).  That same morning, Mr. Conklin apologized for his words, and then the plaintiff complained to his supervisor. (Depo. Of Mr. Mallett, December 4, 2001, p. 109-110, Exhibit A).  Thereafter, on February 22, 2000, and upon Mr. Mallett's complaint, the Town suspended Mr. Conklin for

one day.  (Complaint, Count One, Par. 51; Affidavit of Janet Marineau).

The plaintiff did not report any alleged incident of harassment by Kaine to management.  (Depo. of Mr. Mallett, July 20, 2004, p. 168, Exhibit B).  The plaintiff admits to have reported only two or three instances of harassment by Becker to management, namely, the name-calling incidents in July, 1993 as alleged in Paragraphs 28 and 29 of the Complaint, and none since then.  (Depo. of Mr. Mallett, July 20, 2004, p.168-70, Exhibit B).

The plaintiff does not now of any decisions by former Town Manager Jackson with respect to his employment.  (Depo. of Mr. Mallett, July 20, 2004, p.145, Exhibit B).  The plaintiff does not remember complaining to Jan Marineau regarding any specific individuals, and does not know if she made any decisions with respect to his employment.  (Depo. of Mr. Mallett, July 20, 2004, p.145, 146, Exhibit B).   The plaintiff believes that Shirley Osle made decisions with respect to his employment but cannot remember what they might have been. (Depo. of Mr. Mallett, July 20, 2004, p.146, Exhibit B).

The Defendant John Bohenko did not retaliate against, harass, or defame Mr. Mallett in any way.  (Depo. Of Mr. Mallett, July 20, 2004, p. 99, Exhibit B).  The Defendant Robert Jackson did not retaliate against, harass, or defame Mr. Mallett in any way. Id.  The Defendant Shirley Osle did not retaliate against, harass, or defame Mr. Mallett in any way. Id. at p. 100.  The Defendant Robert Jahn did not retaliate against, harass, or defame Mr. Mallett in any way.  Id.  The Defendant Janet Marineau did not retaliate against, harass, or defame

11

Mr. Mallett in any way. (Depo. Of Mr. Mallett, July 20, 2004, pp. 100, 111-12, Exhibit B).

The plaintiff does not allege that he ever complained to management about being "physically threatened" by anyone.  (Complaint).  The plaintiff does not know in what way, if any, Defendants Bohenko, Jackson, Osle, Jahn or Marineau intended to harm him.  (Depo. Of Mr. Mallett, July 20, 2004, p. 147, Exhibit B).

From approximately March 27, 2001 until June 18, 2001, Mr. Mallett was on workers compensation leave for a hernia.  He did not return to work when released from treatment on or about June 18, 2001.  (Affidavit of Shirley Osle, Exhibit C).  From approximately June 19, 2001, through April 26, 2002, Mr. Mallett was on paid sick leave.  When his accumulated paid sick leave had been exhausted, on April 29, 2002, he did not return to his position.  There being no further leave available or applicable to him, and his not presenting for work, he was deemed to have resigned.  A letter describing this circumstance was sent to him on March 28, 2002.   (Affidavit of Shirley Osle, Exhibit C).

## II.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The movant's burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the non-

moving party's case."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  The burden then shifts to the non-movant to produce evidence "sufficient to establish the existence of [the] element[s] essential to that party's case, and in which that party will bear the burden of proof at trial."  <u>Id.</u> At 322; <u>see also</u> Fed. R. Civ. P. 56(e) (requiring that, when a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial"):

> [A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case. . . "

<u>Celotex Corp.</u>, <u>supra</u> at 323.  The non-moving party may not rely on mere allegations or a denial of the pleadings.  See, <u>Celotex Corp.</u>, <u>supra</u>, at 327.  In order to defeat a motion for summary judgment, the non-moving party must present contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

### III.  <u>Legal Argument</u>

**First Count:  The Plaintiff has failed to set forth evidence sufficient to establish a *prima facie* First Amendment retaliation claim, and the plaintiff specifically denies that any of the Town Defendants retaliated against, harassed or defamed him.**

The Plaintiff alleges harassment, defamation and retaliation for his exercise of First Amendment rights (Complaint ¶ 53, 56), specifically, for reporting "incidents of wrongdoing at the WPC." Complaint ¶ 54.

In order to establish a *prima facie* case of First Amendment retaliation, the plaintiff must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was constitutionally protected, (2) that he was subjected to an adverse employment action, and (3) that there was a causal connection between the protected speech and the adverse action, "so that it can be said that [the plaintiff's] speech was a motivating factor in the [action]." Morris v. Lindau, 196 F.3d 102 (2d Cir. 1999), citing, Mount Healthy City Sch. Dist. Bd. Of Educ. v. Doyle, 429 U. S. 274, 283-87 (1977).   In retaliation claims, the plaintiff must also allege and prove that the specific decision-maker/retaliator, and not merely the employer generally, had actual knowledge prior to the alleged adverse action. Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2nd Cir. 1993).

### 1.	The Plaintiff's "Speech" was not protected under the First Amendment

In determining a public employee's First Amendment rights, the court must seek "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Connick v. Myers, 461 U.S. 138, 142 (1983), quoting, Pickering v. Board of Education, 391 U.S. 563, 568 (1968). "A public

employee's right to freedom of speech is not absolute." <u>Bernheim v. Lift</u>, 79 F.3d 318 (2nd

Cir. 1996). "[W]hen a public employee speaks not as a citizen upon matters of public concern,

but instead as an employee upon matters only of personal interest, …...a federal court is not

the appropriate forum in which to review the wisdom of a personnel decision taken by a

public agency allegedly in reaction to the employee's behavior." <u>Connick</u>, 461 U.S. at 147;

<u>Bernheim</u>, <u>supra</u>. "Whether an employee's speech addresses a matter of public concern must

be determined by the content, form, and context of a given statement...." <u>Connick</u>, 461 U.S. at

147-48.

