**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

RICHARD B. MALLET,                                    :
                                                      :
            PLAINTIFF,                                :NO.: 3:01 CV 1137 (AHN)
                                                      :
v.                                                    :
                                                      :
TOWN OF PLAINVILLE,  ET AL.                           :
                                                      :
            DEFENDANTS.                               :NOVEMBER 19, 2004

**PLAINTIFF'S MEMORADUM IN OPPOSITION TO**
**DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

     Plaintiff, Richard Mallet, submits this Joint Memorandum in Opposition to Defendants' Town of Plainville, John Boehnko, Robert Jackson, Shirley Osle, Robert Jahn, Janet Marineau (hereinafter, "the Town Defendants") Motion for Summary Judgment, and defendants Donald Becker, James Kaine, Michael Conklin's (hereinafter, "the Individual Defendants") Motion for Summary Judgment and defendants Butch Paradis, Steven Clark, and AFSCME Local 1303-56's (hereinafter collectively, "the Union Defendants") Motion for Summary Judgment.  Defendants' Motions for summary judgment should be denied as there are genuine issues of material fact in dispute.  Defendants are not entitled to judgment as a matter of law.

I.    **PRELIMINARY STATEMENT**

     This action arises under Title 42 U.S.C. §§ 1983, 1988 and 2000e; the Civil Rights Act of 1964, the First and Fourteenth Amendments to the United States Constitution and state common law claims of intentional infliction of emotional distress.  The plaintiff withdraws the claims set forth in Counts Five, Six and Seven, for Assault and Threatening against all defendants.

1

Defendants, acting under color of state and federal law, charter, ordinance, regulation, custom or usage, have unlawfully violated plaintiff's constitutional rights to free speech and due process by retaliating against plaintiff and depriving him of his rights without due process of law, including freedom from defamation, assault, and physical threats.

## II.    FACTS

On or about March 1990, the plaintiff began working at the Plainville Water Pollution Control Department (hereinafter "WPC"). (Plaintiff's affidavit ¶ 1). Becker was the union vice president of the union while the plaintiff was employed at the WPC. Mallet Deposition, dated 7/04, p. 9. Soon after his hire, plaintiff noticed defendant Becker consuming alcohol, including beer and whiskey, while working. (Plaintiff's affidavit ¶ 2). Between March 1990 and June 1991, plaintiff was witness to multiple incidents of harassment by Becker targeting other employees at the WPC. (Plaintiff's affidavit ¶ 3).   On or about June 1991, plaintiff himself was harassed and threatened by Becker while at the WPC.  Following this harassment, plaintiff reported the accumulated incidents to his supervisors.  (Plaintiff's affidavit ¶ 4).  After he was reported, Becker continued to harass the plaintiff, telling plaintiff he should leave if he didn't't like the way the WPC was run, and that it was either "my way or the highway." (Plaintiff's affidavit ¶ 5).

Defendant Kaine was an operator II from the time the plaintiff was hired in 1990, which required Kaine to supervise those in the operator I position and had the responsibility as a foreman. Kaine Deposition, p. 8-9, 24-25.  Kaine was the supervisor . Conklin Deposition, p. 89.  Janet Marineau was Kaine's supervisor while the plaintiff was employed by the WPC.  Kaine Deposition, p.  9. Kaine was Becker's supervisor while the plaintiff was employed at the WPC. Kaine Deposition, p. 29.  Kaine and Becker have a good relationship. Kaine Deposition, p. 80. Becker, Kaine and Conklin, socialize outside of work. Conklin Deposition, p. 53-4. .

Defendant Kaine had not received harassment training in the workplace. Kaine Deposition, p. 20. . It is upsetting and scary to be under constant attack in the workplace and would be improper. Kaine Deposition, p. 24, 28, 32.    Profanity is not normal or common at the WPC. Kaine Deposition, p. 14.  Nevertheless, Defendant Kaine participated in this harassment and intimidation, often times joining with Becker in these violent verbal attacks. (Plaintiff's affidavit ¶ 6). Kaine does not think Mallett is sensitive to profanity. Kaine Deposition, p. 15.  However, Kaine saw Mallett in distress at work.  Kaine Deposition, p. 60

On or about July 31, 1992, plaintiff was diagnosed by his physician Dr. Paul Gallagher as having negative physical effects from the stress of work, including but not limited to nausea, sleeplessness, high blood pressure, and loss of the ability to concentrate. (Plaintiff's affidavit ¶ 7). On or about July 31, 1992, Plaintiff met with Defendant Bohenko to report Becker's harassment and his diagnosis by Dr. Gallagher. (Plaintiff's affidavit ¶ 8).

Consequently, on or about July 31, 1992, after a year of constant harassment by Becker and Kaine plaintiff left the WPC.  (Plaintiff's affidavit ¶ 9). Accordingly, on or about July 31, 1992, plaintiff requested worker's compensation and sick leave from the Town of Plainville to recover from work related injuries.  (Plaintiff's affidavit ¶ 10).

On or about August 10, 1992, plaintiff first visited Dr. Daniel Kelleher, a psychiatrist. Over the course of four visits in August 1992, Dr. Kelleher diagnosed plaintiff as having   Post-Traumatic Stress Disorder with depression resulting from his working conditions. (Plaintiff's affidavit ¶ 11). Unfortunately, on or about August 26, 1992, defendants Town of Plainville and Bohenko denied plaintiff's worker's compensation claim. (Plaintiff's affidavit ¶ 12).

On or about September 1992, plaintiff was transferred by Bohenko to the Town of Plainville's Buildings and Grounds Department.  This reassignment forced plaintiff to take a

3

reduction in pay. (Plaintiff's affidavit ¶ 13). On or about February 24, 1993, plaintiff's former position, left vacant since his departure, opened at the WPC. Plaintiff, wanting to resume his career in waste water management, applied for the position. (Plaintiff's affidavit ¶ 14). On or about May 5, 1993, Bohenko and the Town of Plainville required proof of medical fitness as a prerequisite for plaintiff's rehire. (Plaintiff's affidavit ¶ 15). On or about May 6, 1993, Plaintiff was granted medical clearance to resume work at the WPC. (Plaintiff's affidavit ¶ 16).

