UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| RICHARD B. MALLETT | NO.: 3:01CV1137(AHN) |
| v. | |
| TOWN OF PLAINVILLE; AND IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES JOHN BOHENKO, FORMER TOWN MANAGER; ROBERT JACKSON, TOWN MANAGER; SHIRLEY OSLE, ASSISTANT TOWN MANAGER; ROBERT JAHN DIRECTOR, WATER POLLUTION CONTROL DEPARTMENT; DONALD BECKER; JAMES KAINE; MICHAEL CONKLIN; BUTCH PARADIS, FORMER MUNICIPAL EMPLOYEES UNION PRESIDENT; STEVEN CLARK, MUNICIPAL EMPLOYEES UNION PRESIDENT; AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES LOCAL 1303-56 | NOVEMBER 19, 2004 |

**PLAINTIFF'S LOCAL RULE 56(a)1 STATEMENT IN OPPOSITION TO DEFENDANTS' , BECKER, KAIN, CONKLIN, MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56, the plaintiff files this Local Rule 56(a) (1) Statement in response to the defendants, Donald Becker, James Kaine and Michael Conklin, statement of undisputed material facts in support of their Motion for Summary Judgment dated September 22, 2004.

1. Richard Mallett began working for the Town of Plainville in March 1990 as an operator in the Water Pollution Control Department (hereinafter "WPC"). See **Exhibit A, p. 27; Exhibit B, p. 26.**

**Admit.**

2.  Mallett was encouraged to apply for the position by the defendants, Donald Becker and James Kaine., Mallett believes that he was selected for the position based on recommendations from these defendants. See **Exhibit B,** pp. 24, 26.

   **Admit.**

3.  Donald Becker, James Kaine and Michael Conklin were all coworkers of Mallett's. They were not Mallett's supervisors or bosses. See **Exhibit A,** pp. 7-10; and **Exhibit B,** pp.27, 112.

   **Deny in part, in that, when Jan Marineau became superintendent of the WPC, Kaine and Becker assumed duties previously handled by management. Kaine was given credit for "Direct Responsible Charge" time. Kaine was responsible or Job assignments. Kaine was the person Mallet reported to. Many times Mallet would ask Jan Marineau a question pertaining to his job, and she would tell him to see Kaine. James Kaine controlled where Mallet worked and who he worked with. Becker told Mallet "we run this place, not management."**

4.  Mallett is six feet four and weighs two hundred thirty-five pounds. See **Exhibit** B, pp. 47-48.

   **Admit.**

5.  Conklin is six feet two, weighs 210 pounds, and suffers from a neck injury. See **Exhibit C,** pp. 20-21.

   **Deny, in part that Conklin's neck injury did not stop him from doing heavy lifting and that he would regularly punch the "heavy bag" near his desk on the garage.**

6.     Kaine is much smaller than Conklin, and as such, necessarily much smaller than Mallett. See **Exhibit** D, p. 74.

    **Admit.**

7.     At no time did Becker, Kaine or Conklin ever punch Mallett, wrestle with him, strike him or otherwise physically hit him. See **Exhibit** IB, pp. 78-79.

    **Admit.**

8.     Mallett was a beneficiary of the Collective Bargaining Agreement between the Town of Plainville and his union. See plaintiff s Complaint, Count Four, ¶¶83-84; and **Exhibit E.**

    **Admit.**

9.     The Collective Bargaining Agreement sets forth a four-step grievance process that culminates in binding arbitration. Pursuant to the terms of the Agreement, the decision of the arbitrator "shall be final and binding on both parties." See Exhibit E, Article XIII, §13.0.

    **Admit.**

10.    During the 1990-92 time period, Becker, with over 15 years at the WPC, occasionally criticized Mallett and other employees alike regarding their job performance. See Exhibit A, pp. 39-40; and Exhibit B, pp. 39-43.

    **Deny. Becker went beyond merely criticizing for his work performance. Mallet 2001 Deposition, ¶¶ 39, 41-44, 56-59.**

11.    Mallett and Kaine were friends during the 1990-92 time period. Any criticism by Kaine regarding Mallett was motivated by an honest belief that Maltett "wasn't living up to expectations of an employee." See **Exhibit B,** pp. 48-49.

    **Admit.**

12. Mallett filed a claim for Workers' Compensation in late July 1992 due to alleged job stress. As part of the settlement of his claim, Mallett agreed to a reassignment to the Department of Public Works. See **Exhibit A,** pp. 40-44; and **Exhibit** B, p. 50.

