UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| RICHARD MALLETT, | CIVIL ACTION NO. |
|     PLAINTIFF | 3:01-CV-1137 (AHN |
| VS. | |
| TOWN OF PLAINVILLE, ET AL | |
|   DEFENDANTS | December 1, 2004 |

**PLAINTIFF'S JOINT MATERIAL FACTS IN DISPUTE IN SUPPORT OF HIS OPPOSITION TO ALL OF THE DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

1.	On or about March 1990, the plaintiff began working at the Plainville Water Pollution Control Department (hereinafter "WPC"). (Plaintiff's affidavit ¶ 1).

2.	Becker was the union vice president of the union while the plaintiff was employed at the WPC. Mallet Deposition, dated 7/04, p. 9.

3.	Soon after his hire, plaintiff noticed defendant Becker consuming alcohol, including beer and whiskey, while working. (Plaintiff's affidavit ¶ 2).

4.	Between March 1990 and June 1991, plaintiff was witness to multiple incidents of harassment by Becker targeting other employees at the WPC. (Plaintiff's affidavit ¶ 3).

5.      On or about June 1991, plaintiff himself was harassed and threatened by Becker while at the WPC. Following this harassment, plaintiff reported the accumulated incidents to his supervisors.  (Plaintiff's affidavit ¶ 4).

6.      After he was reported, Becker continued to harass the plaintiff, telling plaintiff he should leave if he didn'tlike the way the WPC was run, and that it was either "my way or the highway." (Plaintiff's affidavit ¶ 5).

7.      Defendant Kaine was an operator II from the time the plaintiff was hired in 1990, which required Kaine to supervise those in the operator I position and had the responsibility as a foreman. Kaine Deposition, p. 8-9, 24-25.

8.      Kaine was the supervisor . Conklin Deposition, p. 89.

9.      Janet Marineau was Kaine's supervisor while the plaintiff was employed by the WPC. Kaine Deposition, p. 9.

10.     Kaine was Becker's supervisor while the plaintiff was employed at the WPC. Kaine Deposition, p. 29.

11.     Kaine and Becker have a good relationship. Kaine Deposition, p. 80.

12.  Becker, Kaine and Conklin, socialize outside of work. Conklin Deposition, p. 53- 54.

13.  Kaine had not received harassment training in the workplace. Kaine Deposition, p. 20.

14.  It is upsetting and scary to be under constant attack in the workplace and would be improper. Kaine Deposition, p. 24, 28, 32.

15.  Profanity is not normal or common at the WPC. Kaine Deposition, p. 14

16.  Kaine saw Mallett in distress at work. Kaine Deposition, p. 60.

17.  Defendant Kaine participated in this harassment and intimidation, often times joining with Becker in these violent verbal attacks. (Plaintiff's affidavit ¶ 6).

18.  Kaine does not think Mallett is sensitive to profanity. Kaine Deposition, p. 15

19.  On or about July 31, 1992, plaintiff was diagnosed by his physician Dr. Paul Gallagher as having negative physical effects from the stress of work, including but not limited to nausea, sleeplessness, high blood pressure, and loss of the ability to concentrate. (Plaintiff's affidavit ¶ 7).

20.  On or about July 31, 1992, Plaintiff met with Defendant Bohenko to report Becker's harassment and his diagnosis by Dr. Gallagher. (Plaintiff's affidavit ¶ 8).

21.     On or about July 31, 1992, after a year of constant harassment by Becker and Kaine, plaintiff left the WPC. (Plaintiff's affidavit ¶ 9).

22.     On or about July 31, 1992, plaintiff requested worker's compensation and sick leave from the Town of Plainville to recover from work related injuries. (Plaintiff's affidavit ¶ 10).

23.     On or about August 10, 1992, plaintiff first visited Dr. Daniel Kelleher, a psychiatrist. Over the course of four visits in August 1992, Dr. Kelleher diagnosed plaintiff as having Post-Traumatic Stress Disorder with depression resulting from his working conditions. (Plaintiff's affidavit ¶ 11).

24.     On or about August 26, 1992, defendants Town of Plainville and Bohenko denied plaintiff's worker's compensation claim. (Plaintiff's affidavit ¶ 12).

25.     On or about September 1992, plaintiff was transferred by Bohenko to the Town of Plainville's Buildings and Grounds Department. This reassignment forced plaintiff to take a reduction in pay. (Plaintiff's affidavit ¶ 13).

