UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RICHARD MALLETT,                :
        PLAINTIFF               :
                                :
    v.                          :    CASE NO. 3:01cv1137(AHN)
                                :
TOWN OF PLAINVILLE et. al.,     :
        DEFENDANTS              :

<u>RULING ON MOTIONS FOR SUMMARY JUDGMENT</u>

The plaintiff, Richard Mallett ("Mallett"), a former employee of the Plainville Water Pollution Control Department ("WPC"), brings this action against the town of Plainville (the "Town") and various Town supervisory personnel (collectively, the "Town Defendants") as well as certain co-employees (the "Individual Defendants").  The Town Defendants include John Bohenko ("Bohenko"), the former Town Manager; Robert Jackson ("Jackson"), Town Manager; Shirley Osle ("Osle"), Assistant Town Manager; Robert Jahn ("Jahn"), Director of WPC; and Janet Marineau ("Marineau"), Superintendent.  The Individual Defendants are Donald Becker ("Becker"), James Kaine ("Kaine"), and Michael Conklin ("Conklin").  Additionally, Mallett brings this action against former presidents of the AFSC Municipal Employees ("AFSCME") Union, Butch Paradis ("Paradis") and Steven Clark ("Clark") (the "Union Defendants").[1]

Currently pending before the court are three summary judgment motions -- that of the Town Defendants, the Union

---

[1]Mallett has withdrawn all claims as to AFSCME.

Defendants, and the Individual Defendants.[2]  The defendants seek

judgment on each of the remaining counts:[3] count one, alleging

retaliation under § 1983 as to all defendants; count two,

alleging due process violations; count three, alleging a <u>Monell</u>

claim against the Town; and count eight, alleging intentional

infliction of emotional distress against all defendants.  Because

Mallett fails to identify any genuine issue as to a material fact

in dispute that would require a trial as to any of these claims,

the court grants the motions for summary judgment.

FACTUAL BACKGROUND

The following facts are taken from the parties' Local Rule

56(a) statements, summary judgment briefs, and other evidence

submitted by the parties.  They are undisputed unless otherwise

indicated.

At all relevant times, Marineau was the superintendent of

the WPC; both Bohenko and Jackson were former town managers; Osle

was formerly the assistant town manager and is presently the town

manager; Jahn is the director of the WPC; Butch Paradis is the

---

[2]These motions were previously denied without prejudice to
renewal after substitute counsel replaced Mallett's former
counsel and defendants have renewed their motions.

[3]Mallett has withdrawn counts four, five, six and seven of
the complaint.  Further, in his memorandum opposing summary
judgment, Mallett makes various arguments regarding a hostile
work environment claim and an equal protection claim.  However,
as neither of these causes of action are pleaded, the court
declines to address these arguments.

former AFSCME Local 1303-56 president; and Steven Clark is the current AFSCME Local 1303-56 president.

In March 1990, Mallett commenced his employment with the WPC as an Operator One, after Becker and Kaine encouraged him to apply for the WPC position.  Mallett believes that he was selected for the position based upon their recommendations.  At that time, Becker was the union vice president and Mallett's co-worker, as were Kaine and Conklin.

Mallett's relationship with these individuals deteriorated after he became a WPC employee.  In the first two years of his employment, Becker began criticizing Mallett's work performance. In June 1991, Mallett complained to his supervisor that Becker, who had no supervisory authority over him, had harassed him. After Mallett's harassment complaint, Becker made comments to Mallett such as "my way or the highway" and "if you don't like it, here is the gate."

At times, Kaine was also critical of Mallett's work performance during the period from 1990 to 1992, but Mallett admitted that he believed Kaine's criticisms were motivated by an honest belief that Mallett "wasn't living up to expectations of an employee."  However, Mallett's relationship with Kaine also deteriorated as Kaine increasingly participated in criticisms about his work performance, including laughing at Becker's derogatory comments about him.

3

Mallett believed that Becker and Kaine were trying to convince management that he was incompetent, but Mallett admitted that the Town or WPC management never disciplined, warned, or in any way punished Mallett because of what anybody said about him that was untrue or false.

On July 31, 1992, Mallet filed a workers compensation claim due to job stress and was out of work until approximately September 1992.  The Town contested Mallett's claim.  On September 14, 1992, Mallett signed a Stipulation for Agreement and Award through the Workers Compensation Commission whereby he received a compensation award, settled all of his claims against his co-employees, and agreed to accept a job in the Town's department of public works.  Before leaving the WPC, Mallett decided that he wanted to make a statement describing the general conditions that led to his leaving the WPC, and thus informed WPC management that Becker had consumed alcohol while on the job in 1991, and also had harassed and/or criticized Mallett's work performance.

In February 1993, Mallett re-applied for his position as an Operator One at the WPC.  In June 1993, he was reassigned to his former position at the WPC.  After he returned to the WPC, Mallett believes that he was singled out and mistreated.  For instance, on June 16, 1993, Mallett observed on a bulletin board a picture of a "Frankenstein likeness" which he believed depicted

4

him and/or his wife because of certain details in the picture, including a scar on the figure's arm. He believed that Becker was responsible for this posting.

A month later, in July 1993, an incident occurred in which Becker called Mallett derogatory names. Specifically, as Mallett was delivering a bundle of rags, he said to Becker, who was standing in the doorway, "I don't want to hit you" to which Becker responded, "You're fucking right you don't want to hit me with that bundle of rags, you fucking queer." Subsequently, on July 20, 1993, Becker rode by Mallett in a truck and said "fuck you, asshole." Mallett reported this incident to his supervisor, Jahn. On other occasions, Becker made baby noises in Mallett's ear and called him a "fat ass." Mallett believed that Kaine participated in Becker's alleged harassment by laughing at Becker's conduct and comments directed at Mallett.