      In the instant case, the plaintiff alleges four instances in which he purportedly

exercised his First Amendment rights: (1) in 1193, he reported harassments and threats that

were directed to himself, (2) in 1993, he provided information against the defendant Becker in

an instance of harassment to a co-employee, (3) he <u>may</u> have filed two grievances in May of

1994 against the defendant Kaine for misuse of town facilities, and (4) he leaked information

to a town resident regarding WPC employee time card abuses.   Even if the plaintiff acted in

any of these ways, none of this constitutes protected speech.

      Speech is protected when an employee is acting as a citizen on a matter of public

concern; however, the speech is not protected when the speech is made purely for personal

reasons <u>See</u>, <u>e.g.</u>, <u>Connick</u>, 461 U.S. at 153-54. Even though "an employee's speech [may

touch] on matters of public concern [it still] will not render that speech protected where the

15

employee's <u>motive</u> for the speech is private and personal." (emphasis added) <u>Blum v. Schlegel</u>, 18 F.3d 1005 (2nd Cir. 1994).

The plaintiff's report of instances of unjust criticism of his work performance, and of the name-calling in 1993, occurred only when he was interviewed by then Town Manager Bohenko in 1993 in the context of an investigation of allegations focusing on another employees, Patricia Cassidy. The plaintiff's complaints did not touch on a matter of public concern, and are not protected. <u>See</u>, <u>Connick</u>, 461 U. S. at 147; <u>see</u> e.g., <u>Saulpaugh v. Monroe Community Hosp</u>., 4 F.3d 134 (2d Cir. 1993) (internal complaint of sexual harassment motivated by individual employment situation and therefore not protected under First Amendment); <u>Yatvin v. Madison Metropolitan School Dist.</u>, 840 F.2d 412 (7th Cir. 1988) (sex discrimination lawsuit is not a matter of public concern where the plaintiff did not attempt to debate the issues of sex discrimination).

The plaintiff did not file any grievances regarding Becker's alleged messages on a bulletin board or Kaine's misuse of Town property, but even if he did, such grievances were not matters of public concern and were motivated by his own employment situation. The plaintiff had long known of the gym equipment and dog circumstances at the WPC, but did not report the same, if at all, except when he thought that he was receiving disparate treatment.

With respect to any conversation the plaintiff had with his neighbor over time cards,

the context and intent of the speech demonstrates that it is not protected.  The plaintiff claims to have merely responded to the neighbor's questions, he did not seek out the neighbor to expose any wrongdoing.  He does not recall speaking about time cards.  Thus, the speech was in the context of casual conversation between neighbors, and the plaintiff was not motivated as a citizen to speak on a matter of public concern.  Therefore, the speech is not protected. See, Connick, supra; Blum, supra.

Finally, the plaintiff's speech to his neighbor was not protected in light of the Town's interests in running an efficient department.  See, Connick, 461 U.S. at 142, quoting Pickering, 391 U.S. at 568.  The plaintiff understood how to communicate with the Town, to achieve results to his liking, e.g., the interview with Bohenko that led to Becker's discipline, yet he chose an alternative medium in this instance to expose alleged wrongdoing by fellow employees.  By leaking information to a neighbor, versus reporting supposed timecard abuses directly to any of his supervisors like Osle, Marineau, Jackson or Jahn, who he admits had never retaliated against or harassed him themselves and regarding whom he never worried about retaliation, he disrupted and distracted the Department, *vis*, the commotion in staff meetings, undermined his supervisor's authority, precluded the Town from having the best opportunity to conduct its own investigation absent an FOI request, media and Town scrutiny, and threatened the overall authority of the Town to manage the WPC effectively.

Notably, there is a complete and conspicuous absence of any allegation that the

Plaintiff actually spoke, reported, or communicated in any way with anyone in the matter of the WPC time cards, Complaint, ¶¶ 43-50, or that, if he did, the Town Defendants ever knew of any such communication.   In any event, there is no allegation that the Town Defendants knew, or had any way of knowing, that he "reported" or leaked anything regarding the time cards.   The plaintiff did not disclose such communications to any of the individual Town Defendants  (Depo. Of Mr. Mallett, July 20, 2004, p. 129-30, Exhibit B), and, in the staff meetings, he never spoke, and never acknowledged having anything to do with the neighbor. The individual Town Defendants not having known of any protected activity, they could not have acted adversely to the plaintiff on account of that activity.  See, Cosgrove, supra.

> **2.**    **The Plaintiff has not alleged, and cannot prove, any adverse employment action.**

An  adverse  employment  action  is  a  "materially  adverse  change  in  the  terms  and conditions of employment."  Galabya v. New York City Bd. Of Educ., 202 F.3d 636, 640 (2d Cir. 2000)   To  be  "materially  adverse,  a  change  in  working  conditions  must  be  more disruptive  than  a  mere  inconvenience  or  an  alteration  of  job  responsibilities."  Id.; cf., Torres v. Pisano, 116 F.3d 625, 640 (2d Cir. 1997) (feeling "frightened" or "intimidated" is irrelevant if  there  is  no  "materially  adverse  change  in  the  terms  and  conditions  of  employment"); see also,  Morris v. Lindau,  196 F.3d 102 (2d Cir. 1999);  Gronne v. Apple Bank for Savings, 2000WL  298914  (E.D.N.Y.,  2000)  (purely  subjective  feelings  about  an  allegedly  adverse

18

employment action do not control; otherwise, "every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.")