On or about June 14, 1993, plaintiff resumed his position as Assistant Plant Operator I at the WPC. Upon his return, plaintiff immediately faced constant harassment, intimidation, and threats spearheaded by Becker and Kaine. (Plaintiff's affidavit ¶ 17). On or about July 13, 1993, Becker and Kaine called the plaintiff a fucking queer and then physically threatened him. Plaintiff reported this incident to Bohenko. (Plaintiff's affidavit ¶ 18). Becker was an operator II when he called the plaintiff a fucking queer and Becker had more seniority. Kaine Deposition, p. 105. Kaine witnessed Becker call the plaintiff a fucking queer while the plaintiff was working in "Siberia". Kaine Deposition, p. 102.

On or about July 20, 1993, Becker drove by plaintiff while on duty and said, "Fuck You, Asshole." Plaintiff reported this incident to his supervisor, defendant Jahn. (Plaintiff's affidavit ¶ 19). On or about July 26, 1993, Becker and Kaine harassed and taunted the plaintiff while at work. Plaintiff also reported this incident to Jahn, his supervisor. (Plaintiff's affidavit ¶ 20).

Tragically, Mallet continued to be harassed in the workplace in 1993, when a picture depicting him was posted on the bulletin board which insulted his wife. Mallet Deposition, dated 7/04, p. 14-15. On or about August 1993, plaintiff was interviewed by Bohenko about Becker's harassment of the plaintiff and other employees, especially Patricia Cassidy, a female secretary. The plaintiff provided testimony that implicated Becker in several instances of harassment.

4

(Plaintiff's affidavit ¶ 21). On or about October 7, 1993, Becker was suspended from the WPC for three days. (Plaintiff's affidavit ¶ 22).

In 1993, Mallet told Jahn that Becker had sworn at him and taunted him and that Mallet told Jahn that someone had put a derogatory posting on the public bulletin board about Mallet. (Jahn Request for Admission, Exhibit 5). Becker admitted to Mallet that he had posted the insulting picture on the bulletin board. Mallet Deposition, dated 7/04, p. 15-16. Becker threatened and called the plaintiff a "fucking queer". Mallet Deposition, dated 7/04, p. 16-17.

On or about May 13, 1994, plaintiff filed a grievance against Becker for posting harassing messages on the WPC bulletin board targeted at plaintiff. Defendants Paradis and Watkins were aware of the activity and failed to take action. (Plaintiff's affidavit ¶ 23).

On or about May 13, 1994, plaintiff filed numerous grievances against Kaine. Of them one was for misuse of town property, as he used part of the WPC as a health spa and fitness center. Another was for raising and keeping a pit bull at the WPC. Defendants Paradis and Watkins were aware of the activity and failed to take action. (Plaintiff's affidavit ¶ 24). Unfortunately Joe Watkins merely directed Kaine to stay away from the plaintiff but never told Kaine not to harass the plaintiff. Kaine Deposition, p. 101

From October, 1993, to August 1995, plaintiff was subject to numerous threats and acts of intimidation and harassment directed by Becker and Kaine regarding his numerous filed grievances detailing misuse of town facilities at the WPC. (Plaintiff's affidavit ¶ 25). Plaintiff made a sexual harassment complaint against Becker in 1995. Kaine Deposition, p. 77, 78. Kaine complained to the town manager about the issue of the sexual harassment complaint made by the plaintiff and the town did nothing to address the issue. Kaine Deposition, p. 97, 98.

On or about August 8, 1995, Becker was to receive a hearing of appeal for his suspension, the basis of which was plaintiff's complaints of sexual harassment. The plaintiff agreed to reduce the sexual harassment charge to harassment, and the hearing was adjourned. (Plaintiff's affidavit ¶ 26).

On or about June 1999, plaintiff was offered training toward lab certification by Marineau and Richard Tingle ("Tingle"). However, defendants consistently denied him the necessary training time for certification. Plaintiff was eventually replaced as backup lab technician by another employee, Michael Cianchetti. (Plaintiff's affidavit ¶ 27).

In 1999, Kaine was a union steward and vice president of the union while the plaintiff was employed at the WPC. Mallet Deposition, dated 7/04, p. 8. Accordingly then, Kaine was responsible for making daily assignments including making assignments for Mallet. (Kaine Request for Admission, Exhibit 7).    On or about November 1999, plaintiff was permanently assigned by Kaine to work alone at an isolated facility called "Siberia." He remained at this facility for approximately four months. Plaintiff's affidavit ¶ 28; Kaine Deposition, p. 41.

On or about November 24, 1999, a co-worker, Steven Gregory, approached plaintiff and stated that he was 'concerned for the plaintiff's well being if the plaintiff did not attend the upcoming union meeting and vote for certain individuals. (Plaintiff's affidavit ¶ 29). On or about November 30, 1999, Tingle approached plaintiff and threatened that if the plaintiff did not attend the union meeting and vote for certain individuals including Becker, the plaintiff should "look for a new job." (Plaintiff's affidavit ¶ 30). Plaintiff was unable to attend the union meeting of December 13, 1999. Kaine knew that the plaintiff did not attend the union meeting in 11/99.

On or about December 14, 1999, plaintiff was approached by Kaine at approximately seven o'clock in the morning. Kaine insulted the plaintiff, using profanity, and attempted to

6

provoke the plaintiff into a physical altercation. When plaintiff refused to fight, he was called a "coward." Kaine derided plaintiff, saying ""I thought you wanted to get along." Plaintiff's affidavit ¶ 31, Kaine Deposition, p. 34, 35.

Conklin knew the plaintiff did not vote at the election on 12/13/99. Conklin Deposition, p. 59. Conklin tampered with the plaintiff's assignment sheet in the locker room on `3/15/00. Conklin Deposition, p. 62. On or about June 23, 2000, Kaine and plaintiff got into an argument. Kaine again threatened the plaintiff, stating "If you want to mess with me, I'll mess with you." Kaine then told plaintiff, "you're never going anywhere in this department." (Plaintiff's affidavit ¶ 32).

On or about July 25, 2000, Plainville resident Bill Cunningham ("Cunningham" made a request for time cards of WPC employees. (Plaintiff's affidavit ¶ 33). On or about August 25, 2000, during a crew meeting, Becker accused plaintiff of leaking information to Cunningham. Becker threatened and harassed the plaintiff in front of his co-workers and WPC management. Plaintiff reported the incident to Marineau and asked that she make sure it didn't happen again. (Plaintiff's affidavit ¶ 34). On or about August 30, 2000, Cunningham' investigation into the questionable practices at the WPC, including time card irregularities, began to receive press in *The Herald*, a local newspaper. These stories continued through April 2001. (Plaintiff's affidavit ¶ 35). On or about September 14, 2000, Tingle approached a former employee of the WPC, Daniel Winkler, at a local bakery. Tingle told Winkler that the crew at the WPC believed the plaintiff was leaking information to Cunningham regarding the time card controversy and the crew was "out to get" the plaintiff. Plaintiff reported the conversation to Marineau, who said she would discuss the matter with Defendant Osle. (Plaintiff's affidavit ¶ 36). On or about October 5, 2000, Tingle again approached Winkler at the bakery and repeated the negative comments and

repeated that the crew was "out to get" the plaintiff. (Plaintiff's affidavit ¶ 37).