**Admit.**

13. Before leaving the WPC, Mallett, wanting to describe the general conditions that led to his leaving the WPC, informed management that Becker had allegedly consumed alcohol while on the job in 1991 and that Becker had harassed and/or criticized his work performance. See **Exhibit A, p.** 41; and **Exhibit EJ,** p. 83.

**Admit.**

14. In February 1993, Mallett re-applied to his position as an Operator 1 within the WPC. He resumed this position in June. See Plaintiff's Complaint, Count One, ¶ 27; and **Exhibit A,** p. 44-45.

**Admit.**

15. On July 13, 1993, as Mallett was delivering a bundle of rags, he said to Becker, who was standing in the doorway,, "I don't want to hit you." Becker and Mallett were several feet apart. Becker did not take any physical action toward Mallett. See **Exhibit A,** pp 16-17, 154, 169; and **Exhibit B,** p. 56.

**Deny, in that the plaintiff was not threatening Becker. Mallet 2001 Deposition, ¶¶ 56.**

16. In August 1993, the then Town Manager, John Bohenko, interviewed Mallett concerning Becker's alleged sexual harassment of a co-employee. In regards to the sexual harassment investigation, Mallett informed Bohenko that Becker had on one occasion, grabbed his cheek and made a noise with his mouth. See **Exhibit A,** p. 47; and **Exhibit B,** p. 61-63.

4

**Admit**

17. Mallett also complained about Becker's conduct towards him during this time.. He claims to have reported that on July 13, 1993, Becker had called him a "fucking queer;" that in July 1993, Becker rode by in a truck and said, "fuck you, asshole;" and that on another occasion in 1993, Becker called him a "fat ass." See **Exhibit A,** pp. 47-50, 169-70; and **Exhibit B**, p. 57.

**Admit.**

18. Becker was subsequently suspended for three days. See **Exhibit B,** p. 63.   **Admit**

19. Mallett never filed a grievance against a specific individual. See **Exhibit A,** pp. 20-22, 53-54, 177.

**Deny, the plaintiff filed grievances for the conduct of Becker and Conklin. Mallet 2001 Deposition, ¶ 66; Mallet 2004 Deposition, ¶¶ 57.**

20. Mallett did voice some personal complaints in May 1994 regarding Becker's alleged posting of harassing messages on a bulletin board, and Kaine's alleged misuse of Town property. Mallett has no evidence as to whether Becker was responsible for the posting of harassing messages. Mallett reportedly believes that Kaine misused town property when: (1) with the WPC's permission, Kaine used his own gym equipment while at a town garage; and (2) with the; WPC's permission, Kaine kept a dog at the garage during the daytime. See **Exhibit A,** pp. 177-78; and **Exhibit B,** p. 65-73.

**Deny, in part that Becker did admit to the plaintiff that he was responsible for the postings. Mallet 2004 Deposition, ¶¶ 171-172.  Admit that the plaintiff did complain about improprieties at the WPC. Mallet 2001 Deposition, ¶¶ 67, 94, 95.**

21. Mallett did not complain about the aforesaid conduct until after he thought Becker and Kaine were behaving inappropriately towards him. Mallett was motivated by a desire to point out the disparity in treatment that he believed he was receiving. He had been aware of both the use of gym equipment and the keeping of the dog since he started with the Town four years earlier. See **Exhibit B,** pp. 67-70, 71, 73.

    **Admit.**

22. Mallett has not identified any alleged acts of misconduct by Kaine occurring between August 8, 1995 and June 1999, a gap in time of approximately four (4) years. See Plaintiff's Complaint, Count One, ¶¶36, 37; and **Exhibit B,** p. 82.

    **Deny, that Kaine did harass and retaliate against him consistently from 1995 through 2001 when his employment ended with the WPC but the plaintiff did not complain for fear of further retaliation. Mallet 2001 Deposition, ¶¶ 91; Mallet 2004 Deposition, ¶¶ 167-171.**

23. Mallett has not identified any alleged acts of misconduct by Becker occurring between August 8, 1995 and June 1999, a gap in time of approximately four (4) years. See Plaintiff's Complaint, Count One, ¶¶ 36, 37; and **Exhibit B,** p. 82.

    **Deny, that Kaine did harass and retaliate against him consistently from 1995 through 2001 when his employment ended with the WPC but the plaintiff did not complain for fear of further retaliation. Mallet 2001 Deposition, ¶¶ 91; Mallet 2004 Deposition, ¶¶ 167-171.**

24. The standard overtime practice amongst the WPC crew was for the senior operator to have first call regarding all overtime. See **Exhibit A,** pp. 133, 155-56.