26.     On or about February 24, 1993, plaintiff's former position, left vacant since his departure, opened at the WPC. Plaintiff, wanting to resume his career in waste water management, applied for the position. (Plaintiff's affidavit ¶ 14).

27.   On or about May 5, 1993, Bohenko and the Town of Plainville required proof of medical fitness as a prerequisite for plaintiff's rehire. (Plaintiff's affidavit ¶ 15).

28.   On or about May 6, 1993, Plaintiff was granted medical clearance to resume work at the WPC. (Plaintiff's affidavit ¶ 16).

29.   On or about June 14, 1993, plaintiff resumed his position as Assistant Plant Operator I at the WPC. Upon his return, plaintiff immediately faced constant harassment, intimidation, and threats spearheaded by Becker and Kaine. (Plaintiff's affidavit ¶ 17).

30.   On or about July 13, 1993, Becker and Kaine called the plaintiff a "fucking queer" and then physically threatened him. Plaintiff reported this incident to Bohenko. (Plaintiff's affidavit ¶ 18).

31.   Becker was an operator II when he called the plaintiff a fucking queer and Becker had more seniority. Kaine Deposition, p. 105.

32.   Kaine witnessed Becker call the plaintiff a fucking queer while the plaintiff was working in "Siberia". Kaine Deposition, p. 102.

33. On or about July 20, 1993, Becker drove by plaintiff while on duty and said, "Fuck You, Asshole." Plaintiff reported this incident to his supervisor, defendant Jahn. (Plaintiff's affidavit ¶ 19).

34. On or about July 26, 1993, Becker and Kaine harassed and taunted the plaintiff while at work. Plaintiff reported this incident to Jahn, his supervisor. (Plaintiff's affidavit ¶ 20).

35. Mallet was harassed in the workplace in 1993, when a picture depicting him was posted on the bulletin board which insulted his wife. Mallet Deposition, dated 7/04, p. 14-15.

36. On or about August 1993, plaintiff was interviewed by Bohenko about Becker's harassment of the plaintiff and other employees, especially Patricia Cassidy, a female secretary. The plaintiff provided testimony that implicated Becker in several instances of harassment. (Plaintiff's affidavit ¶ 21).

37. On or about October 7, 1993, Becker was suspended from the WPC for three days. (Plaintiff's affidavit ¶ 22).

38. In 1993, Mallet told Jahn that Becker had sworn at him and taunted him and that Mallet told Jahn that someone had put a derogatory posting on the public bulletin board about Mallet. (Jahn Request for Admission, Exhibit 5).

39. Becker admitted to Mallet that he had posted the insulting picture on the bulletin board. Mallet Deposition, dated 7/04, p. 15-16.

40.     Becker threatened and called the plaintiff a "fucking queer". Mallet Deposition, dated 7/04, p. 16-17.

41.     On or about May 13, 1994, plaintiff filed a grievance against Becker for posting harassing messages on the WPC bulletin board targeted at plaintiff.  Defendants Paradis and Watkins were aware of the activity and failed to take action.  (Plaintiff's affidavit ¶ 23).

42.     On or about May 13, 1994, plaintiff filed numerous grievances against Kaine.  Of them one was for misuse of town property, as he used part of the WPC as a health spa and fitness center.  Another was for raising and keeping a pit bull at the WPC.  Defendants Paradis and Watkins were aware of the activity and failed to take action.  (Plaintiff's affidavit ¶ 24).

43.     Joe Watkins directed  Kaine to stay away from the plaintiff but never told Kaine not to harass the plaintiff.  Kaine Deposition, p. 101

44.     From October, 1993, to August 1995, plaintiff was subject to numerous threats and acts of intimidation and harassment directed by Becker and Kaine regarding his numerous filed grivances detailing misuse of town facilities at the WPC. (Plaintiff's affidavit ¶ 25).

45.     Plaintiff made sexual harassment complaint against Becker in 1995.  Kaine  Deposition, p. 77, 78.

46.     Kaine complained to the town manager about the issue of the sexual harassment complaint made by the plaintiff and the town did nothing to address the issue.  Kaine Deposition, p. 97, 98.

47.     On or about August 8, 1995, Becker was to receive a hearing of appeal for his suspension, the basis of which was plaintiff's complaints of sexual harassment. The plaintiff agreed to reduce the sexual harassment charge to harassment, and the hearing was adjourned. (Plaintiff's affidavit ¶ 26).48. On or about June 1999, plaintiff was offered training toward lab certification by Marineau and Richard Tingle ("Tingle"). However, defendants consistently denied him the necessary training time for certification. Plaintiff was eventually replaced as backup lab technician by another employee, Michael Cianchetti. (Plaintiff's affidavit ¶ 27).