In August 1993, Bohenko interviewed Mallett about Becker's alleged harassment of a female co-employee, Patricia Cassidy. Mallett provided certain information concerning Becker's conduct toward Cassidy as well as information concerning Becker's conduct toward him -- in particular, he complained about the derogatory comments described above. Becker was subsequently suspended for three days.

In August 1995, Mallett complained that Becker sexually harassed him and that a hearing was held on his complaint.

5

During the hearing, Becker tried to pressure Mallett to retract his complaint by, for example, accusing Mallett of "trying to push him over the edge." Thereafter, Mallett agreed to reduce the sexual harassment claim against Becker to a claim of harassment. Mallett did not, however, report that Becker had pressured him to do so.

On December 13, 1999, a union meeting was held which Mallett did not attend due to his part-time job. The next day, Kaine called Mallett "a piece of shit" and "a coward" for not attending the meeting. Although it appeared to Mallett that Kaine was provoking him because he looked at him with rage in his eyes and said "come on," Mallett walked away.

On December 20, 1999, Mallett was assigned to a worksite at an isolated facility called "Siberia." Other Operator Ones and Operator Twos were also assigned to "Siberia," and the lengths of their assignments varied from one week to seven weeks. During the period from September 1999 through January 2000, five WPC employees were assigned to "Siberia." Conklin served the longest stint of seven weeks. Mallett served five weeks.

On June 23, 2000, Mallett failed to report to a job assignment and this caused Kaine to become upset with Mallett. When Mallet explained to Kaine that he had misunderstood the assignment, Kaine replied, "if you mess with me, I'll mess with you." Kaine further said, "You're never going anywhere in this

department."  Mallett never reported this incident.

On or before July 26, 2000, Richard Tingle ("Tingle"), a chemist at the WPC, reported to Marinaeu that Mallett, who was acting as the primary back-up in the chemistry lab, was having a problem getting tests done correctly and Tingle was annoyed because he did not want to spend time redoing them.  On July 26, 2000, Marineau explained to Mallett that there had been problems with his lab tests and asked him if he would consider working as second back-up.  Marineau also discussed with Mallett the possibility of providing him additional training in the areas in which Mallett had experienced difficulty.  Mallett said he was not interested.

In August 2000, Cunningham, a Town resident and Mallett's neighbor, began to publish stories about time-card abuses at the WPC.  At an August 2000 town meeting, Becker accused Mallett of leaking information to Cunningham for his stories.  Mallett did not admit or deny the allegations, but complained about Becker's accusations to Marineau.

On November 24 and 25, 2000, Mallett was denied leaf-raking overtime.  As a result, Mallett filed a grievance.  An arbitration panel of the State Board of Mediation denied his grievance, finding that the Town had not violated its contract or any past practice in denying him overtime.

On November 28, 2000, Mallett attended a crew meeting at

7

which Becker again accused him of leaking information about
alleged time-card abuses to Cunningham.  Jahn, Marineau, and Osle
were also at the meeting.

On February 7, 2001, Mallett and Conklin were involved in a
verbal confrontation.  Although Mallett is a white male, Conklin
called Mallett a "cunt" and said Mallett was "stealing something
from the town and you're going down for that, nigger."  Shortly
thereafter, Conklin apologized to Mallett.  Mallett reported the
incident to his supervisor, and on February 22, 2001, the Town
suspended Conklin for one day.

From approximately March 27, 2001 until June 18, 2001,
Mallett was on workers compensation leave for a hernia.  He did
not return to work when he was released from treatment on June
18, 2001.  From June 19, 2001 through April 26, 2002, Mallett was
out of work on paid sick leave.  On October 26, 2001, he
requested that the Town provide him with a safe and healthful
environment as required by OSHA.  When his accumulated sick leave
was exhausted on April 29, 2002, Mallett did not return to work
because, according to him, he could not return to the WPC
environment.  He claims that he sought, but was denied, a
transfer out of the WPC.  The Town's position is that because
Mallett did not return to work after he exhausted his leave time,
he was deemed to have resigned.

Mallett makes other factual assertions, but does not provide

8

any facts to support them.  Specifically, he claims that he filed numerous grievances on May 13, 1994 regarding, inter alia, Becker's and Kaine's conduct, in particular that Becker posted harassing messages and that Kaine verbally harassed him and also misused Town property by maintaining and using his personal gym equipment at a WPC plant and by keeping his a dog on WPC property.  Mallett admitted that he made these complaints because he wanted to point out the "disparate" treatment that he believed he was receiving.  Mallett also claims, without providing factual support, that in June 1999, Marineau offered him training toward lab certification, but that the defendants denied him this training.  Further, Mallett claims without any factual support that on October 23, 2000 Marineau promoted him to the position of crew leader and that the next day, she rescinded the promotion and/or demoted him without an explanation.  The defendants deny these assertions, and thus, these alleged but unsupported facts are disputed.

STANDARD

Summary judgment should be granted if the record demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir.1994); Fed. R. Civ. P. 56(c).  The burden of demonstrating the absence of any genuine issue of material fact

rests on the moving party, see Celotex Corp. v. Catrett, 477 U.S.
317, 323 (1986), and all ambiguities and inferences that may
reasonably be drawn from the facts must be viewed in the light
most favorable to the nonmoving party, see Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248-49 (1986).  Once a party moving
for summary judgment has made a properly supported showing as to
the absence of any genuine issue as to all material facts, to
defeat summary judgment the nonmoving party must come forward
with evidence such as affidavits, deposition testimony, answers
to interrogatories and admissions on file, that show there is a
genuine factual issue for trial.  See, e.g., Amnesty Am. v. Town
of West Hartford, 288 F.3d 467, 470 (2d Cir. 2002); Goenaga v.
March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir.
1995).  A disputed issue is not created by a mere allegation in
the pleadings, see Applegate v. Top Assoc., Inc., 425 F.2d 92, 96
(2d Cir. 1970), or by surmise or conjecture, see Quinn v.
Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir.
1980).  Conclusory assertions also do not create a genuine
factual issue.  See Delaware & Hudson Ry. Co. v. Conrail, 902
F.2d 174, 178 (2d Cir. 1990).  Where affidavits are submitted on
summary judgment they "shall be made on personal knowledge, shall
set forth such facts as would be admissible in evidence, and
shall show affirmatively that the affiant is competent to testify
to the matters stated therein."  Santos v. Murdock, 243 F.3d 681,

10

683 (2d Cir. 2001) (quoting Fed. R. Civ. P. 56(e)).  Thus, "as to

issues on which the non-moving party bears the burden of proof,

the moving party may simply point out the absence of evidence to

support the nonmoving party's case."  Nora Beverages, Inc. v.