With respect to the more recent time card issue, and apart from the absence of any allegations either that the Plaintiff spoke or that the Town Defendants knew that he spoke, there is a dearth of material adverse employment action that could possibly be related to such known exercise of a right. The only two alleged acts of the Town Defendants (other than not quieting Becker, ¶ 50) that followed any presumed speech of the Plaintiff (summer, 2000) were an alleged "promotion" in October, withdrawn the next day (¶ 48), and a denial of "overtime opportunities" on two days in November (¶ 50). The denial of two overtime "opportunities" is not a material adverse employment action. Further, the absence of a "promotion" or assignment for more than one day—a "promotion" or assignment to which the Plaintiff does not allege an entitlement, let alone a request, which is not a change of position, and which did not involve additional compensation —likewise does not constitute a materially adverse employment action. There is no allegation that these acts were in any way related to any alleged speech by the Plaintiff.

To the extent that the material adverse employment action that the Plaintiff has in mind is the Town Defendants' failure to change or to correct the behavior of his co-workers, this cannot constitute adverse employment action. See, Munday v. Waste Management, Inc., 126 F.3d 239, 243 (4th Cir. 1997); Manning v. Metropolitan Life Ins. Co., 127 F.3d 686, 692

19

(8th Cir. 1997) (holding that personal animus by employees and supervisors toward plaintiff could not as a matter of law be considered adverse employment action.)  "Ordinary workplace strife" cannot constitute adverse employment action.  Matvia v. Bald Head Island Management, Inc., --F.3d—(4th Cir. 8-8-2001) (ostracizing and vilifying behavior by co-workers toward the plaintiff in retaliation for her participation in a sexual harassment investigation is not a material adverse employment action.)  The sporadic incidents of name-calling or postings on a bulletin board do not rise to the level of a constitutional violation.  "[T]he law is ineffective to compel friendship or courtesy."  Diesel v. Town of Lewisboro, 232 F.3d 92, 104 (2d Cir. 2000).1

        In fact, the only adverse action the plaintiff could identify focused on "lost opportunities," by which he meant the back-up lab role and the "lost opportunity to interact with people."  (Depo. July 20, 2004, pp. 122, 60-61, Exhibit B).  It was not treatment by management, but treatment by co-workers that allegedly had an adverse impact on his career and life.  Id. at p. 123.  According to the plaintiff, management simply could have taken

---

1 Plaintiff's counsel has spoken the phrase "constructive discharge" in conferences. The plaintiff has failed to allege a claim of constructive discharge at all, and any claim now should be declined on pleading grounds. Nevertheless, the Defendants address the plaintiff's failure to satisfy the strictures of constructive discharge.  "To establish a 'constructive discharge,' a plaintiff must show that the employer 'deliberately ma[de her] working conditions so intolerable that [she was] forced into an involuntary resignation.'" Stetson v. Nynex Serv. Co., 995 F.2d 355, 360 (2nd Cir. 1993) (quoting Pena v. Brattleboro Retreat, 702 F.2d 322, 325 (2nd Cir. 1983)); Chertkova v. Connecticut General Life Insurance Co., 92 F.2d 81, 89 (2nd Cir. 1996).  A constructive discharge is not established through evidence that an employee was dissatisfied with his assignments, or that conditions were difficult or unpleasant. Stetson, 995 F.2d at 360; Pena, 702 F.2d at 325-26; Spence v. Maryland Cas. Co., 995 F.2d 1147, 1156 (2d Cir. 1993) The employee's subjective perceptions are not determinative.  Victory v.

action that would have helped him from suffering.  Id. at p. 147.  None of these circumstances is an adverse employment action by the Town or its supervisors, the Town Defendants herein.

      **3.**      **There is no evidence of a causal connection between the Plaintiff's claimed protected speech and an adverse employment action.**

Assuming, *arguendo*, that the plaintiff was engaged in speech and that he suffered an adverse employment action, he cannot establish the third element of his *prima facie* case.  To establish the causal connection, the plaintiff must show that his speech was a "substantial motivating factor" behind the adverse employment action.  See Washington v. County of Rockland, 373 F.3d 310, 321 (2d Cir. 2004), citing, Deters v. Lafeunte, 368 F.3d 185, 190 (2d Cir. 2004).  "To do so, plaintiff must aver some 'tangible proof' demonstrating that [his] protected speech animated [the adverse employment action].  Id.  The plaintiff "may not rely on conclusory assertions or retaliatory motive."  Id.

Crucially, in his deposition, the plaintiff directly disavowed any retaliation, harassment or defamation on the part of the Defendants Bohenko, Jackson, Osle, Jahn and Marineau.  (Depo. Of Mr. Mallett, July 20, 2004, pp. 99-100, 111-12, Exhibit B).  This is not truly surprising given the entire focus of the Complaint on the alleged antagonism of his co-workers, and the dearth of allegations of harm at the hand of any of the individual Town Defendants.

---

Hewlett-Packard Co., 34 F.Supp.2d 809, 826 (E.D.N.Y. 1999).  The plaintiff has failed to offer any evidence whatsoever that the Town of its managers deliberately made his working conditions intolerable.