On or about October 23, 2000, plaintiff was promoted by Marineau to crew leader. The next day, however, this promotion was withdrawn without explanation. (Plaintiff's affidavit ¶ 38). n or about November 24 and 25, 2000, plaintiff was denied overtime opportunities at the Roadways Department. This was against past practice and union agreement. (Plaintiff's affidavit ¶ 39).

On or about November 28, 2000, plaintiff attended a crew meeting. Becker again accused plaintiff, in front of entire crew, of helping Cunningham. Jahn, Marineau, and Osle were in attendance at the meeting and did nothing to quiet Becker. (Plaintiff's affidavit ¶ 40). Conklin harassed and threatened the plaintiff in the workplace. Mallet Deposition, dated 7/04, pp. 12-13. Becker was in charge of time cards which were one of the issues a citizen, Bill Cunningham, alleged regarding stealing time from the town. Conklin heard a false rumor through t he WPC employees that the plaintiff was stealing time from the WPC . Conklin & Kaine believed Mallett gave Cunningham the information about the time card fraud, which made Kaine mad at Mallett. This also provoked Conklin into calling the plaintiff a nigger and a cunt. Conklin Deposition, p. 37-39. Kaine Deposition, p. 55, 56, 62, 112, 113, 114. Conklin Deposition, p. 48. n or about February 7, 2001, Conklin confronted plaintiff in break room at the WPC. Conklin called plaintiff a "cunt" and then threatened him, saying "you're going    down, nigger." More than two weeks passed after plaintiff reported the incident to Marineau before Conklin was suspended for just one day. (Plaintiff's affidavit ¶ 41). Kaine was aware of the article that was published on 3/20/01, indicating the WPC  was full of incompetent, ignorant employees. Kaine Deposition, p. 118-119.

On or about March 27, 2001, plaintiff was diagnosed with a hernia. He has been out since then on worker's compensation. (Plaintiff's affidavit ¶ 42).

In 1993, 1994, 1995, 2000, and 2001, Mallet told Jahn that he was nervous and stressed at times. (Jahn Request for Admission, Exhibit 5). In 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, and 2001, Becker was aware that Mallet suffered from stress and anxiety. (Becker Request for Admission, Exhibit 6). In 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, and 2001, Kaine was aware that Mallet suffered from stress and anxiety. (Kaine Request for Admission, Exhibit 7). Jahn received complaint about Becker's behavior in the workplace between 1992 and the present. (Jahn Request for Admission, Exhibit 5).

The union does not act on behalf of its members and is weak. Kaine Deposition, p. 40. The union steward, Becker, wrote a complaint to the town manager and superintendent about an occurrence that happened out of work between Mallett and himself. Kaine Deposition, p. 133-134. The union has not filed any grievances on behalf of the plaintiff as Becker has been the union steward for the WPC. In order to file a grievance, the plaintiff would have to file the grievance with Becker. Kaine Deposition, p. 142-143.

## III.    LAW AND ARGUMENT

### A.    STANDARD OF REVIEW

A motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure should be granted only when the "pleadings, depositions, and affidavits on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

Before a court can rule on a motion for summary judgment, the moving party must satisfy its burden of production, by either "putting evidence into the record which affirmatively

9

disproves an element of the non-moving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim". <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-25 (1986).   Once the moving party has met its burden of production, the non-moving must provide specific facts showing a genuine issue for trial. <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Aldrich v. Randolph Cent. Sch. Dist.</u>, 963 F.2d 520, 523 (2d Cir. 1992). The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." <u>Id</u>. Thus "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." <u>Bryant v. Maffucci</u>, 923 F.2d 979, 982 (2d Cir.) <u>cert. denied</u>, 502 U.S. 849 (1991).   Moreover, not only must there be no genuine issue as to the evidentiary facts, but there must also be no controversy regarding the inferences to be drawn from them. <u>Diamontopulos v. Brookside Corp.</u>, 683 F. Supp. 322, 325 (D. Conn. 1988), citing <u>Donohue v. Windsor Locks Board of Fire Commissioners</u>, 834 F.2d 54, 57-58 (2d Cir. 1987).

**B.    SUMMARY JUDGMENT STANDARD UNDER § 1983.**

To state a cause of action under §§ 1983, the plaintiff must show (1) that the defendants deprived him of a right "secured by the Constitution or laws of the United States"; and (2) that they did so "under color of state law." <u>Am. Mfrs. Mut. Ins. Co. v. Sullivan</u>, 526 U.S. 40, 49-50 (1999); accord <u>Snider v. Dylag</u>, 188 F.3d 51, 53 (2d Cir. 1999); <u>Dwares v. City of New York</u>, 985 F.2d 94, 98 (2d Cir. 1993). The elements of a plaintiff's case are the same under Section 1981, Section 1983, or Title VII. Direct evidence is not necessary to prove employer acted with discriminatory motive. <u>Randle v. City of Aurora</u>, 69 F.3d 441 (10th Cir. 1995). A showing of

pretext is evidence which allows a jury to infer discriminatory intent. <u>Randle v. City of Aurora</u>, 69 F.3d 441 (10th Cir. 1995). Because a jury may find illegal discrimination upon nothing more than a prima facie case and pretext, such a showing at the summary judgment state is sufficient to get the case to the jury.  <u>Randle v. City of Aurora</u>, 69 F.3d 441 (10th Cir. 1995).  Procedural irregularities can provide sufficient evidence of pretext to defeat summary judgment where the disregarded procedures directly and uniquely disadvantage a minority employee, ..." <u>Randle v. City of Aurora</u>, 69 F.3d 441 (10th Cir. 1995).