    **Admit.**

25.     Becker was senior to Mallett. See **Exhibit A,** p. 159.

   **Admit.**

26.     In 1996-1997, Mallett and Becker alternated overtime until such time as Mallett failed to call in Becker on one occasion,  From then on, Becker began adhering to the standard practice of the senior man's right of first refusal as to all overtime. Becker did not treat Mallett less favorably than others, but in fact, had in the past been treating him more favorably. See **Exhibit A,** pp. 70-72, 74-76, 156.

   **Deny, that Becker treated the plaintiff favorable or equally.  Becker denied the plaintiff overtime as retaliation. Mallet 2004 Deposition, ¶¶ 56-73.**

27.     There is no evidence that these defendants had any involvement in Mallett's alleged decrease in lab time in 1999 and/or his removal from the lab in 2000. Neither Becker nor Kaine were the final decision makers. See Exhibit A, pp. 175-76; and Exhibit B, p. 84.

   **Deny, in that Kaine was responsible for Mallet's assignments. Kaine assigned a junior man with less experience than the plaintiff. Mallet 2001 Deposition, ¶¶ 83, 119; Mallet 2004 Deposition, ¶¶ 60-66, 83-85.**

28.     "Siberia" is an isolated facility that is set off from the main building and manned by one person. See Exhibit A, p. 35.

   **Admit.**

29.     Generally, crew members classified as Operator 1s were assigned to "Siberia." Mallett, as well as other Operator 1s and 2s within the WPC, including Kaine himself, were regularly assigned to "Siberia" for various lengths of time. See Exhibit A, pp. 35-38; and

Exhibit D, p. 45.

**Deny, that every employee had to serve the same amount of time in "Siberia". The plaintiff was assigned to "Siberia" for long periods of time beyond the normal lengths. Mallet 2001 Deposition, ¶¶ 84-85; Mallet 2004 Deposition, ¶ 89. Prior to Jan Marineau's arrival, operators were usually rotated weekly to give operators well rounded experience in a variety of tasks. This, however, changed when Kaine was given the authority to assign job assignments. Plaintiff's Affidavit, ¶ 43.**

30.     Mallett believes that Kaine assigned him to "Siberia" for four months in 1999 in order to remove him from some hostility at the plant and to allow Mallett and others to do their jobs. See Exhibit B, p. 85.

**Admit, that KAine assigned the plaintiff to "Siberia". Deny, that the transfer was done with good intentions toward the plaintiff.  Mallet 2001 Deposition, ¶¶ 84-85; Mallet 2004 Deposition, ¶ 89.**

31.     Mallett did not attend a late November/early December1999 union meeting due to his part-time job. See **Exhibit B,** p. 87.

**Admit.**

32.     Mallett spoke with a town resident, a neighbor, regarding alleged time card abuses by certain WPC employees. The resident approached Mallett and Mallett responded to the neighbor's questions. Mallett did not seek out the resident to expose any wrongdoing within the Town. He does not even recall giving information to the resident about time cards. See Exhibit A, pp. 128-29, 159; and Exhibit B, p. 96. See Exhibit A, p. 159.

8

**Deny, that the plaintiff did not volunteer information to Cunningham. The plaintiff offered information regarding improprieties at the WPC to Cunningham with knowledge that Cunningham would publish such information as Cunningham had such a reputation. Mallet 2001 Deposition, ¶¶ 92, 117; Mallet 2004 Deposition, ¶ 127-129.**

33.   On or about February 7, 2001, Mallett and Michael Conklin were involved in a verbal confrontation. Conklin had heard that Mallett was being paid for work he didn't do, and said to Mallett, "that's stealing something from the town and you're going to go down for that, nigger." Conklin turned and walked away from the altercation. See Exhibit A, p. 12; Exhibit B, pp. 108-09; and Exhibit C, pp. 35-36, 46.

   **Admit.**

34.   With respect to the remark, "you're going down," Conklin meant that Mallett was going to get in trouble. See Exhibit C, pp. 36, 129.

   **Admit.**

35.   Mallett reported the February 7, 2001 incident to his supervisor. See Exhibit A, p. 168; and Exhibit B, p. 110.

   **Admit.**

36.   Conklin received a one-day suspension for calling Mallett a "nigger." See Exhibit C, pp.29, 30.  **Admit**

37.   Mallett stopped working for the Town in 2001. See Exhibit A, pp. 138-39.

   **Admit.  The plaintiff could not return to the WPC because of the hostile work environment that he was subjected to and because the Town and its officials would not make any changes to improve his work environment. Mallet 2001 Deposition, ¶¶ 50.**