49.     In 1999, Kaine was responsible for making daily assignments including making assignments for Mallet. (Kaine Request for Admission, Exhibit 7).

50.     On or about November 1999, plaintiff was permanently assigned by Kaine to work alone at an isolated facility called "Siberia." He remained at this facility for approximately four months. Plaintiff's affidavit ¶ 28; Kaine Deposition, p. 41.

51.     Kaine was a union steward and vice president of the union while the plaintiff was employed at the WPC. Mallet Deposition, dated 7/04, p. 8.

52.     On or about November 24, 1999, a co-worker, Steven Gregory, approached plaintiff and stated that he was "concerned for [the plaintiff's] well being" if the plaintiff did not attend the upcoming union meeting and vote for certain individuals. (Plaintiff's affidavit ¶ 29).

53.     On or about November 30, 1999, Tingle approached plaintiff and threatened that if the plaintiff did not attend the union meeting and vote for certain individuals including Becker, the plaintiff should "look for a new job." (Plaintiff's affidavit ¶ 30).

54.     Plaintiff was unable to attend the union meeting of December 13, 1999. Kaine knew that the plaintiff did not attend the union meeting in 11/99. On or about December 14, 1999, plaintiff was approached by Kaine at approximately seven o'clock in the morning. Kaine insulted the plaintiff, using profanity, and attempted to provoke the plaintiff into a physical altercation. When plaintiff refused to fight, he was called a "coward." Kaine derided plaintiff, saying "I thought you wanted to get along. Plaintiff's affidavit ¶ 31, Kaine Deposition, p. 34, 35.

55.     The union does not act on behalf of its members and is weak. Kaine Deposition, p. 40.

56.     Conklin knew the plaintiff did not vote at the election on December 13, 1999. Conklin Deposition, p. 59.

57.     Conklin tampered with the plaintiff's assignment sheet in the locker room on March 15, 2000. Conklin Deposition, p. 62.

58.     On or about June 23, 2000, Kaine and plaintiff got into an argument. Kaine again threatened the plaintiff, stating "If you want to mess with me, I'll mess with you." Kaine then told plaintiff, "you're never going anywhere in this department." (Plaintiff's affidavit ¶ 32).

59.     On or about July 25, 2000, Plainville resident Bill Cunningham ("Cunningham") made a request for time cards of WPC employees. (Plaintiff's affidavit ¶ 33).

60.     On or about August 25, 2000, during a crew meeting, Becker accused plaintiff of leaking information to Cunningham. Becker threatened and harassed the plaintiff in front of his co-workers and WPC management. Plaintiff reported the incident to Marineau and asked that she make sure it didn't't happen again. (Plaintiff's affidavit ¶ 34).

61.     On or about August 30, 2000, Cunningham's investigation into the questionable practices at the WPC, including time card irregularities, began to receive press in *The Herald*, a local newspaper. These stories continued through April 2001. (Plaintiff's affidavit ¶ 35).

62.     On or about September 14, 2000, Tingle approached a former employee of the WPC, Daniel Winkler, at a local bakery. Tingle told Winkler that the crew at the WPC believed the plaintiff was leaking information to Cunningham regarding the time card controversy and the crew was "out to get" the plaintiff. Plaintiff reported the conversation to Marineau, who said she would discuss the matter with Defendant Osle. (Plaintiff's affidavit ¶ 36).

63.     On or about October 5, 2000, Tingle again approached Winkler at the bakery and repeated the negative comments and repeated that the crew was "out to get" the plaintiff. (Plaintiff's affidavit ¶ 37).

64.     On or about October 23, 2000, plaintiff was promoted by Marineau to crew leader. The next day, however, this promotion was withdrawn without explanation. (Plaintiff's affidavit ¶ 38).

65.     On or about November 24 and 25, 2000, plaintiff was denied overtime opportunities at the Roadways Department.  This was against past practice and union agreement. (Plaintiff's affidavit ¶ 39).

66.     On or about November 28, 2000, plaintiff attended a crew meeting.  Becker again accused plaintiff, in front of entire crew, of helping Cunningham.  Jahn, Marineau, and Osle were in attendance at the meeting and did nothing to quiet Becker.
(Plaintiff's affidavit ¶ 40).