Perrier Group of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998).

DISCUSSION

There are three summary judgment motions pending.  The Town

Defendants, the Individual Defendants, and the Union Defendants

seek judgment on Mallett's § 1983 retaliation and due process

claims as well as his state-law claim for intentional infliction

of emotional distress.  The Town moves for judgment on Mallett's

Monell claim.  Because there are no genuine issues of material

fact as to any of these claims, summary judgment is appropriate

on all of these claims as more fully discussed below.

I.    First Amendment Retaliation

In his § 1983 First Amendment retaliation claim, Mallett

alleges that the Town Defendants, the Individual Defendants, and

the Union Defendants retaliated against him by assigning him to

"Siberia," revoking his alleged promotion and thus demoting him,

denying him overtime opportunities, lab time and training, and

denying his request to return to work in a "safe work

environment" and/or to transfer to a safe work location, all on

account of his protected speech.  His alleged protected speech

consists of his (1) complaints to supervisors regarding the

11

behavior of Becker, Kaine, and Conklin in 1992 through 1995, 2001, and 2002; (2) participation in a sexual-harassment investigation of Becker in 1993; (3) grievances against Becker and Kaine in 1994 and 2002 regarding improprieties in the workplace; (4) providing information to Cunningham regarding WPC time-card abuses; and (5) refusing to vote for Becker at a union election in 1999.  According to the defendants, none of these activities constitutes protected speech for purposes of a First Amendment retaliation claim, none of the alleged retaliatory actions constitute adverse employment actions, and Fago has not demonstrated a causal connection between the alleged protected activity and the alleged retaliation.

A public employee asserting a First Amendment retaliation claim under § 1983 must show by a preponderance of the evidence that: (1) his speech or actions constituted speech on a matter of public concern, see Connick v. Myers, 461 U.S. 138, 146 (1983), and (2) the speech was "at least a 'substantial' or 'motivating' factor" in the adverse action taken by the employer.  See White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1058 (2d Cir. 1993) (quoting Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle, 429 U.S. 274, 287 (1977)).

The determination of whether a particular instance of speech is related to a matter of public concern presents a question of law and must be determined by the "content, form, and context of

12

a given statement, as revealed by the whole record." Connick,
461 U.S. at 147-48; see also Ezekwo v. New York City Health &
Hosp. Corp., 940 F.2d 775, 781 (2d Cir. 1991).  To fall within
the realm of "public concern," an employee's speech must relate
to a matter of political, social or other concern to the
community, and the employee must speak "as a citizen upon matters
of public concern," not simply "as an employee upon matters only
of personal interest."  Pappas v. Giuliani, 290 F.3d 143, 152 (2d
Cir. 2002).  If an employee's speech relates solely to issues
that concern the employee personally, the speech is generally not
protected.  See Ezekwo, 940 F.2d at 781.  In making its
determination, the court should focus on the speaker's motive and
attempt to discern whether the speech was calculated to redress
personal grievances or whether it had a broader public purpose.
See Lewis v. Cowen, 165 F.3d 154, 163-64 (2d Cir. 1999).  A
plaintiff "may not cast [his] personal work grievances in the
light of public concern merely by offering [a] conclusory
allegation" that his speech or conduct is a matter of public
concern.  See Thorpe v. Luisi, No. 00 Civ. 3144, 2005 WL 1863671,
*6 (S.D.N.Y. Aug.4, 2005).  "Speech on a purely private matter,
such as an employee's dissatisfaction with the conditions of his
employment, does not pertain to a matter of public concern."
Lewis, 165 F.3d at 164 (citing Connick, 461 U.S. at 147).  Even
if an issue could arguably be viewed as a matter of public

13

concern, an employee's First Amendment right to comment on that issue is entitled to little weight if the issue was raised solely to further his own employment interest.  See White Plains Towing Corp., 991 F.2d at 1059.  Once an employee establishes that he has spoken as a citizen on a matter of public concern, he must also establish that the protected speech was at least a "substantial" or "motivating" factor in the adverse employment action.  Mt. Healthy, 429 U.S. at 287.

    With regard to the second element of a First Amendment retaliation claim, there are no bright line rules for what type of action constitutes an adverse employment action.  See Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997).  An employment action is not adverse merely because the employee does not like or agree with it.  Rather, to be adverse, the employment action must constitute a materially adverse change in the terms and conditions of his employment.  See Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000).  Courts typically look at whether the action had an adverse effect on a plaintiff's wages, benefits, or work hours; was more than an inconvenience or alteration of the plaintiff's job responsibilities; and was the type of action that is "reasonably likely to deter" employees from engaging in protected speech.  See Staff v. Pall Corp., 233 F. Supp. 2d 516, 531 (S.D.N.Y. 2002) ("changes in assignment or work-related duties do not ordinarily

14

constitute adverse employment actions if unaccompanied by a
decrease in salary or work hour changes") (citation and
quotations omitted).  "Adverse employment actions include
discharge, refusal to hire, refusal to promote, demotion,
reduction in pay, and reprimand." Id.