### 4. The Town Defendants are entitled to qualified immunity.

Assuming, *arguendo*, that the plaintiff has established a *prima facie* case, then they are entitled to summary judgment on the grounds of qualified immunity. See <u>Harlow V. Fitzgerald</u>, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982). The defense is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." <u>Saucier v. Katz</u>, 533 U.S. 194, 200-201, 121 S.Ct. 2151 (2001), *quoting,* <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985).

The summary judgment standard to be applied was articulated in <u>Lennon v. Miller</u>, 66 F.3d 416, 422 2nd Cir. 1995), as follows:

> To establish qualified immunity, a defendant must demonstrate either that his conduct did not violate any of the plaintiffs.. .clearly established rights, …that would have been known to a reasonable person or that it was objectively reasonable for him to believe that his.. .actions did not violate any of those clearly established rights.

<u>Lennon</u>, 66 F.3d at 422. The availability of this defense does not depend on whether the plaintiffs rights were in fact violated. See <u>Id</u>. "Even where a right is clearly established, a defendant may enjoy immunity if it was objectively reasonable for the official to believe that his acts did not violate that right." <u>Kaluczkv v. City of White Plains</u>, 57 F.3d 202 (2d Cir. 1995). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Saucier</u>, 533 U.S. at 202. "[T]he right allegedly violated must be

22

defined at the appropriate level of specificity before a court can determine if it was clearly established." Id.

In order to be liable under a First Amendment retaliation theory, the plaintiff must prove both that the defendants retaliated against him on account of protected speech and that the speech at issue was "clearly established" as protected speech. As a matter of law, the plaintiff's internal complaints, to the extent that there were any, were not clearly established as protected speech. See Saulpaugh, supra. Similarly, the defendants are not aware of any precedent within the Second Circuit that would indicate that the plaintiff's other conduct was clearly established at the time as protected speech. The law does not require municipal employees to guess or speculate as to the state of the law. Therefore, where, as here, the subject matter of the plaintiff's claim was not clearly established as protected speech, the defendant is entitled to summary judgment.

Accordingly, this count should be dismissed as to all Town Defendants.

**Second Count: The Plaintiff has failed to set forth evidence of any violation of due process rights, and he has failed to exhaust his administrative remedies.**

    **1.  The Plaintiff does not state a violation of procedural due process.**

The Plaintiff alleges a deprivation of liberty without due process of law by the Defendants' carrying out of a pattern of outrageous conduct including harassment, failing to act upon plaintiff's complaints, and disparaging plaintiff in his workplace (¶ 65), and a

deprivation of a fair and meaningful opportunity to be heard (¶ 67).  The plaintiff has not identified the liberty interest that he contends he was denied. Assuming *arguendo,* however, that the plaintiff's allegation that the defendants disparaged him is an attempt to set forth a liberty interest claim based on loss of reputation or good name, his claim must fail.

The United States Supreme Court has repeatedly held that a claim of defamation is not actionable under the Fourteenth Amendment. See Siegert v. Gilley, 500 U.S. 226,111 S.Ct. 1789 (1991); Paul v. Davis, 424 U.S. 693,96 S.Ct. 1155 (1976). "Defamation, by itself, is a tort actionable under the laws of most States, but not a constitutional deprivation." Siegert, 500 U.S. at 233.

The term "liberty," as guaranteed by the Fourteenth Amendment, denotes freedom from bodily restraint.  Board of Regents v. Roth, 408 U.S. 564, 572,92 S.Ct. 2701 (1972). Conversely, the infliction of a stigma on a person's reputation, absent more, does not constitute a liberty interest; the alleged defamation by a public official must be accompanied by a "tangible injury" such as a loss of employment to invoke the protections of the Fourteenth Amendment. See Paul, 424 U.S. at 701-10. In other words, "[d]ue process is only implicated when there is 'stigma plus,' that is to say a loss of reputation 'coupled with some other tangible element.'" Morris v. Lindau, 196 F.3d 102, 114 (2nd Cir. 1999).

Once again, as a matter of fact, the plaintiff has directly disavowed any retaliation,

harassment or defamation on the part of the Defendants Bohenko, Jackson, Osle, Jahn and Marineau.  (Depo. Of Mr. Mallett, July 20, 2004, pp. 99-100, 111-12, Exhibit B).  The focus of any defamation, as virtually every other complaint, is on the co-worker defendants.

Assuming, *arguendo*, that the plaintiff claims that some liberty interest in his employment was violated, that claim must fail.  Huntley v. Community School Board of Brooklyn, 543 F.2d 979, 985, 986 (2d Cir. 1976).  In Board of Regents v. Roth, 408 U. S. 564 (1972), the Supreme Court held that a non-tenured professor did not have his liberty interests infringed when he was not rehired by the defendant.  In the instant case, the Town Defendants have not deprived the Plaintiff of his right to engage in any of the common occupations of life; the Town did nothing to prevent either his continued employment by the Town or his employment by any other employer.

In Huntley, public charges of professional incompetence were leveled against an acting school principal during the course of his termination.  Such public charges by the school board and its superintendent, without affording the plaintiff the prior opportunity to be heard, imposed on him a stigma that foreclosed his freedom to take advantage of other employment opportunities.  543 F.2d at 985-86.  In sharp contrast to Huntley, the Plaintiff herein was not the object or victim of any stigma created by the Town Defendants, was never accused of any wrongdoing by any Town Defendants, and was never deprived of any

employment opportunities by the Town Defendants.