Due to the difficulty of proving a subjective state of mind, cases involving motivation and intent are usually inappropriate for summary judgment. <u>Lac Du Flambeau Indians v. Stop Treaty Abuse-Wis.</u>, 991 F.2d 1249 (7th Cir. 1993). Evidence of mixed motives is "ordinarily not the gist for the summary judgment mill." <u>Lac Du Flambeau Indians v. Stop Treaty Abuse-Wis.</u>, 991 F.2d 1249 (7th Cir. 1993). Trier of fact may consider the same evidence introduced to prove prima facie case in determining whether discipline was pretextual. <u>Lowe v. City of Monrovia</u>, 775 F.2d 998 (9th Cir. 1985) Decision as to employer's motive is almost always for the trier of fact to determine at trial. <u>Lowe v. City of Monrovia</u>, 775 F.2d 998 (9th Cir. 1985).

Plaintiff may defeat summary judgment in a discrimination or retaliation case if he or she can present evidence that the proffered reason for the adverse action was pretextual or "unworthy of belief" or if he or she can otherwise introduce evidence of illegal motive.  <u>Beaird v. Seagate Technology, Inc.</u>, 145 F.3d 1159 (10th Cir. 1998). To survive summary judgment, a plaintiff will prevail "by either a) discrediting the employer's proffered reasons, either circumstantially or directly or b) by adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determining cause of the adverse employment action." <u>Torres v. Casio Inc.</u>, 42 F.3d 825 (3d Cir. 1994).

## C. THE DEFENDANTS RETALIATED AGAINST MALLET IN VIOLATION OF HIS FIRST AMENDMENT RIGHTS

The plaintiff's claim meets the criteria necessary to establish a violation of plaintiff's First Amendment rights. To prevail on a First Amendment retaliation claim, the plaintiff must establish: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Garcia v. S.U.N.Y. Health Sciences Center, 280 F.3d 98 (2nd Cir. 2001). Plaintiff has sufficiently alleged retaliation for First Amendment activity.

The Supreme Court has stated that the First Amendment "protects state employees not only from patronage dismissals but also from even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her from exercising her free speech rights." Rutan, 497 U.S. 62, 75 n..8 (1990). Since the Rutan decision, the Second Circuit "allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass." Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002)

### 1. Mallet's speech was protected because it was a matter of public concern.

Whether speech addresses a matter of public concern is determined "by the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-48 (1983). "To fall within the realm of public concern, moreover, an employee's speech must 'relate to a ... matter of political, social, or other concern to the community.'" Locurto v. Giuliani, 269 F. Supp. 2d 368, 385 (2d Cir. 2003) (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)).

If a plaintiff's complaint "implicates system-wide discrimination" they become a matter of public concern. See Marshall v. Allen, 984 F.2d 787 (7th Cir.1993) (allowing Section 1983

12

claim where plaintiff was discharged following his support of other employees who had filed suit for gender discrimination); Auriemma v. Rice, 910 F.2d 1449, 1460 (7th Cir.1990) (in banc) (finding public interest where there was a "wholesale change in the highest police echelons allegedly only on a racial basis"), cert. denied, 501 U.S. 1204, 111 S.Ct. 2796, 115 L.Ed.2d 970 (1991). In addition, such a decision requires a "focus on the motive of the speaker . . . to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." Lewis v. Cowen, 165 F.3d 154, 163-64 (2d Cir. 1999). "Speech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment, does not pertain to a matter of public concern." Id. at 164 (citing Connick, 461 U.S. at 147). "Speech is more likely to be of public concern if the speaker is speaking as a citizen on matters of public interest, and not solely as an employee on matters only of personal interest." Sacco v. Pataki, 982 F. Supp. 231, 240 (S.D.N.Y. 1997). "Virtually every citizen has a personal interest in matters of public concern; after all, each citizen is a member of the public and is, in some way, impacted by the resolution of societal problems. The determinative question is whether that interest arises from the speaker's status as a public citizen or from the speaker's status as a public employee." Blum v. Schelegel, 18 F.3d 1005, 1012 (2d Cir. 1994). Statements regarding internal employment policies may raise at once issues that are of both personal and public concern for purposes of state statute prohibiting employer from discharging employee for exercising rights under First Amendment. Daley v. Aetna Life & Cas. Co., 249 Conn. 766 (1999).

The plaintiff's speech was protected. The plaintiff engaged in the following speech: (1) In 1992, 1993, 1994, 1995, 2001 and 2002, complaining to his supervisors regarding the harassment he suffered at the hands of Becker, Kaine and Conklin. (Plaintiff's Material Facts In

13

Dispute (hereinafter "Plaintiff's Facts"), ¶¶ 20, 79, 80, 91, 82, 83); (2) Voluntarily providing information to a local resident about corruption and falsification of time cards, information which ended up in newspaper articles that outlined the improprieties of the WPC. (Exhibits 8, 9; Plaintiff's Facts, ¶¶ 78, 70, 68, 62, 61, 60, 59.) ; and (3) Filing grievances in 1994 and 2002 regarding improprieties in the workplace. (Plaintiff's Facts ¶¶ 42, 80, 81.); (4) Voluntarily providing information as part of a sexual harassment investigation regarding Becker and his harassment of a co-worker. Plaintiff's Facts ¶ 36. (5) Refusing to vote for Becker at a Union election in 1999. These actions taken by the plaintiff are speech and are protected speech as the plaintiff was speaking on a matter of public concern not as a citizen on matters of public interest.

### 2. Defendants Took Adverse Action Against Plaintiff

"Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand. . . .lesser actions may meet the adversity threshold, but we have not explicitly defined what quantum of lesser actions constitutes an adverse employment action." Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002). A suspension is an adverse employment action. See, e.g., Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001) (holding that suspension without pay for one week, even if plaintiff was later reimbursed, constituted an adverse employment action); Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998) (holding that a one-day suspension constituted one of the numerous adverse employment actions taken against plaintiff); Parkinson v. Anne Arundel Med. Ctr., Inc., 214 F. Supp.2d 511, 518 (D.Md. 2002) (holding that plaintiff's one-day, unpaid suspension could constitute an adverse employment action).

The Supreme Court has stated that the First Amendment "protects state employees not only from patronage dismissals but also from even an act of retaliation as trivial as failing to hold

a birthday party for a public employee . . . when intended to punish her from exercising her free speech rights." Rutan, 497 U.S. 62, 75 n.8 (1990). Since the Rutan decision, the Second Circuit "allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass." Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002).