67.     Conklin harassed and threatened the plaintiff in the workplace. Mallet Deposition, dated 7/04, pp. 12-13.

68.     Becker was in charge of time cards which were one of the issues a citizen, Bill Cunningham, alleged regarding stealing time from the town.  Conklin heard a false rumor through the WPC employees that the plaintiff was stealing time from the WPC. Conklin & Kaine believed Mallett gave Cunningham the information about the time card fraud, which made Kaine mad at Mallett. This also provoked Conklin into calling the plaintiff a nigger and a cunt.  Conklin Deposition, p. 37-39.  Kaine Deposition, p. 55, 56, 62, 112, 113, 114.  Conklin Deposition, p. 48.

69.     On or about February 7, 2001, Conklin confronted plaintiff in break room at the     WPC.  Conklin called plaintiff a "cunt" and then threatened him, saying "you're going     down, nigger."  More than two weeks passed after plaintiff reported the incident to Marineau before Conklin was suspended for just one day. (Plaintiff's affidavit ¶ 41).

70. Kaine was aware of the article that was published on 3/20/01, indicating the WPC was full of incompetent, ignorant employees. Kaine Deposition, p. 118-119.

71. On or about March 27, 2001, plaintiff was diagnosed with a hernia. He has been out since then on worker's compensation. (Plaintiff's affidavit ¶ 42).

72. In 1993, 1994, 1995, 2000, and 2001, Mallet told Jahn that he was nervous and stressed at times. (Jahn Request for Admission, Exhibit 5).

73. In 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, and 2001, Becker was aware that Mallet suffered from stress and anxiety. (Becker Request for Admission, Exhibit 6).

74. In 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, and 2001, Kaine was aware that Mallet suffered from stress and anxiety. (Kaine Request for Admission, Exhibit 7).

75. Jahn received complaint about Becker's behavior in the workplace between 1992 and the present. (Jahn Request for Admission, Exhibit 5).

76. The union steward, Becker, wrote a complaint to the town manager and superintendent about an occurrence that happened out of work between Mallett and himself. Kaine Deposition, p. 133-134.

77. The union has not filed any grievances on behalf of the plaintiff as Becker has been the union steward for the WPC. In order to file a grievance, the plaintiff would have to file the grievance with Becker. Kaine Deposition, p. 142-143.

78. On April 16, 2001, Cunningham wrote a letter to the editor regarding fiscal management at the WPC, to which a letter was printed in response on April 23, 2000, that was written by the WPC, including Becker, Kaine, Kahle, Cianchetti,

      Conklin, Gregory, Tingle and the plaintiff, although the plaintiff at the time was not working because of an injury and did to authorize his name to be used. Exhibit 10.

79. On September 5, 1995, the plaintiff wrote letters to Robert Jahn complaining that he had been intentionally not invited to a company outing, to which Jahn responded. Exhibit 11.

80. The plaintiff submitted a written grievance to Union President Steve Clark on February 6, 2002. Exhibit 12.

81. On May 13, 1994, the plaintiff submitted six (6) grievances to his union steward, Butch Paradis regarding his treatment at work. Exhibit 13.

82. On July 15, 1993, and July 22, 1993, Robert Jahn submitted letters to the Director of Public Works, Caryl Bradt, regarding the harassment that the plaintiff had suffered. Exhibit 14.

83. On October 26, 2001, the plaintiff requested that the Town provide him with a safe environment to work in prior to him returning to work, but the Town would not transfer him to a safer location as indicated in a letter from the Union Steward dated November 7, 2001. Exhibit 15.

                                    THE PLAINTIFF,

                  BY:_____
                          Erin I. O'Neil, Esq.
                          Brewer & O'Neil
                          818 Farmington Avenue
                          West Hartford, CT 06119
                          (860)523-4055
                          Federal Bar #ct23073

# **CERTIFICATION**

       This is to certify that a copy of the foregoing was faxed or mailed, postage prepaid, on this December 1, 2004, to all counsel of record including:

Dennis G. Ciccarillo
Eisenberg, Anderson, Michalik & Lynch
136 West Main St.
PO Box 2950
New Britain, CT 06050-2950

J. William Gagne, Jr.
J. William Gagne & Assoc.
1260 Silas Deane Highway
Wethersfield, CT 06109

Michael J. Rose
Daniel C. DeMerchant
Melinda A. Powell
Alexandria L. Voccio
Howd & Ludorf
65 Wethersfield Avenue
Hartford, CT 06114

                                                                    _____
                                                                          Erin O'Neil