     A.    The Town Defendants

    The Town Defendants maintain that Fago's alleged First
Amendment activity was not protected, that Fago did not suffer an
adverse employment action, and that Fago has failed to show the
required causal connection between the alleged protected speech
and the alleged adverse employment action.

    At oral argument, Mallett conceded that the only possible
protected activity for purposes of his First Amendment
retaliation claim against the Town Defendants was his reporting
time-card abuses to Cunningham in the summer of 2000.  While such
activity appears to fall within the realm of public speech,
inasmuch as any time-card abuses by Town employees might be a
matter of concern to the community, see Pappas, F.3d at 152, this
alone does not end the inquiry.  To conclude that the activity
was, in fact, protected speech, the court must focus on Mallett's
motive and discern whether the speech was calculated to redress
his personal grievances or whether it had a broader public
purpose.  See Lewis, 165 F.3d at 163-64.  Thus, Mallett's
admission that he discussed the time-card issue with Cunningham

because he was dissatisfied with how things were run at the WPC belies his claim that this activity falls within the realm of public speech.  See Lewis, 165 at 164 (noting that an employee's dissatisfaction with the conditions of his employment does not pertain to a matter of public concern).

But even if his conversations with Cunningham regarding alleged time-card abuses was protected speech, Mallett's reliance on this activity to support his retaliation claim would be unavailing because he has not shown that the Town Defendants took any adverse action in retaliation for that speech.  Specifically, the alleged adverse actions, i.e., his assignment to "Siberia," the revocation of his promotion or his demotion, the denial of overtime opportunities, the denial of training, the denial of his request to work in a "safe work environment," the denial of his request for a transfer to a safe work location, and the denial of lab time, do not constitute adverse employment actions as a matter of law because none of them involved material adverse changes in the terms and conditions of his employment.

Mallett's assignment to "Siberia" does not constitute a materially adverse term or condition of his employment because there is no evidence that it was accompanied by a decrease in pay, see Staff, 233 F. Supp. 2d at 531, that it had any adverse effect on his benefits or work hours, or that it was anything other than a posting that most employees would prefer to avoid.

16

<u>See</u> <u>Galabya</u>, 202 F.3d at 690.  Further, while Mallett claims that
Marineau's promotion of him to crew leader and subsequent
demotion constitute adverse employment action, he presents no
evidence from which a reasonable jury could infer that the
alleged promotion and/or demotion actually occurred.[4]  But even
if there was such evidence, Mallett has no evidence showing that
the promotion/demotion involved the required change in job
duties, pay, or material loss of benefits.  Likewise, the denial
of lab time and training cannot constitute adverse job actions
because there is no evidence that these actions resulted in any
material change in the terms and conditions of his employment.
Moreover, even if the denial of overtime for leaf raking
constituted an adverse action, Mallett admitted that this action
was not retaliatory.  Finally, as to his claim that the denial of
his request to work in a safe environment was an adverse action,
he submits no evidence that the position he sought to be
transferred from was not safe or that there was an opening in a
"safe location."  <u>See</u> <u>Miller v. Edward Jones & Co.</u>, 355 F. Supp.
2d 629, 641-42 (D. Conn. 2005) (noting that an employer's failure

----

[4]Even if Mallett could establish that the promotion and
demotion took place as alleged, it is difficult to impute an
invidious motive with respect to the alleged adverse action where
the same decisionmaker who promoted him, Marineau, allegedly
demoted him the next day.  <u>See</u> <u>Grady v. Affiliated Cent., Inc.</u>,
130 F.3d 553, 560 (2d Cir. 1997) (holding that when the person
who made the decision to fire was the same person who made the
decision to hire, it is difficult to impute an invidious motive
that would be inconsistent with the decision to hire).

to transfer an employee is not retaliatory without some evidence
of an open position in which to transfer).  In sum, Mallett has
failed to establish any adverse employment action.

More significantly, with regard to the third element of a
First Amendment retaliation claim, Mallett has failed to show any
causal connection between his alleged protected speech and any
alleged adverse employment action.  Specifically, he alleges but
does not demonstrate how his allegedly protected speech was a
"substantial motivating factor" behind any alleged adverse
employment action.  See Washington v. County of Rockland, 373
F.3d 310, 321 (2d Cir. 2004).  He has no tangible proof from
which a jury could infer that such protected speech animated any
adverse action.  See id.  His conclusory assertions, without such
tangible proof, do not satisfy his burden of proving the required
causal connection.

In sum, Mallett fails to establish any of the required
elements of a First Amendment retaliation claim against any of
the Town Defendants.

B.    The Individual Defendants

This is also true with regard to Fago's First Amendment
retaliation claim against the Individual Defendants.  Not only
has Mallett failed to establish a prima facie case of First
Amendment retaliation, he has also failed to establish that the
Individual Defendants were acting under color of state law.

18

Moreover, much of the conduct he relied on to support his claim is barred by the applicable statute of limitations.

      1.    <u>Prima Facie Case</u>

    Mallett fails to establish that his activity was protected speech and that the Individual Defendants took any adverse employment actions against him as a result of the allegedly protected speech.