Where there is only evidence of a <u>de minimus</u> change in responsibility, there is no deprivation of legal right or status. <u>Morris</u>, <u>supra</u>, quoting <u>Valmonte v. Bane</u>, 18 F.3d 992, 1000 (2d Cir. 1994). "Personnel decisions short of termination do not constitute a deprivation under the due process claim of the Fourteenth Amendment." <u>Wargat v. Long</u>, 590 F. Supp. 1213, 1215 (D. Conn. 1984). In <u>Wargat</u>, the plaintiff alleged a due process deprivation when he was transferred from one assignment to another. The District Court rejected the plaintiff's constitutional claims by concluding that the "constitution must not be trivialized by being dragged into every personnel dispute in state and local government." <u>Id</u>. (internal citations and quotations omitted). In this case, the plaintiff was not subject to a negative employment action by any of the individual Town Defendants.

Finally, just what "fair and meaningful opportunity to be heard" the Plaintiff was deprived of, or ever sought or desired, and for what possible purpose, remain matters of pure speculation. The plaintiff admits to not having reported to management virtually any of the slights or anxieties of which he now complains, and to not speaking in staff meetings, though he also admits that he never feared any retaliation from the supervisors to whom he could have complained.

**2. The Plaintiff has failed to state a violation of substantive due process.**

26

Assuming, *arguendo*, that Count Two can be read to include a substantive due process claim, the defendants are nonetheless entitled to summary judgment.

Substantive due process has been extended to those rights that are "fundamental" and "implicit in the concept of ordered liberty." Palko v. Connecticut, 302 U.S. 319, 325 (1937). The Supreme Court has been reluctant to expand the scope of substantive due process. See Albright v. Oliver, 510 U.S. 266, 271-72, 114 S.Ct. 807 (1994). Protection has generally been afforded only "to matters relating to marriage, family, procreation, and the right to bodily integrity." Id. at 272. In a due process challenge to abusive conduct by a state actor, the court must determine "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." County of Sacramento v. Lewis, 523 U.S. 833, 848, 118 S.Ct. 1708 (1998). "[M]inor discomfort and hurt feelings do not make a federal case." Wise v. Pea Ridge Sch. Dist., 855 F.2d 560, 565 (8th Cir. 1988). It is insufficient that the conduct be "merely incorrect or ill-advised." Catanzaro v. Weiden, 188 F.3d 56, 54 (2d Cir. 1999)

Here, the plaintiff does not claim harassment or intimidation by the individual Town Defendants; rather, the only claim against these Defendants seems to be that they did not come to his rescue: that they did not stop his co-workers from expressing animosities toward, or criticisms of him that were hurtful. There is nothing about such conduct that is brutal or

shocking to the conscience.  See Lewis, supra.  As such, any substantive due process claim must fail as a matter of law.

**Third Count:  The Plaintiff has failed to set forth evidence sufficient to support a Monell claim against the Town.**

As is evident from the Par. 73, the Third Count focuses on the Town's alleged "failures" to supervise and control the plaintiff's co-workers.  Thus, the conduct of the co-workers must itself be actionable in the first instance before the Town could become responsible for "failing" to control their conduct.  To the extent that the plaintiff has failed to set forth any cognizable claims against the co-worker Defendants under the First or Second Counts, there can be no claim, under Monell or otherwise, against the Town.  Additionally, the Plaintiff cannot prevail under the Monell doctrine.

A suit against municipal employees in their official capacities under 42 U.S.C. § 1983 is a suit against the municipal employer itself.  See, Monell v. Department of Social Sercies of the City of New York, 436 U.S. 658, 690, n.55 (1978); see also, Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993).  In order to prevail on a claim under 42 U.S.C. § 1983, a plaintiff must allege facts which, if true, would show that the governmental entity itself deprived him of his rights under § 1983, and that the deprivation was caused by a municipal policy or custom.  See Hafer v. Melo, 112 S.Ct. 358, 361-362 (1991); Oklahoma City v. Tuttle, 471 U.S. 808, 85 L.Ed.2d 791, 804 (1985).  The plaintiff must establish the existence

28

of an official policy or custom that caused the violations of the Plaintiff's rights under § 1983. <u>Dwares</u>, <u>supra</u>, 985 F.2d at 100; <u>Batista v. Rodrigues</u>, 702 F.2d 393, 397 (2d Cir. 1983) (plaintiff must show proximate cause between municipal custom or policy and the plaintiff's injury).

The Plaintiff alleges, at ¶ 72, that the undifferentiated "actions" of the undifferentiated "defendants" "were instituted, planned and conducted by policy making officials of the Town, including but not limited to Jackson, Marineau, and Osle, and became the custom, decisions, and statements of the Town . . ."   First, the Complaint is devoid of any allegation that the Defendant Jackson, the supervisor of Defendants Osle and Marineau, either knew or did not know, or did, or did not do, anything.  The only paragraph in which he is even mentioned is ¶ 6, identifying his capacity of Town Manager.  Specifically, the plaintiff has acknowledged <u>that he does not know of any decisions by Robert Jackson with respect to his employment</u>. (Depo. Of Mr. Mallett, July 20, 2004, p. 145, Exhibit B)

The plaintiff believes that Ms. Osle made decisions with respect to his employment but cannot remember what they might have been.  (Depo. of Mr. Mallett, July 20, 2004, p.146, Exhibit B).   The plaintiff does not remember complaining to Ms. Marineau regarding specific individuals, and does not know if she made any decisions with respect to his employment.  (Depo. of Mr. Mallett, July 20, 2004, p.145, 146, Exhibit B).