The plaintiff has been repeatedly subject to adverse employment actions at the hands of the defendants. The plaintiff was assigned to Siberia in 1999 by Kaine where he stayed in seclusion for four (4) months. Plaintiff's Facts ¶ 50. In October, 2000, the plaintiff was promoted by Marineau to crew leader for one day, and the promotion was revoked after one day and the plaintiff was demoted by Marineau at the behest of Bekcer and Kaine. Plaintiff's Facts ¶ 64. In November, 2000, the plaintiff was denied overtime opportunities by Becker and Kaine. Plaintiff's Facts ¶ 65. In 2001 and 2002, the Town, specifically John Bohenko and Shirley Osle, denied the plaintiff's request to return to work after a hernia operation to a safe work environment and refused to transfer the plaintiff to a safer location within the Town. Plaintiff's Facts ¶ 83. In 2000, the plaintiff was denied lab time by Kaine, in which he could have gained experience and skills. Plaintiff's Response to Town Defendants 56(a) Statement, (hereinafter, "Town 56(a)") ¶¶ 33-39. These are all adverse employment actions by the Town that resulted in a material change in the plaintiff's employment and job duties and responsibilities.

### 3. There Is A Causal Connection Between The Protected Speech And Defendant's Actions

To establish a causal connection, the courts look to whether there is an inference that defendants had a retaliatory motive. Morales v. Mackalm, 278 F.3d 126 (2d Cir. 2002). "The causal connection must be sufficient to support the inference 'that the speech played a substantial part' [in the adverse action]." Dawes, supra, 239 at 492, quoting Ezekwo v. NYC Health &

Hosp. Corp., 940 F.2d 775, 780-91 (2d Cir. 1991).

The adverse actions listed above all occurred in 1999, 2000, 2001, and 2002. These specific events fall into the purview of the applicable Statute of Limitations. These instances were part of a continuous pattern of harassment and retaliation that stemmed from 1993. There is a direct causal connection, however, between the adverse actions of 2000 through 2002 and the protected speech that the plaintiff participated in that occurred in the summer of 2000, when he provided information to Bill Cunningham, who reported the information that he received from the plaintiff in several local newspapers. The article of October 3, 2000, that was published in The Bristol Press (Exhibit 10, p. 3), specifically references the plaintiff and that the other WPC employees retaliated against him for leaking such information about the improprieties at the WPC.

There is evidence that Becker accused the plaintiff of leaking such information to Cunningham at two crew meetings. Plaintiff's Facts¶¶ 60, 66. Between the summer of 2000, when the plaintiff provided the information to Cunningham and November 2000, the plaintiff had been denied time in the lab, had been demoted from crew leader and had been denied overtime opportunities by Kaine and Becker. These are clearly connected in time and the adverse actions are related specifically to the plaintiff's comments and speech.
Material facts indicate that Mallet was retaliated against for his protected activities and defendants should not prevail on their motion for summary judgment of this claim.

There further is a direct causal connection between the plaintiff's refusal to vote for Becker at a Union election in 1999 and his transfer to "Siberia" in December, 1999. The plaintiff was initially assigned to "Siberia" in December 1999, the union election took place on December 13, 1999. Instead of rotating other employees into the position in "Siberia" every few

16

weeks as had previously been the practice, Kaine kept the plaintiff in "Siberia" for three more months following the refusal of the plaintiff to vote for Becker at the union election. Plaintiff's Facts ¶¶ 50-54; Town 56(a) ¶¶ 40-43.

The Union's activities toward the plaintiff include the failure of the union to pursue the plaintiff's grievances or to act on the plaintiff's complaints. Specifically, Becker, who has served a the Union President and Union Steward would be the recipient of the plaintiff's grievances. Plaintiff's Facts ¶ 80, 81.

The adverse actions of 1999 and 2000 are causally connected to the protected speech of the plaintiffs. Further the adverse actions that continued through out the plaintiffs employment until 2002, were in direct retaliation for the plaintiff's speech, in that the Town refused to provide the plaintiff with a safe environment so that he could return to work because the plaintiff had made so many complaints to the Town. Plaintiff's Facts ¶ 83. Therefore, the Individual, Union and Town Defendants Motions should be denied.

### D.    DEFENDANTS CREATED A HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII.

Defendants actions created a hostile work environment in violation of his aforementioned constitutional rights.  Evidence exists to indicate that defendants created a hostile environment; because of the issues of material fact associated with this claim, it is not a candidate for summary judgment.

The prohibition of employer conduct which discriminates against any individual "in respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex or national origin" 42 U.S.C. § 2000e-2(a)(1) extends to the creation of a discriminatorily hostile or abusive environment. Meritor Savings Bank, FSB v.

Vinson, 477 U.S. 57, 64 (1986).  The harassing conduct does not need to result in an emotional or physical breakdown in order to invoke Title VII, instead it needs only to be "severe or pervasive enough to create an objectively hostile or abusive work environment".  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

A hostile and abusive work environment "can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers....and offends Title VII's broad rule of workplace equality".  Harris, 510 U.S. at 22.

The Supreme Court delineated several factors which a court may consider when determining whether a work environment violates an employee's rights.  Harris stressed that it is not a "mathematically precise test", and that "no single factor is required" but that all the circumstances must be reviewed, including: "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. To make the requisite showing of a hostile work environment, the plaintiff must demonstrate that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did perceive to be so." Faragher, 524 U.S. at 787 (citing Harris, 510 U.S. at 21-22).

In assessing a pattern of alleged misconduct, the court should not require a showing of "a threshold magic number of harassing incidents," Richardson v. New York State Dep't of Correctional Services, 180 F.3d 426, 439 (2d Cir. 1999) (internal quotations omitted), nor should the court base its evaluation solely on "how long the [challenged] innuendos, slurs, verbal assaults or obnoxious course of conduct lasts." Whidbee, 223 F.3d at 69 (quoting Carrero v. New York City Housing Auth., 890 F.2d 569, 578 (2d Cir. 1989)). Rather, it should consider the

"offensiveness of the individual actions complained of in determining whether such actions are pervasive." Id. In other words, the challenged conduct must be "of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." Whidbee, 223 F.3d at 70 (quoting Torres v. Pisano, 116 F.3d 625, 632 (2d Cir.), cert. denied, 522 U.S. 997 (1997)).

To survive a motion for summary judgment, a plaintiff alleging a hostile work environment must present evidence from which a reasonable fact-finder could conclude: (1) that the workplace was permeated by sufficiently severe or pervasive intimidation so as to alter the conditions of the plaintiff's work environment, and (2) that a specific factual basis exists for imputing the unlawful conduct creating the hostile environment to the plaintiff's employer. Mack, 326 F.3d at 122.