    As a preliminary matter, the conduct that occurred more than three years prior to the date of his complaint in this action cannot serve as the basis of Mallett's retaliation claim because it is barred by the statute of limitations.[5]  <u>See</u> Conn. Gen. Stat. § 52-577; <u>see</u> <u>also</u> <u>Williams v. Walsh</u>, 558 F.2d 667, 670 (2d Cir. 1977) (holding that this three-year statute of limitations applies to § 1983 actions).  But even if that conduct was not time-barred, such conduct would not constitute protected speech because it involved purely personal matters, not matters of

_____

[5]Mallett's argument that the conduct of the Individual Defendants stretched out over ten years and amounted to a pattern of harassment does not save his claim from the time bar.  "[A] continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice."  <u>See</u> <u>Cornwall v. Robinson</u>, 23 F.3d 694, 704 (2d Cir. 1994).  This continuing course of conduct rule does not apply here because Mallett fails to provide proof of specific ongoing discriminatory policies or practices.  In fact, there is no evidence in the record of any conduct that occurred between 1995 and 1999.

public concern.[6]  Thus, the only possible protected activity for purposes of his First Amendment retaliation claim against the Individual Defendants is (1) his conversation with Cunningham regarding time card abuse at the WPC and (2) his missing and thus failing to vote at a union meeting.

Mallett's claim that his failure to attend and vote at a union meeting is protected speech is unavailing by his own admission that his reason for not attending the meeting was personal -- because he was working at another job -- and thus he could not have been motivated by matters of public concern to miss the meeting and not vote.  Further, as already discussed above, it is doubtful his conversations with Cunningham about time-card abuse constitutes was protected speech.

However, even if such conduct was protected activity, the

---

[6]The time-barred conduct on which Mallett relies is not protected because it involves purely personal matters such as name calling and harassment.  This is also the case with regard to the alleged grievance he filed against Becker for his harassing postings on the message board.  See Pappas, 290 F.3d at 152.  The complaints Mallett filed to redress such conduct did not touch on issues of political, social, or other concern to the community, but were merely calculated to redress his personal work grievances.  See Lewis, 165 F.3d at 163-64.  Similarly, Mallett's complaint about Kaine's alleged misuse of Town property does not constitute protected speech because Mallett admitted that he complained about it for personal reasons -- because he felt that he was receiving disparate treatment from Kaine. Further, his corroboration of a female co-worker's sexual harassment allegations against Becker did not involve a matter of public concern, but only a personal grievance.  See Saulpaugh v. Monroe Cmty. Hosp., 4 F.3d 134 (2d Cir. 1993) (holding that an internal complaint of sexual harassment was not protected speech under the First Amendment).

alleged retaliatory actions of the Individual Defendants do not
amount to adverse employment actions.  The fact that Becker may
have criticized Mallett for leaking information to Cunningham
about alleged time-card abuses does not rise to the level of
actionable retaliation because criticism alone is not a material
change in the terms and conditions of employment.  See Brennan v.
City of White Plains, 67 F. Supp. 2d 362, 374 (S.D.N.Y.
1999)("While verbal abuse might at times be sufficiently severe
and chronic to constitute an adverse employment action, such
behavior, without more, hardly rises to the level of actionable
retaliation.").  For the same reasons, the fact that Conklin used
offensive and inappropriate language and called Mallett names on
a few occasions does not constitute adverse action.  See id.
Also, even if Becker threatened Mallett with a personal lawsuit,
such a threat would not constitute an adverse employment action.

    Further, as discussed above, his assignment to "Siberia" is
not an adverse employment action because other employees were
also temporarily assigned to that location and the assignment did
not involve a change in hours, duties, or pay.  See Staff, 233 F.
Supp. 2d at 531; see also Galabya, 202 F.3d at 690.  Moreover,
even if reducing Mallett's lab time constitutes adverse
employment action, Mallett concedes that he does not know who
made the decision to reduce his lab time, but believes it was
made by Tingle who is not a defendant, and that he is unsure of

the reasons why the decision was made.

Finally, just as Mallett failed to establish the required causation with regard to his First Amendment retaliation claim against the Town Defendants, he has also failed to show any causal connection with regard to this claim against the Individual Defendants.

3.  Under Color of State Law

Nonetheless, even if Mallett had made a prima facie case of First Amendment retaliation against the Individual Defendants, these defendants would not be liable unless they were acting under color of state law.  See West v. Atkins, 487 U.S. 42, 49 (1988).  Mallett has failed to make this showing.

Officials act under color of state law when they act pursuant to the power they possess by state authority.  See id. A finding of state action is warranted only where the alleged conduct is related to the duties and powers inherent in the actor's job.  See Kern v. City of Rochester, 93 F.3d 38, 43 (2d Cir. 1996) (citing Atkins, 487 U.S. at 49); see also Wyatt v. Cole, 504 U.S. 158, 161 (1992) ("The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.").  "A state official may be liable for co-worker harassment under section 1983 when the abuse is related to state-conferred authority or

22

duties -- the same test that applies when the victim is not a state employee." <u>Anthony v. County of Sacramento</u>, 845 F. Supp. 1396, 1401 (E.D. Cal. 1994) (citations omitted).

While Mallett argues that the Individual Defendants were acting under color of law because they had supervisory powers over him, he does not provide any specific facts or evidence to support that assertion or to otherwise show that they used state-conferred authority to deprive him of his rights.  To the contrary, the undisputed evidence shows that Becker and Conklin did not have supervisory authority over him.  Therefore, their alleged harassing comments could not be related to any state-conferred authority.  <u>See</u> <u>id</u>.  However, to the extent that Kaine acted pursuant to state-conferred authority in making Mallett's job assignments, as discussed above, the assignment to "Siberia" did not constitute an adverse employment action thus would not be actionable even if Kaine was a state actor.

II.  <u>Due Process Claims</u>

The Town and Individual Defendants also move for summary judgment on Mallett's § 1983 claim based on due process violations.  In this claim, Mallett asserts that he was denied procedural due process when he was demoted the day after he was promoted to crew leader because the demotion occurred without any explanation or hearing.  He also alleges that he was denied procedural due process when he was denied overtime opportunities

and lab experience.  Mallett also alleges substantive due process
violations consisting of the harassing conduct of the Individual
Defendants and the Town Defendants' failure to stop such conduct
on the grounds that such conduct was egregious and "shocked the
conscience."  All of the defendants move for summary judgment on
these claims on the grounds that Mallett has not identified
either a protected interest[7] and because he has no evidence that
any such conduct was shocking to the conscience, arbitrary, or
oppressive.