There is hardly an allegation against any of the individual Town Defendants that constitutes any affirmative action, let alone the institution or planning of any policy or custom.

The Plaintiff's allegations in ¶ 73 are most telling with respect to his failure to satisfy the pleading, let alone the proof, requirements of <u>Monell</u>: that unspecified constitutional rights were deprived by way of a) *failure to promulgate policies or customs* on investigations and discipline, b) failure to supervise, and c) failure to take disciplinary action.  None of these "failures" can constitute a policy or custom, and, in fact, the Plaintiff complains that there were no policies or customs.

The Complaint in this case does not contain the requisite allegations of an official policy or custom; hence, the Plaintiff cannot succeed on the merits.

**Fifth Count: The Court has no jurisdiction over state criminal statutes, the alleged FEP statute does not apply to the Town.**

The Plaintiff cites a criminal statute of the State (§ 53a-62, Threatening), and a statute that pertains only to the State of Connecticut as employer (§ 46a-71, Discriminatory practices by state agencies).  Neither of these set forth a civil cause of action against any of the defendants.

Section 53a-62, part of the Penal Code of the State of Connecticut, defines and proscribes "threatening," a Class A misdemeanor. There is no civil cause of action under the criminal statute section 53-62. <u>See,</u> <u>Torres v. Armstrong</u>, 2001 Ct. Sup. 12554 (September 6,

2001) (Thompson, J.) (no civil cause of action arising from criminal statute).  As such, summary judgment on this claim should be granted.

The Fifth Count also claims a violation of C.G.S. § 46a-71 as to the individual Town Defendants.  However, that section of the Connecticut Fair Employment Practices Act (CFEPA) applies only to state agencies. The Town is a municipal corporation, and the rest of the defendants, with the exception of the union, are municipal employees.  Complaint, Par. 2-10.

**Sixth Count: As to any Sec. 46a-60 claim against the Town, the Plaintiff has failed to exhaust his administrative remedies, and he has failed to set forth evidence sufficient to support any such claims of discrimination.**

The Plaintiff recites that the Town failed to protect him in violation of § 46a-70— another state statute that applies only to the State of Connecticut as employer.  That count also alleges a violation of § 46a-60 "as more specifically described herein" (Complaint, Sixth Count, ¶ 77), but the Complaint does not specifically describe any discriminatory activity for which this Court may grant any relief.  Section 46a-60(a) prohibits discriminatory employment practices, i.e., those that are motivated by ("because of") suspect considerations such as age, race, sex, etc.  Nowhere in the Complaint does the Plaintiff mention that any suspect consideration motivated any adverse employment action of the Town against him. Further, regardless of precisely what the Plaintiff means by his citation to § 46a-60, the Plaintiff has never filed any administrative complaint with either the Commission on Human

31

Rights and Opportunities (CHRO) or the Equal Employment Opportunities Commission

(EEOC) during the entire course of his employment by the Town.

To the extent that the remarks "fucking queer" in 1993, or "cunt" or "nigger" in 2001

might be viewed as sex, sexual orientation, or racial harassment, there are many fatal legal

deficiencies with such claims. The plaintiff cannot succeed on any claim of discrimination

under state statute due to his failure to exhaust his administrative remedies. Exhaustion of

state administrative remedies is a prerequisite to bringing a claim pursuant to CFEPA.

DeLoreto v. Ment, 94 F.Supp. 1023 (Conn. 1996); see, §§ 46a-100 and -101(a),

Conn.Gen.Stat. The Connecticut Supreme Court held in Sullivan v. Board of Police

Commissioners, 196 Conn. 208 (1985):

> Read in its entirety, the CFEPA not only defined important rights designed to rid the
> workplace of discrimination, but also vests first-order administrative oversight and
> enforcement of these rights in the CHRO. It is the CHRO that is charges by the act
> with initial responsibility for the investigation and adjudication of claims of
> employment discrimination. Failure to follow these procedures divests the court of
> jurisdiction.

"Plaintiff cannot circumvent the statutory administrative process by joining a claim for

discrimination under the state statute with their federal constitutional claims." DeLoreto,

infra. Additional deficiencies with this claim include that it is barred by the pertinent statute

of limitations, i.e., Conn.Gen.Stat. § 46a-82(e), prescribing filing within 180 days; that the

isolated, episodic nature of these remarks demonstrate that the alleged harassment is not

sufficiently severe or pervasive under <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21 (1993); see, also, <u>Perry v. Ethan Allen, Inc.</u>, 115 F.3d 143, 149 (2d Cir. 1997); <u>Alfano v. Costello</u>, 294 F.3d 365 (2d Cir. 2002) to state a claim; and that in both the 1993 and 2001 instances, the Town dealt with the remarks by interviewing the Plaintiff, disciplining the culprit, and, in 1995, without any duty so to do, consulted with the Plaintiff in terms of resolving the labor dispute over the 1993 remark.  Complaint, ¶¶ 28-32, 36, 51.  Finally, the plaintiff himself has not belief that any of the words spoken were on account of his gender or orientation.  (Depo. Of Mr. Mallett, December 4, 2001, p. 57, Exhibit A).  For all of these reasons, summary judgment should be granted to the Town Defendants on this count.