In addition to demonstrating victimization by a hostile environment, the plaintiff must also establish a factual basis for holding the employer liable for the alleged misconduct of its agents. See Faragher, 524 U.S. at 804; Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765 (1998). This can be done by demonstrating that a "supervisor with immediate or successively higher authority over the employee" engaged in the alleged misconduct. See Mack, 326 F.3d at 123 (quoting Ellerth, 524 U.S. at 765). Alternatively, if a co-worker or employee with no actual or apparent authority over the plaintiff engaged in the alleged misconduct, the plaintiff must demonstrate that "the employer either provided no reasonable avenue of complaint or knew of the harassment and did nothing about it." See Torres, 116 F.3d at 633 (quoting Kotcher v. Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59, 62 (2d Cir. 1992)).

The hostility of the environment that the plaintiff was subjected to is not in dispute. The repeated harassing conduct of Becker and Kaine and Conklin that stretched over ten (10) years

resulted the plaintiff being forced to leave a job that he otherwise loved and wished to retire at. The defendants, Osle, Marineau, Bohenko and Jahn were fully aware of the treatment of the plaintiff but did not provide the plaintiff with a transfer to a safer location or made any attempt to stop the harassment of the plaintiff. Therefore, the Town defendants are liable for the actions of Becker, Kaine and Conklin and their Motion should be denied.

### D.    THE DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

Defendants are not entitled to qualified immunity. The doctrine of qualified immunity provides that: "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Moffit v. Brookfield, 950 F. 2d 880, 885 (2d Cir. 1991),

"The relevant inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Thus, as the Supreme Court has pointed out, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." (Emphasis added; internal quotations and citations omitted) Stephenson v. Doe, 332 F.3d 68, 77-78 (2d Cir. 2003).

"A courts evaluation of a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." Wilson v. Layne, 526 U.S. 603, 609 (1999). If the court finds that a clearly established right of the plaintiff has been violated, the court must then determine whether the defendant's actions "could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638 (1987). The Supreme Court has held that "a claim of

20

immunity is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated." Mitchell v. Forsyth, 472 U.S. 511, 527-28 (1985). Qualified Immunity is an affirmative defense, and as such the burden is on defendant to establish its existence. See In re: State Police, 88 F.3d 111, 123

"[A] suit for money damages may be prosecuted against a state officer in his individual capacity for unconstitutional or wrongful conduct fairly attributable to the officer himself, so long as the relief is sought . . . from the officer personally." Alden v. Maine, 527 U.S. 706, 757 (1999). Additionally, sovereign immunity "does not bar certain actions against state officers for injunctive or declaratory relief." Id.

Becker intentionally and repeatedly harassed and tortured the plaintiff in his job. Kaine further intentionally and repeatedly harassed and retaliated against the plaintiff through verbal insults, profanity and adverse actions. Conklin also intentionally attacked the plaintiff. The Town defendants knew of the conduct that the plaintiff was subject to but did not provide a safer location for the plaintiff and did not attempt to find him another location in the Town to work to protect him from further attacks. Therefore the defendants knowingly set out on a course to harm the plaintiff in violation of his constitutional rights and the defendants are not entitled to qualified immunity.

## F.    MALLET WAS DEPRIVED OF PROCEDURAL DUE PROCESS

The Fourteenth Amendment guarantees an individual due process of the law where the state deprives an individual of a constitutionally protected liberty or property interest. Board of Regents v. Roth, 408 U.S. 564, 569 (1972). If the state deprives a person of a protected interest, the state must provide such procedures as the circumstances demand. Mathews v. Eldridge, 424

U.S. 319,333 (1976) (the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).  In order to have a protected property interest, plaintiff must establish that he has a legitimate, constitutionally based, claim of entitlement to the position sought, not merely an unprotected unilateral expectation of employment. Id.

An interest protected or cognizable under the due process clause must have a basis in existing rules or understandings that stem from an independent source such as state law--rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." (Citations omitted; internal quotation marks omitted.) Hunt v. Prior, 236 Conn. 421, 436, 673 A.2d 514 (1996). Application of the ['clear entitlement'] test must focus primarily on the degree of discretion enjoyed by the issuing authority, not on the estimated probability that the authority will act favorably in a particular case." (internal citations omitted) Kelley Property Development, Inc., v. Town of Lebanon, 226 Conn. 314 (1993).

"Due process is inherently fact-bound because due process is flexible and calls for such procedural protections as the particular situation demands.... The constitutional requirement of procedural due process thus invokes a balancing process that cannot take place in a factual vacuum." (Internal quotation marks omitted.) Thalheim v. Greenwich, 256 Conn. 628, 648, 775 A.2d 947 (2001).

Plaintiff was deprived of his procedural due process because he was demoted from his position as crew leader with out any process or explanation.  The plaintiff was also denied the ability to earn overtime or work in the lab to gain experience and skills without any process. Therefore, the Town and Individual defendants request for summary judgment on this issue should be denied.

G.    **THE DEFENDANTS VIOLATED THE PLAINTIFF'S RIGHT TO SUBSTANTIAL DUE PROCESS.**

Where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."" Russo v. City of Hartford, 184 F. Supp. 2d 169, 184 (D. Conn. 2002) (finding plaintiff properly alleged substantive due process violation) (quoting Albright v. Oliver, 510 U.S. 266, 273, 127 L. Ed. 2d 114 (1994)).

### 1.    **Plaintiff Had a Property Interest.**

[T]o establish a violation of either substantive or procedural due process, plaintiff must initially show that [he] was deprived of a property or liberty interest." Gordon v. Nicoletti, 84 F. Supp.2d 304, 309 (D. Conn. 2000).  In many circumstances a state employee may have a property interest in continued employment or a promotion. See, e.g., Harhay v. Town of Ellington Bd. of Educ., 323 F.3d 206, 212 (2d Cir. 2003) (finding contractual right to reappointment under a collective bargaining agreement to be an important interest as opposed to a trivial and insubstantial interest, and therefore a property interest); Board of Regents of State Colleges v. Roth, 408 U.S. 564, 576 (1972) (discussing property interests in public employment created by tenure provisions or employment contracts). Because courts recognize that a promotion is a type of property interest, plaintiff has met the first requirement of this claim.