A.    Procedural Due Process

State action violates procedural due process requirements
where it takes place without notice and an opportunity to be
heard.  See Mathews v. Eldridge, 424 U.S. 319, 333 (1976).  To
establish a violation of procedural due process, a plaintiff has
to identify a liberty or property interest that is protected by
state law and a deprivation of that interest.  See id. at 309;
see also Board of Regents v. Roth, 408 U.S. 564, 577 (1972).  In
the employment context, a plaintiff must show that he has a
property interest created by state law in the employment or the
benefit that was removed.  See Bernheim v. Litt, 79 F.3d 318, 322
(2d Cir. 1996).  To do so, he must establish that he has a

---

[7]The court notes that Mallett has pleaded the deprivation of
a protectable liberty interest, yet in his memorandum, he argues
the deprivation of a property interest. Because Mallett has
failed to identify any such liberty interest and has not briefed
the issue, the court considers this claim abandoned.

24

legitimate, constitutionally-based claim of entitlement to the
position, not merely an unprotected, unilateral expectation of
employment.  <u>See</u> <u>Board of Regents</u>, 408 U.S. at 577; <u>see also</u>
<u>Malla v. Univ. of Conn.</u>, 312 F. Supp. 2d 305, 320 (D. Conn.
2004).  A promotion is not a protectable property interest unless
the plaintiff has a claim of entitlement to it.  <u>See</u> <u>Andreucci v.</u>
<u>City of New Haven</u>, 916 F. Supp. 146, 147-48 (D. Conn. 1996).  "A
civil servant seeking a promotion 'does not possess any mandated
right to appointment or any other legally protectable interest'".
<u>McMenemy v. City of Rochester</u>, 241 F.3d 279, 286 (2d Cir. 2001).
The mere promise of a promotion by a superior is not sufficient
to create a property interest in that promotion.  <u>See</u> <u>id.</u>  If
there is any uncertainty as to the plaintiff's entitlement, the
court should not find a federally protectable property right.
<u>See</u> <u>Gordon v. Nicoletti</u>, 84 F. Supp. 2d 304, 308 (D. Conn. 2000).

    Mallett fails to satisfy any of these requirements because
none of the personnel actions of which he complains are property
interests that are entitled to procedural due process.  <u>See</u>
<u>Wargat v. Long</u>, 590 F. Supp. 1213, 1215 (D. Conn. 1984) (holding
that personnel decisions short of termination do not constitute a
deprivation under the due process claim of the Fourteenth
Amendment).  At best, Mallett has only shown a unilateral
expectation with regard to overtime and lab experience because he
has not identified any contractual, regulatory, or statutory

25

provision that created an entitlement to such overtime or
experience.  See Ghaly v. United States Dep't of Agric., 228 F.
Supp. 2d 283, 291-92 (S.D.N.Y. 2002); see also Caniello v. City
of New York, No. 00 Civ. 3009, 2001 WL 11061, at *1 (S.D.N.Y.
Jan. 4, 2001) (holding that "the right to work overtime is not a
constitutionally protected property interest").  This is also
true with regard to the alleged demotion.  See Wargat, 590 F.
Supp. at 1215.

     Without establishing a protected property interest,
Mallett's procedural due process claim fails as a matter of law.

     B.   Substantive Due Process

     Similarly, Mallett's substantive due process claim is
without merit.

     There are two alternative tests by which substantive due
process claims are analyzed.  Under the first test, the plaintiff
must prove that the conduct of the governmental entity "shocks
the conscience."  See DeLeon v. Little, 981 F. Supp. 728, 734 (D.
Conn. 1997).  Under the second test, the plaintiff must
demonstrate a violation of an identified liberty or property
interest that is protected by the Due Process Clause.  Id.  The
court has already determined that Mallett has failed to
demonstrate such a constitutionally-protected interest.  Thus,
the only issue before the court is whether Mallett has identified
conduct of the defendants that either shocks the conscience or is

26

arbitrary or oppressive.

Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, and not merely action that is incorrect or ill-advised.  See Catanzaro v. Weiden, 188 F.3d 56, 64 (2d Cir. 1999).  "[W]ith regard to [the] 'shocks the conscience' test that [t]he acts must do more than offend some fastidious squeamishness or private sentimentalism ...; they must be such as to offend even hardened sensibilities, or constitute force that is brutal and offensive to human dignity."  Id. (internal citation omitted).  Only the most egregious official conduct violates a party's substantive due process rights.  See County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998).  Thus, the Second Circuit has held that malicious and sadistic abuses of government power that are intended only to oppress or to cause injury and serve no legitimate government purpose unquestionably shock the conscience.  See Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 252 (2d Cir. 2001).

Mallett has not proffered any evidence of harassment or intimidation by the Town Defendants.  The fact that, as he alleges, the Town Defendants did not stop his co-workers from expressing animosity toward him is insufficient to sustain a due process violation.  In the absence of evidence showing that any of the Town Defendants themselves acted sadistically or

27

maliciously towards him or otherwise engaged in arbitrary or oppressive behavior, his substantive due process claim against them fails as a matter of law.

This is also true with regard to Mallett's claim that the Individual Defendants' conduct shocked the conscience. Indeed, while the Individual Defendants' conduct and comments may have been juvenile or inappropriate in the workplace, there is nothing about their conduct that is brutal or shocking to the conscience. See Lewis, 523 U.S. at 846.

Accordingly, Mallett's substantive due process claim against all the defendants is dismissed.

III. Qualified Immunity

Additionally, the Town Defendants and the Individual Defendants have moved for summary judgment on Mallett's § 1983 retaliation and due process claims on qualified immunity grounds.