**Seventh Count: The Court has no jurisdiction over state criminal statutes, and the plaintiff has failed to establish a claim for common law assault, both generally and specifically as to the Town Defendants.**

Count Seven of the plaintiff's Complaint sets forth a claim for assault by unspecified "defendants," but references only criminal statutes Section 53a-62 (Threatening) and Section 53a-64 (Reckless Endangerment).  As discussed above, no civil action can arise from a criminal statute.   Therefore, summary judgment on Count Seven is appropriate as to all individual defendants.

Assuming, *arguendo*, that the plaintiff has attempted to bring a common law cause of action for assault, in the traditional sense, he must prove "the intentional causing of imminent apprehension of harmful or offensive contact in another." <u>Dewitt v. John Hancock Mutual</u>

33

<u>Life Ins. Co.</u>, 5 Conn. App. 590, 594 (1985); 1 Restatement (Second) Torts, §21(1965). In order to be held liable under § 21, "it is necessary that the actor intend to inflict a harmful or offensive bodily contact upon the other or a third person or put him in apprehension of such contact. Unless he acts with such intent, the actor is not liable for an assault. An assault cannot be accomplished by words alone. There must be an overt act evidencing some corporeal threat." D. Wright, J. Fitzgerald & W. Ankerman, <u>Connecticut Law of Torts</u> at § 8, p. 9.  Connecticut cases on the subject of assault as so rare that Connecticut courts have virtually discarded the classical definition of assault, and the word "assault" is often used when "battery" would be more accurate.  <u>Id</u>.

As to the individual Town Defendants, there are simply no allegations in the Complaint that any of them said, let alone did anything to cause apprehension of harmful or offensive contact with the plaintiff.  The allegation, in Par. 80, that "they" threatened to hit the plaintiff could not possibly refer to these Town Defendants, as to each of whom the plaintiff has disclaimed even retaliation, harassment and defamation.  (Depo. Of Mr. Mallett, July 20, 2004, pp. 99-100, 111-12, Exhibit B), and has, at most claimed a <u>failure to act.</u>

**Eighth Count: The alleged conduct does not support a claim for intentional infliction of emotional distress against the individual Town Defendants.**

As to the Eighth Count claiming intentional infliction of emotional distress, the Town Defendants' alleged "inaction and failure to discipline" falls far short of the extreme and

outrageous conduct required to support such a theory.  A claim of intentional emotional

distress under Connecticut law requires proof that: (1) the defendant intended or knew that

emotional distress was a likely result of his conduct; (2) defendant's conduct was extreme and

outrageous; (3) defendant's conduct caused emotional distress and  (4) the distress was

severe. Cowan v. Federal Exp. Corp., 25 F.Supp.2d 33 (Conn. 1998); Petyan v. Ellis, 200

Conn. 243, 253 (1986).  "'[L]iability has been found only where the conduct has been so

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

Id., citing Restatement (Second) of Torts § 46, cmt. d (1965); "Conduct that is merely

insulting, that reflects bad taste or judgment, or that results in hurt feeling is not enough to

maintain a cause of action for intentional infliction of emotional distress." Id.; see, also,

Martin v. Citibank, N.A., 762 F.2d 212, 220 (2nd Cir. 1985); DeLaurentis v. New Haven, 220

Conn. 225, 266-67 (1991).  According to the Restatement, a case of intentional infliction "is

one in which the recitation of the facts to an average member of the community would arouse

his resentment against the actor, and lead him to exclaim, "Outrageous!'" Mellaly v. Eastman

Kodak Co., 42 Conn.Supp. 17, 20 (1991), citing 1 Restatement (2d), Torts § 46 comment (d).

The Plaintiff alleges that the "acts and/or omissions" (¶ 81) of the Town and its

management employees constituted extreme and outrageous behavior.  Focusing on the

allegations of Town involvement from 1999 to 2001 (because of the three year statute of

limitations for intentional torts, Conn. Gen. Stat. Sec. 52-577), the Town's or individual Town Defendants' alleged conduct included: a) denial of internal lab training, Par. 37; b) assignment to "Siberia," Par. 38; c) not stopping Becker from talking in a staff meeting, Par. 44, 50; d) denial of overtime in November, 2000, Par. 49; and e) delay, and the insufficiency of the suspension of, Conklin, Par. 51. Such allegations are wholly insufficient on their face to constitute extreme or outrageous conduct beyond all possible bounds of decency.

Further, the plaintiff does not know in what way, if any, Defendants Bohenko, Jackson, Osle, Jahn or Marineau intended to harm him, but simply asserts that they could have taken action that would have helped him from suffering. (Depo. Of Mr. Mallett, July 20, 2004, p. 147, Exhibit B). Furthermore, to the extent that the plaintiff claims that the Town is vicariously liable for the intentional wrongs of the co-worker Defendants, the plaintiff has failed to allege, and has failed to set forth proof, that the conduct complained of was within the scope of the co-workers' employment by the Town. The doctrine of *respondeat superior* applies when the affairs of the principal, and not solely the affairs of the agent, are being furthered by the objectionable act. See, e.g., <u>A-G Foods, Inc. v. Pepperidge Farm, Inc.</u>, 216 Conn. 200, 208 (1990). "A master is liable only for those torts of his servant…which have for their purpose the execution of the master's orders or the doing of the work assigned to him to do." <u>Bradlow v. American Dist. Tel. Co.</u>, 131 Conn. 192, 196 (1944). "'In the course of employment' means while engaged in the service of the master, and it is not synonymous with

36

the phrase 'during the period covered by his employment.'" <u>Levitz v. Jewish Home for the Aged, Inc.</u>, 156 Conn. 193, 198 (1968) (citation omitted).  Since there are no facts to support the conclusory, implicit allegation that one or more employees were acting in furtherance of the Town's business when they allegedly harassed him to the point of intentionally inflicting emotional distress, the plaintiff has failed to state a cause of action for *respondeat superior*.