### 2.    **Defendants' actions "shock the conscience".**

Defendants' behavior toward plaintiff "shock the conscience" and constitute a violation of his substantial due process rights. A claim for a substantive due process violation must "shock the conscience." Rochin v. California, 342 U.S. 165, 172 (1952); see e.g. Russo v. City of

Hartford, 184 F. Supp. 2d 169, 196-97 (D. Conn. 2002) (finding allegations that police chief had refused to investigate police officer's allegations of physical threats by supervisors or to take steps to prevent potential harm by fellow police personnel to police officer sufficiently stated a claim for a violation of substantive due process); Jensen v. City of Oxnard, 145 F.3d 1078, 1084 (9th Cir. 1998) (finding that, notwithstanding Collins, plaintiff police officer properly states a claim for substantive due process violation where police officer alleges intentional or reckless acts of a government employee directed against another government employee).

The purpose to the Due Process Clause is to prevent the government 'from abusing [its] power, or employing it as an instrument of oppression.'" De Shaney v. Winnebago County Dept. of Social Services, 489 U.S.189, 196 (1989) quoting Davidson v. Cannon, 474 U.S. 344, 348 (1986). Substantive due process is designed to protect against government actions that are "arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised." Kaluczky v. City of White Plains, 57 F.3d 202, 211 (2d Cir.1995).The Second Circuit has pointed out that malicious and sadistic abuses of government power which are intended only to oppress or to cause injury and serve no legitimate government purpose unquestionably shock the conscience. Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 252 (2d Cir.2001)

Actions intended to injure in some way and unjustifiable by any government interest will most likely be found conscience-shocking. Id. This is a fact-specific inquiry that requires a case by case analysis. Understanding that actions which would shock the conscience in one set of circumstances could be considered completely rational in another set of circumstances, the Supreme Court has established that the "deliberate indifference" standard will determine if an official's actions "shock the conscience." Sacremento v. Lewis, 523 U.S. at 850-51; see also

24

Betts v. Brady, 316 U.S. 455, 462 (1942). Inherent to the word "deliberate" is the idea that the actor must contemplate her actions within a given time frame; split-second decisions that result in harm are not equal to those actions that are considered and implemented over a longer period of time. Pre-meditated actions are decidedly more egregious and therefore often rise to the level of constitutional violation. Id. A government official shocks the conscience and violates one's substantive due process rights when, given the opportunity to deliberate and decide upon a course of action that would intentionally harm an individual, that official carries through with such actions. Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662 (1986).

The conduct toward the plaintiff is beyond the bounds of decent society. While many of the profane and outrageous conduct occurred prior to 1999, the conduct did continue toward the plaintiff in 1999 and 2000, where the plaintiff was repeatedly publicly humiliated and attacked in his workplace by Becker and Conklin and Kaine. The Town knew of the history of harassment toward the plaintiff but allowed to let the conduct continue. Therefore, the Town and individual defendants Motions should be denied.

### H.    MALLET CAN PREVAIL ON HIS TITLE VII AND SECTION 1983 CLAIMS AGAINST THE TOWN

The Town Defendants argue that Plaintiff has failed to set forth evidence sufficient to support a Monell claim against the Town. "A plaintiff who seeks to recover against a municipality under § 1983 must show that the violation of his constitutional rights resulted from a municipal policy or custom." Davis v. City of New York, 75 Fed. Appx. 827, 829 (2d. Cir. 2003) (internal quotations and citations omitted). There are four circumstances in which a policy or custom may be established. The plaintiff may establish (1) a formal policy, officially promulgated or adopted by the municipal defendant, Monell v. Department of Social Services., 436 U.S. 658, 690, 56 L. Ed. 2d 611 (1978), or (2) a specific action or decision by an official

responsible for establishing final policy with respect to the subject matter, if that action or decision caused the violation of plaintiff's constitutional rights, Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84, 89 L. Ed. 2d 452 (1986) (plurality opinion), or (3) the existence of an unlawful practice by subordinate officials so permanent and well settled as to constitute a 'custom or usage' and proof that this practice was so manifest or widespread as to imply the constructive acquiescence of the policy-making officials, City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 130, 99 L. Ed. 2d 107 (1988); Sorlucco v. New York City Police Dept., 971 F.2d 864, 871 (2d Cir. 1992), or (4) the failure of the City to train or supervise its employees in a fashion designed to prevent the violation of plaintiff's rights, if such failure amounts to 'deliberate indifference' to the rights of those with whom the municipal employees will come into contact. Gottlieb v. County of Orange, 84 F.3d 511, 518 (2d Cir. 1996); Walker v. New York, 974 F.2d 293, 297 (2d Cir. 1992).

"Actions by an individual with final decision-making authority in a municipality constitute official policy for purposes of a § 1983 claim." Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir. 2003) (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84, 89 L. Ed. 2d 452 (1986). The individual must be responsible for establishing final government policy" in order for municipal liability to attach." Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir. 2003).

"Whether the official in question possessed final policymaking authority is a legal question, which is to be answered on the basis of state law. The relevant legal materials, include state and local positive law as well as custom or usage having the force of law." .Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000).

In applying the Pembaur standard, The Second Circuit has explained that where an

26

official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy. An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions. Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir. 2003) (quoting Rookard v. Health & Hosps. Corp., 710 F.2d 41, 45 (2d Cir. 1983). Such a policy may be inferred from circumstantial proof. Gagne v. DeMarco, 281 F. Supp. 2d 390, 398 (D. Conn. 2003).

In O'Connor v. Barnes, 1998 U.S. Dist. LEXIS 3386 (N.D.N.Y. Mar. 18, 1998) Judge Kahn was presented with the question of whether a County Sheriff is a policymaking official. Id. at 14. Judge Kahn noted that the Sheriff is responsible for matters of supervision, discipline, scheduling and training within the Sheriff's Department. Id. at 14-15. The municipality argued that the Sheriff is not a policymaker for the County because he is an elected official and because the County does not direct or control personnel of the Sheriff's Department. Id. at 115.

Judge Kahn, relying on previous Second Circuit cases which found that a Sheriff is a policymaker for the County in which he is employed, found the Sheriff to be a policymaker. Id. (citing to Weber v. Dell, 804 F.2d 796, 803 (2d Cir. 1986) (1987); Heisler v. Kralik, 981 F. Supp. 830, 841 (S.D.N.Y. 1997); Wagner v. County of Cattaraugus, 866 F. Supp. 709, 718 (W.D.N.Y. 1994) (County not liable for arrests made without probable cause where there was "no evidence that the Sheriff ever condoned or acquiesced in these arrests")).Judge Kahn then went on to find that retaliation was in the scope of the Sheriff's policymaking authority. Id. at 17-21.