However, because Mallett has failed to establish a violation of any constitutional right, the court does not need to consider whether the defendants' conduct was objectively reasonable and thus shielded from liability by qualified immunity.

IV. Municipal Liability

Mallett seeks to hold the Town liable for its alleged failure to supervise and discipline his co-workers, Becker, Conklin and Kaine. Specifically, he claims that the Town failed to promulgate and enforce proper guidelines for investigating and

disciplining WPC employees, failed to adequately supervise WPC employees, and failed to take appropriate supervisory and disciplinary action for their alleged conduct caused, and thus permitted and, in fact ratified, the Individual Defendants alleged conduct.  The Town moves for judgment on this <u>Monell</u> claim on the grounds that Mallett has not established either a constitutional deprivation or that such a deprivation was caused by a municipal policy or custom.  The court agrees.

Pursuant to <u>Monell v. Dept. of Social Servs.</u>, 436 U.S. 658 (1978), a municipality may be liable under § 1983 if official municipal policy of some nature caused the alleged constitutional tort.  <u>See</u> <u>Monell</u>, 436 U.S. at 690-91.  A plaintiff alleging liability pursuant to <u>Monell</u> must demonstrate (1) an official policy or custom that (2) caused the plaintiff to be subjected to (3) a denial of a constitutional right.  <u>See</u> <u>Zahra v. Town of Southold</u>, 48 F.3d 674, 685 (2d Cir. 1995).  Municipal liability is limited to actions for which the municipality is actually responsible.  <u>See</u> <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 479-80 (1986).  Thus, in order to prevail on a <u>Monell</u> claim against the Town, Mallett must provide facts showing that the alleged conduct deprived him of a constitutional right and occurred under an official policy or custom.  <u>See</u> <u>Jeffes v. Barnes</u>, 208 F.3d 49 (2d Cir. 2000).  Given that the court has granted summary judgment on all of Mallett's constitutional

claims, the Monell claim against the Town necessarily fails as
well.  See Zahra, 48 F.3d at 685.

In any event, Mallett has not established any official
policy or custom that caused him to be subjected to the denial of
any constitutional right.  First, Mallett fails to establish that
the Town Defendants were final policymakers, see Jeffes, 208 F.3d
at 57-58 (holding that it is incumbent on the plaintiff to
establish final policymakers as a matter of law), and thus, would
not be liable even if, as alleged, they ratified the acts or
decisions of their subordinates.  See City of St. Louis v.
Praprotnik, 485 U.S. 112, 127 (1988) (establishing Monell
liability where authorized policymakers approve a subordinate's
conduct).

But even if the Town Defendants were policymaking officials,
Mallett has not shown that they approved and ratified the alleged
inappropriate conduct of the Individual Defendants because he has
no evidence that the Town Defendants acquiesced in or exhibited
deliberate indifference to the alleged constitutional
deprivations caused by the Individual Defendants.  See Vann v.
City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995).  The
operative inquiry in this regard is whether the facts suggest
that the policymaker's inaction was the result of a "conscious
choice" rather than mere negligence.  See City of Canton, 489
U.S. at 389.  Mallett has presented no evidence that the Town

Defendants acquiesced, or exhibited deliberate indifference, or made a conscience choice as opposed to mere negligence.

Further, Mallett submits no evidence to support his claim that the Town Defendants failed to adequately supervise or discipline WPC employees.  See id.; see also Vann, 72 F.3d at 1049.  When a plaintiff brings a Monell claim on a failure to supervise theory, the plaintiff must establish evidence as to the violation itself and the policymakers' reaction to it, and that policymaking officials deliberately ignored an obvious need for supervision.  See Amnesty America v. Town of West Hartford, 361 F.3d 113, 128 (2d Cir. 2004).  Mallett has not proffered any evidence showing a deficiency in the Town Defendants' supervision of the Individual Defendants or the existence of any municipal custom, policy or decision that resulted in an alleged violation of his constitutional rights.

Moreover, Mallett's conclusory and factually unsubstantiated claim that the Town failed to promulgate and enforce appropriate guidelines and policies regarding the investigation and discipline of WPC employees is similarly unavailing.

In sum, Mallett's factually unsupported assertions would be insufficient to impose liability on the Town even if he had proven that the conduct of any defendant had amounted to a violation of his constitutional rights.

V.    Intentional Infliction of Emotional Distress

In addition to his federal claims, Mallett also asserts a
state-law claim of intentional infliction of emotional distress.
Specifically, he claims that the conduct of the Town Defendants,
the Individual Defendants, and the Union Defendants was extreme
and outrageous, that they intended by their conduct to inflict
emotional distress or knew or should have known that their
conduct would result in severe emotional distress, and that their
conduct caused him severe emotional distress.  The defendants
maintain that Mallett fails to establish any specific evidence of
extreme and outrageous conduct, but even if he had, this claim
would be barred because Mallett failed to exhaust his
administrative remedies.  The court agrees.

In order to prevail on a cause of action for intentional
infliction of emotional distress, the plaintiff must establish
four elements: "(1) that the actor intended to inflict emotional
distress; or that he knew or should have known that the emotional
distress was a likely result of his conduct; (2) that the conduct
was extreme and outrageous; (3) that the defendant's conduct was
the cause of the plaintiff's distress; and (4) that the emotional
distress sustained by the plaintiff was severe."  Petyan v.
Ellis, 200 Conn. 243, 253 (1986).  Whether a defendant's conduct
is sufficient to satisfy the requirement that it be extreme and
outrageous is initially a question for the court to determine.