**The Defendants are entitled to summary judgment on all counts as the plaintiff has failed to exhaust his contractual remedies.**

The defendants are also entitled to summary judgment as to Counts Two, Seven and Eight because the plaintiff failed to file a grievance pursuant to the applicable Collective Bargaining Agreement.  "It is well settled under both federal and state law that a before a resort to the courts is allowed, an employee must at least attempt to exhaust exclusive grievance and arbitration procedures, such as those contained in the Collective Bargaining Agreement between the defendant and the plaintiff's Union.  <u>Hunt v. Prior</u>, 236 Conn. 421, 31-432 (1996). "Failure to exhaust the grievances procedures deprives the court of subject matter jurisdiction." <u>Id</u>. at 431, *quoting,* <u>Labbe v. Pension Commission</u>, 229 Conn. 801, 811 (1994).

> The purpose of the exhaustion requirement is to encourage the use of grievance procedures, rather than the courts, for settling disputes. A contrary rule which would permit an individual employee to completely sidestep available grievance procedures in favor of a lawsuit has little to commend it. . . . [I]t would deprive employer and union of the ability to establish a uniform and exclusive method for orderly settlement of employee grievances. If a grievance procedure cannot be made exclusive, it loses

> much of its desirability as a method of settlement. A rule creating such a situation would inevitably exert a disruptive influence upon both the negotiation and administration of collective [bargaining] agreements.

Hunt, 236 Conn. at 431-32, *quoting,* Labbe, 229 Conn. at 811-12; see also, School

Administrators Assn. v. Dow, 200 Conn. 376, 382 (1986).

The doctrine of exhaustion is not limited to breach of contract claims, but applies

equally to common law tort claims as well. See e.g., Bigio v. Montagna, 2003 Ct. Sup. 11015

(Oct. 2, 2003) (Gilardi, J.); Peters v. National Wholesale Liquidators, 2002 Ct. Sup. 2841

(Mar. 6, 2002) (Sequino, J.); Cassotto v. Winchester Board of Education, 1994 Ct. Sup.

11479, *11484 (Nov. 15, 1994) (Pickett, J.).  (Copies of each of the foregoing decisions are

appended to the Memorandum in Support of Summary Judgment of the Defendants Becker,

Kaine and Conklin, dated September 27, 2004.)

In this case, the grievance process is set forth at Article XIII of the collective

bargaining agreement. (Attachment 4 to Affidavit of Shirley Osle, Exhibit C)  Pursuant to

§13.0, "disputes and consultations on any questions arising out of the Employer-Employee

relationship" are to be handled via the grievance process."  Though he is vague, even

confused in his deposition regarding the filing of grievances, the plaintiff does plead that he

previously submitted his complaints about his co-workers to the grievance procedures,

evidencing that his concerns could be addressed through those procedures.  (Complaint,

Count One - Eight, Par. 33-34). The plaintiff, however, did not file a grievance as a result of

any the alleged conduct by any individual Defendant that occurred within the three years prior to his initiating this lawsuit, with the exception of the leaf-raking issue, previously discussed. Therefore, his common law claims of assault and intentional infliction of emotional distress, even if claimed against the individual Town Defendants in any way, are barred.

The plaintiff's §1983 due process claim (Second Count) must also fail due to the availability of the grievance procedure and the plaintiff's failure to pursue the same. The essential elements of due process are notice and an opportunity to be heard. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985). Post-deprivation grievance procedures that provide for a hearing to contest a challenged employment decision satisfy the due process requirement. See Harhay v. Town of Ellinciton, 323 F.3d 206 (2d Cir. 2003). "Although one need not exhaust state remedies before bringing a Section 1983 action claiming a violation of procedural due process, one must nonetheless prove as an element of that claim that state procedural remedies are inadequate." Marino v. Ameruso, 837 F.2d 4547 (2d Cir. 1988); Narumanchi v. Bd. of Trustees of Conn. State University, 850 F.2d 70, 72 (2d Cir. 1988). The plaintiff's failure to do so in this case is fatal to his claim.

## Conclusion

For the foregoing reasons and arguments, the Town Defendants respectfully submit that the Plaintiff's Motion for Summary Judgment should be granted in their favor on all counts.

Dated at New Britain, Connecticut, this 30th day of September, 2004.

**DEFENDANTS,**
**TOWN OF PLAINVILLE, ET AL.,**

BY: _____

Dennis G. Ciccarillo, Esquire
Fed. Bar # ct06580
Eisenberg, Anderson, Michalik & Lynch LLP
136 West Main Street
P.O. Box 2950
New Britain, CT 06050
Tel: (860) 225-8403

**<u>CERTIFICATION</u>**

I certify that a copy of the foregoing was mailed, postage prepaid, this 30th day of September, 2004 to the following counsel of record:

James S. Brewer, Esq.
818 Farmington Avenue
West Hartford, CT 06119

Alexandria L. Voccio, Esq.
Michael J. Rose, Esq.
Howd & Ludorf
65 Wethersfield Avenue
Hartford, CT 06114

J. William Gagne, Jr., Esq.
1260 Silas Deane Highway
Wethersfield, CT 06109

_____
Dennis G. Ciccarillo