Becker intentionally and repeatedly harassed and tortured the plaintiff in his job. Kaine further intentionally and repeatedly harassed and retaliated against the plaintiff through verbal insults, profanity and adverse actions. Conklin also intentionally attacked the plaintiff. The

Town defendants knew of the conduct that the plaintiff was subject to but did not provide a safer location for the plaintiff and did not attempt to find him another location in the Town to work to protect him from further attacks. Therefore the defendants knowingly set out on a course to harm the plaintiff in violation of his constitutional rights and the defendants are not entitled to qualified immunity.

I. **DEFENDANTS TREATED MALLET DIFFERENTY IN VIOLATION OF HIS FOURTEENTH AMENDMENT RIGHT TO EQUAL PROTECTION.**

"Equal Protection means simply that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., Inc, 473 U.S. 432 439 (1985). To prove a Fourteenth Amendment Equal Protection violation, "the plaintiff must prove that (1) in comparison with others similarly situated, he was selectively treated, and (2) such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Lisa's Party City, Inc. v. Town of Henrietta, 185 F.3d 12, 16 (2d Cir. 1999).

The Second Circuit has long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials. Harlan Assoc. v. Incorporated Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2000). In Village of Willowbrook v. Olech, 528 U.S. 562, 564, (2000) (per curiam), "the Supreme Court affirmed the validity of such class of one claims where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. To prevail on a class of one equal-protection claim, plaintiff must show, not only irrational and

28

wholly arbitrary acts, but also intentional disparate treatment." <u>Barstow v. Shea</u>, 196 F. Supp. 2d 141, 148 (D. Conn. 2002) (citing <u>Olech</u>, 528 U.S. at 564); <u>see also</u> <u>Russo v. City of Hartford</u>, Docket No. 3-97-CV-2380 (D. Conn. 2001) (stating, "successful equal protection claims may be brought by a "class of one," where the plaintiff alleges that he has been intentionally treated differently from other similarly situated and that there is no rational basis for the difference in treatment.").

The plaintiffs can establish a "class of one" equal protection claim by proving that (a) they were similarly situated to others, (b) they were intentionally treated differently from others similarly situated, and (c) there is no rational basis for the difference in treatment. <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000)(per curiam). The Supreme Court found that Olech's complaint could "fairly be construed as alleging" differential treatment from similarly situated property owners which, coupled with Olech's allegation that the Village's conduct was irrational and wholly arbitrary, was "sufficient to state a claim for relief under traditional equal protection analysis." <u>Id</u>. at 565. Such allegations, quite apart from a defendant's subjective motivation, are sufficient to state a claim for relief under traditional equal protection analysis. <u>Id</u>. 564. The Court of Appeals in <u>Olech</u> held that "a plaintiff can allege an equal protection violation by asserting that state action was motivated solely by a "spiteful effort" to "get" him for reasons wholly unrelated to any legitimate state objective.' "<u>Village of Willowbrook v. Olech</u> 160 F.3d 386, 387 (7th Cir.1998).

If there ever was a "Class of One" plaintiff, it is the plaintiff in this case. For the ten years that the plaintiff was employed by the WPC, the plaintiff has been the subject of a campaign targeted against him to make his employment insufferable. This campaign was started and religiously adhered to by the main offender Becker. Along the way, Kaine joined in

29

the efforts.   The plaintiff had been outcast and ostracized by all members of the WPC staff.   The

staff and the administration condoned and accepted that the plaintiff would be the focal point of

Becker' harassment.   No other employee was subjected to such a continuous and intentional

pattern of harassment and retaliation.   Therefore the Town and the Individual defendants' Motion

should be denied.

### J.    MALLET'S INTENTIONAL INFLICTION OF EMOTIONAL HARM CLAIM WILL PREVAIL.

To prevail on his claim for intentional infliction of emotional distress the plaintiff must

prove the following:  (1) that defendant intended or should have known that emotional distress

was a likely result of their conduct; (2) that the conduct was extreme and outrageous (3) that the

conducted caused plaintiff distress (4) and that the plaintiff suffered severe emotional distress.

Drew v. K-Mart Corp., 37 Conn App. 239, 251 (1995).   To sustain a claim for intentional

infliction of emotional distress, the plaintiff must show that the defendants' conduct exceeds "all

bounds usually tolerated by decent society." DeLaurentis v. City of New Haven, 220 Conn. 225,

597 A.2d 807, 828 (1991).

The Individual and Union and Town Defendants argue that the alleged conduct does not

support a claim for intentional infliction of emotional distress and that the condcut falls far short

of extreme and outrageous conduct required to support such a theory. Evidence supports the

finding that the Defendants intentionally inflicted emotional harm on Mallet. Becker

intentionally and repeatedly harassed and tortured the plaintiff in his job.  Kaine further

intentionally and repeatedly harassed and retaliated against the plaintiff through verbal insults,

profanity and adverse actions.  Conklin also intentionally attacked the plaintiff. The Town

defendants knew of the conduct that the plaintiff was subject to but did not provide a safer location for the plaintiff and did not attempt to find him another location in the Town to work to protect him from further attacks. Therefore, the Town and the individual defendants Motions should be dismissed.

## CONCLUSION

For the above stated reasons, both of Defendants' Motions for Summary Judgment should be denied.

THE PLAINTIFF,

BY:

Erin I. O'Neil
Brewer & O'Neil
818 Farmington Avenue
West Hartford, CT 06119
(860)523-4055
Federal Bar #ct23073

THE PLAINTIFF,

BY: _____
Erin I. O'Neil, Esq.
Brewer & O'Neil
818 Farmington Avenue
West Hartford, CT 06119
(860)523-4055
Federal Bar #ct23073

## CERTIFICATION

This is to certify that a copy of the foregoing was faxed or mailed, postage prepaid, on this November 19, 2004,  to all counsel of record including:

Dennis G. Ciccarillo
Eisenberg, Anderson, Michalik & Lynch
136 West Main St.
PO Box 2950
New Britain, CT 06050-2950

J. William Gagne, Jr.
J. William Gagne & Assoc.
1260 Silas Deane Highway
Wethersfield, CT 06109

Alexandria L. Voccio
Howd & Ludorf
65 Wethersfield Avenue
Hartford, CT 06114

_____
Erin I. O'Neil