See Johnson v. Chesebrough-Pond's USA Co., 918 F. Supp. 543, 552
(D. Conn. 1996); see also Bell v. Bd. of Educ., 55 Conn. App.
400, 410 (1999).  Only where reasonable minds disagree does it
become an issue for the jury.  See id.  "Liability for
intentional infliction of emotional distress requires conduct
that is so extreme and outrageous that it goes beyond all
possible bounds of decency, is regarded as atrocious, is utterly
intolerable in a civilized society, and is of a nature that is
especially calculated to cause, and does cause, mental distress
of a very serious kind."  Miner v. Town of Cheshire, 126 F. Supp.
2d, 184 194 (D. Conn. 2000) (citations omitted).

        In an employment setting, individuals reasonably should
expect to be subject to routine employment-related conduct,
including performance evaluations, transfers, demotions,
disciplinary action, investigations arising from actual or
alleged misconduct, workplace gossip, and rivalry.  See Perodeau
v. Hartford, 259 Conn. 752, 757 (2002).  "If a defendant's
conduct is merely insulting, displays bad taste, or results in
hurt feelings or embarrassment, the claim is generally dismissed
as a matter of law."  Cowras v. Hard Copy, 56 F. Supp. 2d 207,
210 (D. Conn. 1999).  Courts in this circuit have held that an
employer's "failure 'to respond' or 'to prevent', or 'choos[ing]
to ignore,' [harassing conduct by another employee] does not rise
to the level of extreme and outrageous behavior, nor does it

constitute a basis for vicarious liability for the acts of
another." Kilduff v. Cosential, Inc., 389 F. Supp. 2d 12, 22 (D.
Conn. 2003).  Mallett has failed to satisfy these requirements as
to any defendant.

The alleged conduct of the Individual Defendants was not
extreme and outrageous as a matter of law.  As previously noted,
any conduct that occurred prior to June 1998 is barred by the
statute of limitations.  Thus, the only conduct supporting his
emotional distress claim against the Individual Defendants is
that (1) Becker accused him of leaking Town information to
Cunningham and threatened him with a civil lawsuit, (2) Kaine
assigned him to "Siberia" for an extended period to isolate him
and  cause him psychological harm and spoke to him in a
confrontational manner when he missed an assignment, and (3)
Conklin used offensive and inappropriate language and called him
names.  This conduct, even if unpleasant, does not contravene all
bounds of decency and cannot be regarded as extreme and
outrageous as a matter of law.  Further, Mallett's reliance on
Oppenheim v. Gruell, 2005 WL 407594, *11 (Conn. Super. Jan. 11,
2005) to avoid summary judgment on this claim is unavailing
because he has no evidence of physical intimidation, physical
harm, or threats of physical harm.  See id.

Similarly, none of the allegations relating to the conduct
of the Town Defendants, even if there was supporting evidence,

rise to the required level of outrageousness or amount to
behavior that was beyond all possible bounds of decency.  In
fact, there is no evidence whatsoever of specific acts directed
toward Mallett by any of the Town Defendants.  His claim that
Bohenko, Jackson, Osle, Jahn, and Marineau should have known that
he was being treated unfairly and was suffering, yet took no
action to remedy the abuse or respond to his suffering, is also
unavailing because such conduct is not extreme and outrageous as
a matter of law.  See Kilduff, 389 F. Supp. 2d at 22.

Finally, Mallett's intentional infliction of emotional
distress claim is barred because before filing suit, he failed to
exhaust the grievance procedures mandated by the CBA.  "It is
well settled under both federal and state law that before a
resort to the courts is allowed, an employee must at least
attempt to exhaust exclusive grievance and arbitration
procedures, such as those contained in the Collective Bargaining
Agreement."  Hunt v. Prior, 236 Conn. 421, 431-32 (1996); see
Sobczak v. Bd. Educ. Of City of Meriden, 88 Conn. App. 99, cert.
denied, 273 Conn. 941 (2005) (finding no subject matter
jurisdiction where plaintiff fails to exhaust administrative
remedies prior to bringing suit).  Because it appears that
Mallett failed to follow the provisions of § 13 of the CBA, which
provides that "disputes and consultations on any questions
arising out of the Employer-Employee relationship" must be

handled in the first instance by filing a grievance with the
union, his emotional distress would be barred even if his
allegations and proof of extreme and outrageous conduct were
sufficient to get to a jury.

VI.    <u>Union Defendants</u>

     The Union Defendants move for summary judgment on Mallett's
§ 1983 retaliation and due process claims and his state-law claim
of intentional infliction of emotional distress on the grounds
that Mallett has no evidence that they retaliated against him or
otherwise acted in a way that shocked the conscience or exceeded
all bounds tolerated by society.  The court agrees, and also
notes that at oral argument his counsel conceded that there was
little merit to the claims against these defendants.  Moreover,
inasmuch as the allegations against Paradis and Clark concern
their conduct as union presidents, there can be no liability.
<u>See</u> <u>Morris v. Local 819, Int'l Bros. of Teamsters</u>, 169 F.3d 782
(2d Cir. 1999) (concluding that union officers are not
individually liable to third parties for acts performed as
representatives of the union); <u>see</u> <u>also</u> <u>Covello v. Depository</u>
<u>Trust Co., Local 153</u>, 88 F. Supp. 2d 59, 61 (E.D.N.Y. 2000)
(holding that union officers and employees are not individually
liable for acts performed as representatives of the union).  In
this case, Mallett claims that Clark and Paradis failed to pursue
his grievances, but such activity necessarily entails

their performance in their capacities as union representatives.

     For these reasons, counts one, two and seven against the
Union Defendants are dismissed.

                              CONCLUSION

     For the foregoing reasons, the defendants' motions to
reconsider [docs. ## 130 and 131] and GRANTED and the defendants'
motions for summary judgment [docs. ## 96,99, and 104] are
GRANTED.  The clerk is directed to enter judgment for all
defendants and to close the case.

     SO ORDERED this 31st day of March, 2006, at Bridgeport,
Connecticut.


                              _____/s/_____
_____  Hon. Alan H. Nevas
                                  United States District Judge